UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LORINE GAINES,

        Plaintiff,

vs.

                                  Case No. 3:18-cv-1332-J-39PDB

JULIE JONES,[1] et al.,

        Defendants.

_____

**ORDER**

**I.  Introduction**

    Plaintiff Lorine Gaines is proceeding as the personal representative for the estate of Vincent Gaines (decedent), Plaintiff's son, who was an inmate of the Florida penal system. Plaintiff, represented by counsel, is proceeding on her First Amended Complaint (Amended Complaint) (Doc. 24), and she is asserting claims on behalf of the decedent's estate and as the survivor, the decedent's mother.  Plaintiff states she brings a "civil rights, statutory, and simple negligence action" to redress wrongs to the decedent pursuant to the Civil Rights Act (Eighth and Fourteenth Amendments); the Americans with Disabilities Act (ADA); and Section 504 of the Rehabilitation Act (RA).  Complaint at 1-2.[2]

---

    [1] Mark S. Inch, the Secretary of the Florida Department of Corrections, is substituted as the proper party defendant for Julie Jones, in her official capacity, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

    [2] In this opinion, the Court references the document and page numbers designated by the electronic filing system.

In support, Plaintiff submits Defendants denied and deprived her son of adequate nutrition and treatment for basic and serious mental health and medical needs, resulting in the decedent being malnourished and ultimately starving to death. <u>Id</u>. at 2.

Plaintiff names Julie Jones, the former Secretary of the Florida Department of Corrections (FDOC), as a Defendant. Jones is named in her individual and official capacities. <u>Id</u>. at 3-4. As noted previously, Mark S. Inch, the current Secretary of the FDOC, is substituted as the proper party defendant for Julie Jones in her official capacity pursuant to Rule 25 (d)(1), Fed. R. Civ. P. ("The officer's successor is automatically substituted as a party."). Plaintiff also names Kevin D. Jordan, the former Warden of Union Correctional Institution (UCI), as a Defendant in his individual capacity. Complaint at 4-5. Finally, Plaintiff names Corizon Health, Inc. (Corizon), a Tennessee Corporation registered in the State of Florida, as a Defendant. <u>Id</u>. at 5.

This cause is before the Court on two pending motions to dismiss: Defendants, Julie Jones and Kevin D. Jordan's Motion to Dismiss Counts I, II and IV of the Amended Complaint (Defendants' Motion) (Doc. 34) and Defendant Corizon Health, Inc.'s Motion to Dismiss the Plaintiff's Amended Complaint (Corizon's Motion) (Doc. 35). Plaintiff filed responses to these motions. <u>See</u> Plaintiff's Response to Defendants Julie Jones and Kevin D. Jordan's Motion to Dismiss Counts I, II and IV of the Amended Complaint (Response)

(Doc. 41); Plaintiff's Amended Response to Defendant Corizon
Health, Inc.'s Motion to Dismiss the Plaintiff's Amended Complaint
(Response/Corizon) (Doc. 42). With the Court's leave, Defendant
Corizon filed a Reply (Doc. 48).

## II. Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim to
relief that is plausible on its face.'" Ashcroft v. Iqbal, 556
U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550
U.S. 544, 570 (2007)). "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).
"[T]he tenet that a court must accept as true all of the
allegations contained in a complaint is inapplicable to legal
conclusions. Threadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not suffice."
Id. (citing Twombly, 550 U.S. at 555). But, "[t]he denial of a
motion to dismiss is proper if the plaintiff's complaint, taking
the facts alleged therein as true, makes out a claim that is
plausible on its face." Paez v. Mulvey, 915 F.3d 1276, 1292 (11th
Cir. 2019) (quotation and citation omitted).

### III.  Claims and Relief Requested

Four claims are raised in the Amended Complaint: (1) Count I: a violation of 42 U.S.C. § 1983 and the Eighth Amendment against Defendant Jones in her individual and official capacities (now Defendant Inch in his official capacity) for subjecting the decedent to cruel and unusual punishment; (2) Count II: a violation of 42 U.S.C. § 1983 and the Eighth Amendment against Defendant Jordan in his individual capacity for subjecting the decedent to cruel and unusual punishment; (3) Count III: a violation of 42 U.S.C. § 1983 and the Eighth Amendment against Defendant Corizon for directly and vicariously subjecting the decedent to cruel and unusual punishment; and (4) Count IV: violations of Title II of the ADA and § 504 of the RA against Defendant Jones in her official capacity (now Defendant Inch in his official capacity).

For Counts I, II, and III, Plaintiff seeks the following relief: (1) equitable relief against Defendant Jones in her official capacity (now Defendant Inch), seeking the relinquishment of the decedent's remains to Plaintiff; (2) compensatory and punitive damages against Defendant Jones in her individual capacity, against Defendant Jordan in his individual capacity, and against Defendant Corizon; (3) attorneys' fees, interest and costs under 42 U.S.C. § 1988; and (4) all such other relief as the Court deems just and proper.  Amended Complaint at 46-47.

For Count IV, Plaintiff seeks the following relief against Defendant Jones in her official capacity (now Defendant Inch in his official capacity): (1) declaratory relief of a violation of the ADA and RA; (2) equitable relief in the form of relinquishment of the decedent's remains to Plaintiff; (3) compensatory and punitive damages; (4) attorneys' fees, interest and costs; and (5) all other such relief as the Court deems just and proper. Amended Complaint at 47-48.

## IV. Factual Allegations of Amended Complaint

Plaintiff presents supporting factual allegations of the Amended Complaint in three parts: (1) Corizon's history of mistreating mentally ill prisoners in Alabama, Oregon, and Florida; (2) the FDOC and Corizon's substandard treatment of mentally ill prisoners at UCI and awareness of that inadequate treatment; and (3) the decedent's incarceration in the FDOC. Amended Complaint at 6-27. Plaintiff first purports that there is a history of Corizon mistreating mentally ill prisoners, as demonstrated through several cases. Initially, Plaintiff references a class action lawsuit, in which seriously mentally ill inmates claimed the State of Alabama provided constitutionally inadequate mental-health care in prison facilities in violation of the Eighth Amendment, made applicable to the states by the Fourteenth Amendment and as enforced through 42 U.S.C. § 1983, and the class sought injunctive and declaratory relief. <u>Braggs v. Dunn</u>, 257 F.Supp.3d 1171 (M.D. Ala. June 27,

2017).  Although Plaintiff identifies <u>Braggs</u> as a class action lawsuit against Corizon, Amended Complaint at 6, the defendants in <u>Braggs</u> are the Commissioner of the Alabama Department of Corrections (ADOC) and the Associate Commissioner of Health Services, named in their official capacities.  <u>Braggs</u>, 257 F.Supp.3d at 1180.  MHM Correctional Services, Inc., a for-profit corporation providing medical and mental health services to corrections facilities, is identified in <u>Braggs</u> as the ADOC's contractor for mental-health care.  <u>Id</u>. at 1183.

Without providing a relevant case citation, Plaintiff references a suit against Corizon concerning a suicidal and paranoid schizophrenic jail inmate in Lane County, Oregon, Kelly Conrad Green, who ran headfirst into a concrete wall fracturing his neck.  Amended Complaint at 8-9.  Upon review, in <u>Johnson v. Corizon Health Inc.</u>, No. 6:13-cv-1855-TC, 2015 WL 1549257, at *8 (D. Or. April 6, 2015), the plaintiff, the personal representative of decedent Green, claimed Corizon failed to screen Green during intake on February 11, 2013, and failed to provide necessary care post-injury.  The court granted in part and denied in part "the Corizon defendants motion for partial summary judgment[.]" <u>Id</u>. at *17.  Apparently, the case ended in settlement.  Amended Complaint at 8 n.6.

Again without citation to a pertinent case, Plaintiff references a civil rights lawsuit against Corizon, filed by the

representative of Darren Rainey's estate. Id. at 9-12. Darren Rainey was a Florida inmate confined at Dade Correctional Institution (DCI) of the FDOC and died after being scalded in a hot shower. Id. at 9-10. The representative of his estate raised alleged violations of the Eighth and Fourteenth Amendments and a disability discrimination claim under the ADA, and this case too ended in settlement. Chapman v. Fla. Dep't of Corr., Corizon, LLC, et al., No. 14-23323-Civ-Scola (Orig. Case No. 14-24140-Civ-Scola), 2018 WL 5313881, at *3 (S.D. Fla. Oct. 26, 2018).

Finally, Plaintiff relies on a Middle District of Florida case, Case No. 3:18-cv-179-J-20JRK, Disability Rights Florida, Inc. v. Julie Jones and the Florida Department of Corrections. The plaintiff, on behalf of its clients and constituents,[3] brought the case pursuant to 42 U.S.C. § 1983, the ADA, and the RA, and named Julie Jones, in her official capacity, and the FDOC, an agency of the State of Florida, as defendants. The plaintiff sought only declaratory and injunctive relief. See id., Settlement Agreement (Doc. 10) at 1.

The parties settled the case. Id., Settlement Agreement (Doc. 10). The Settlement Agreement provides a brief summary of the case:

---

[3] The client and constituents are the inmates within the FDOC who are mentally ill and confined in a FDOC inpatient mental heath unit or who may be transferred to a FDOC inpatient mental health unit. See Case No. 3:18-cv-179-J-20JRK, Settlement Agreement (Doc. 10) at 1.

In the Complaint, Plaintiff alleges
Defendants, by their actions and inactions,
have deliberately and chronically denied
mental health care to individuals with mental
illness who were and are confined in inpatient
mental health units operated and managed by
Defendants.  Plaintiff alleges that many of
these patients are confined in segregated,
isolated and harsh conditions which exacerbate
their illnesses.  As a result of their
segregation and isolation, Plaintiff claims
that these patients are denied the benefits of
many of the Defendants' programs, services and
activities.

On February 20-23, 2017, the FDC[4]
allowed Plaintiff's expert team access to
Union CI and Lake CI to view and tour the
physical plant, including the housing areas,
treatment space, staff office space,
recreation areas, indoor recreation space,
dayroom, medication and administration areas.
Plaintiff's experts were also permitted to
observe daily operations, group treatment,
individual treatment, treatment team meetings,
medication passes, meal time and disciplinary
or classification meetings.  The experts were
permitted to interview FDC management staff
and health services staff and 4-5 patients per
inpatient level of care at each facility.

The Defendants state that prior to and
since the initiation of this litigation, the
FDC commenced significant initiatives to
improve recruiting and retention of qualified
security staff and enhance the delivery of
mental health services.  This process has been
ongoing prior to and throughout the course of
this litigation.  To date, the FDC's
initiatives include, but are not limited to,
the following: Creation of a Central Office
Mental Health Ombudsman and Mental Health
Ombudsman four at (4) [sic] inpatient units;
Creation of a Behavior Risk Management Team
(BRMT) comprising one (1) psychologist, a

---

[4] The Florida Department of Corrections.

> part-time psychiatrist and a part-time psychiatric nurse; development and implementation of two (2) Quality Assurance instruments (MHIMI - Mental Health Inpatient Monitoring Instrument and STAMI - Structured Therapeutic Activities Monitoring Instrument) to monitor mental health services in inpatient units; policy revisions; targeted training for security staff; site visits conducted by OHS leadership.

Id. at 2 (paragraph designation omitted). Significantly, as part of the agreement, the parties agreed the FDOC would discontinue using the Transitional Care Unit (TCU) at UCI for inpatient mental health care, with allowance to resume use of the dormitories if adequate modifications are made to provide sufficient treatment space. Id. at 5.

In the second part of the factual allegations, Plaintiff undertakes a review of what is characterized as the FDOC and Corizon's substandard treatment of mentally ill prisoners at UCI and awareness of that inadequate treatment. Amended Complaint at 12-18. Plaintiff describes the inception of the Correctional Medical Authority (CMA), and the issuance of Corrective Action Plans (CAPS). Amended Complaint at 13. Plaintiff explains: "[t]he CMA's survey reports are monitored via [CAPS] for each facility 'until the facilities are in compliance with accepted community standards.'" Amended Complaint at 13-14 (footnote omitted).

In this regard, Plaintiff states the surveys showed and CAP assessments determined mental health care services at UCI were not in compliance, as exhibited by staffing shortages and prisoners

reporting "ghost trays" being served during mealtimes in confinement or inpatient mental health units.[5]  Amended Complaint at 14-15.  The Self Harm Observation Status (SHOS) admission cell reportedly had dried blood on the walls and other cells had standing water and black mold.  <u>Id</u>. at 15.  Plaintiff opines that as Secretary, Defendant Jones received the CMA's survey, and Defendant Jordan, as Warden of UCI, received the survey as well. <u>Id</u>.

A subsequent CAP assessment for UCI indicated deficient post-discharge evaluation for former SHOS prisoners.  <u>Id</u>. at 15-16.  An inspection team's report advised Jones of poor medical and mental health care in the FDOC, and Jones promptly responded, insisting on more staff, training, oversight and specialist appointments.  <u>Id</u>. at 16-17.  A 2016 CAP assessment of UCI's 2015 inpatient mental health records showed an overall non-compliance rate of 70 percent. <u>Id</u>. at 17.  A follow-up audit also showed deficiencies in mental health treatment.  <u>Id</u>.  Plaintiff submits that as head of the FDOC, Defendant Jones was fully aware of the 2016 cap assessment and findings of the follow-up audit.  <u>Id</u>. at 18.  Furthermore, Corizon, as the contractor for medical services to FDOC, was aware of and responsible for the reported deficiencies in mental health treatment at UCI.  <u>Id</u>.

---

[5]  "Ghost trays" are defined as empty, Styrofoam meal containers.  Amended Complaint at 15 n. 23.

Finally, Plaintiff provides the following factual allegations with respect to the decedent's incarceration in the FDOC. Notably, when sentenced, the state trial court recommended the decedent be housed close to his family in Palm Beach County and be placed in a mental health program. Id. at 18. The FDOC received the decedent in custody on or about June 24, 2013, and placed him in the South Florida Reception Center (SFRC). Id. at 18-19. The decedent weighed approximately 190 pounds and stood five feet nine inches tall. Id. at 19. He had a Body Mass Index (BMI) of 28.1 (characterized as overweight). Thereafter, he received a custody assessment of close custody and the FDOC assigned him to South Bay Correctional Facility. Id.

The decedent received a mental health assessment on October 9, 2013. Id. Staff noted a history of auditory hallucinations, and a history of twice being involuntary committed pursuant to the "Baker Act." Id. The mental health staff diagnosed Plaintiff with bipolar disorder, mania, with psychotic features and mild mental retardation. Id. Pursuant to an emergency referral, the FDOC transferred the decedent to DCI on March 21, 2014, with a provisional diagnosis of bipolar disorder, mania, and borderline intellectual functioning. Id. at 20. The decedent exhibited mood swings, auditory hallucinations, paranoia, disorganized thinking, and he talked to himself. Id. The decedent was non-compliant with his medications, taking them sporadically. Id. Staff recognized

the decedent's risk for exploitation and noted his previous hospitalizations due to psychosis. Id. On March 27, 2014, upon being diagnosed as suffering form bipolar disorder and psychosis, the decedent was admitted to the TCU at DCI. Id.

On or about November 10, 2014, the decedent experienced auditory hallucinations and delusions, was urinating and defecating on the floor, and refused medication and treatment. Id. Staff at the facility did not find he exhibited suicidal ideation. Id. at 20-21. On November 12, 2014, a doctor ordered the decedent's transfer to the Crisis Stabilization United (CSU) of the SFRC and that he be placed on suicide watch and fed a boneless diet in a Styrofoam tray, without utensils. Id. at 21. The decedent refused medication and treatment and slept only two to three hours a night. Id. At that point, approximately sixteen months after being admitted to the FDOC, the decedent weighed 151 pounds, a loss of 39 pounds since incarceration in the FDOC. Id.

The decedent received a disciplinary report on April 16, 2015, for failure to obey a verbal or written order when he was reprimanded for attempting to enter the food service area, without permission. Id. at 21-22. Staff transferred the decedent to Florida State Prison (FSP), located in north Florida, 300 miles away from his family. Id. at 22. Thereafter, staff transferred the decedent to UCI in north Florida. Id. On May 15, 2015, staff placed the decedent in Close Management (CM) custody. Id. Mental

health staff, on August 24, 2015, requested the decedent be transferred from inpatient treatment at UCI's TCU to the CSU. Id. at 22-23. Staff had observed the decedent having difficulty and smearing feces on the floor, although he remained cooperative with staff and security. Id. at 23.

On September 29, 2015, mental health staff requested the decedent be transferred back to the TCU, as he was no longer demonstrating psychosis or bizarre behavior and had achieved a level of stability appropriate for TCU. Id. In October 2015, mental health staff recommended the decedent remain in the TCU. Id.

On November 4, 2015, the decedent refused to come out for individual and psychiatric mental health call-outs. Id. Corizon employee, Bih Tambi, M.D., a psychiatrist, noted the decedent's prescription for Tegretol had been discontinued due to hyponatremia.[6] Id. at 23-24. The decedent had been prescribed Tegretol prior to and while in FDOC custody since 2013. Id.

---

[6] Plaintiff explains:

> Hyponatremia is a condition that occurs when the level of sodium in the blood is too low. It is a common side effect of taking Tegretol, which is often prescribed to control acute mania associated with manic depressive disorder, also known as bipolar disorder. If left uncorrected, hyponatremia can be fatal.

Amended Complaint at 24 n.33.

On November 24, 2015, the decedent refused to sign his Individualized Service Plan for treatment. Id. at 24. On December 1, 2014, Eccles found the decedent alert, standing at the cell door, looking through the window. Id. Eccles found the cell clean and organized and the decedent's appearance clean, appropriate and neat. Id. Eccles considered the decedent's speech to be appropriate, and found the decedent calm and cooperative. Id.

On December 2, 2015, Dr. Tambi noted that although the decedent had been taken off Tegretol for hyponatremia, he had not been provided an alternate psychotropic medication to replace Tegretol. Id. Also, Dr. Tambi pointed out there were no follow-up sodium level results and no indication of any medication being prescribed to control the hyponatremia. Id. at 24-25. On that date, at 8:00 a.m., F. Morrison, a Corizon employee and member of the decedent's Multi-disciplinary Services Team (Team), recorded that the decedent declined the opportunity for group recreation activity but exhibited no behaviors or appearance of concern. Id. at 25. Around 11:00 a.m., Erika Biskie, a Corizon employee, Senior Psychologist, and Team member, recorded that the Team met and decided to maintain the decedent's current treatment in TCU. Id.

On December 3, 2015, at 12:30 p.m., correctional officers served the decedent lunch; however, when they returned to the cell a short time later, the officers noticed the decedent had not moved and had no eaten. Id. The officers contacted the prison nurse,

and the nurse advised the officers to enter the cell.  Id.  At 1:26
p.m., the officers entered the decedent's cell and found him
unresponsive.  Id. at 25-26.  Efforts were made to revive the
decedent, including cardiopulmonary resuscitation, and he was taken
to UCI's Urgent Care Center.  Id. at 26.  These efforts were
unsuccessful, and the decedent was pronounced dead at 2:48 p.m.
Id.

The Medical Examiner conducted an autopsy on December 4, 2015,
and found probable cause of death: undetermined.  The examiner,
however, made these findings: (1) malnutrition (height 69 inches,
weight 115 pounds);[7] (2) unwashed appearance and probable feces on
soles of feet; (3) coronary artery atherosclerosis, mild to
moderate; (4) heavy lungs (1865 g) with marked congestion and
edema; (5) minor skin injuries of variable age involving anterior
and posterior trunk and extremities; (6) King TL tube placement in
tracheal lumen; and, (7) negative toxicology.  Id. at 26-27.

The Medical Examiner noted the paramedic attributed difficulty
in using the tube during resuscitation efforts to trismus, or lock
jaw, but the examiner believed rigor mortis of the jaw had set in,
apparently before attempts at intubation.  Id. at 27.  After the
decedent's death, Defendants did not timely inform Plaintiff of the

---

[7] Plaintiff points out the decedent's loss of 75 pounds during
the approximately two-and-a-half years of incarceration in the
FDOC.  Amended Complaint at 26 n.34.  Also noted is the decedent's
BMI at death, 17.0, well below underweight (a BMI of 18.5 is
underweight).  Id.

death, did not release the body to the decedent's family, and buried the decedent on FDOC property against the wishes of his family and without Plaintiff's consent.  <u>Id</u>.

## V.  Negligence

At the outset of the Amended Complaint, Plaintiff mentions she is raising a "simple negligence action[;]" however, upon a thorough review of the Amended Complaint, Plaintiff has not raised any negligence claims.  Amended Complaint at 1.  Therefore, one will not be addressed by this Court.

## VI. Eighth and Fourteenth Amendments

Plaintiff raises Eighth Amendment claims in Counts I, II, and III of the Amended Complaint: (1) Count I: a violation of 42 U.S.C. § 1983 and the Eighth Amendment against Defendant Jones in her individual and official capacity (now Defendant Inch in his official capacity) for subjecting the decedent to cruel and unusual punishment; (2) Count II: a violation of 42 U.S.C. § 1983 and the Eighth Amendment against Defendant Jordan in his individual capacity for subjecting the decedent to cruel and unusual punishment; (3) Count III: a violation of 42 U.S.C. § 1983 and the Eighth Amendment against Defendant Corizon for directly and vicariously subjecting the decedent to cruel and unusual punishment.  For this review, the Court accepts the facts in the

Amended Complaint as true and views them in the light most favorable to the Plaintiff.[8]

Plaintiff alleges the decedent was denied and deprived of adequate nutrition and treatment for his serious mental health and medical needs, which resulted in his malnutrition, starvation, and death. Amended Complaint at 2. Plaintiff claims, in Counts I, II, and III, the decedent received constitutionally inadequate mental and medical care in the prison facilities of the FDOC, resulting in a violation of the Eighth Amendment, made applicable to the states by the Fourteenth Amendment, and as enforced through 42 U.S.C. § 1983.

Under Count I, Plaintiff alleges Defendant Jones was personally aware of the history and culture of widespread and longstanding abuse and deliberately indifferent treatment by her employees and agents and that of Defendant Corizon. Amended Complaint at 28. Plaintiff claims Jones was deliberately indifferent to the FDOC and Corizon policies, customs, and practices that increased the known risk of serious harm and death, in violation of the Eighth Amendment. Id.

_____

[8] In considering the motion, the Court must accept all factual allegations in the Amended Complaint as true, consider the allegations in the light most favorable to the plaintiff, and accept all reasonable inferences that can be drawn from such allegations. Miljkovic v. Shafritz and Dinkin, P.A., 791 F.3d 1291, 1297 (11th Cir. 2015) (quotations and citations omitted). As such, the recited facts are drawn from the Amended Complaint and may differ from those that ultimately can be proved.

Plaintiff alleges, once Jones became aware of the policies, customs, or practices as documented in the CMA's CAP assessments, relevant surveys, or media reports, she exhibited deliberate indifference when she: (1) failed to stop the FDOC policy, custom, or practice of disciplining and punishing prisoners for behaviors stemming from mental illness; (2) failed to stop the FDOC custom or practice of serving mentally ill prisoners "ghost trays;" (3) failed to stop the custom or practice of retaliatory conduct by FDOC personnel against mentally ill prisoners; (4) failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of the decedent's mental health history, including adequate consideration of his Baker Act commitments; (5) failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of the decedent's mental illness to determine which prison and at what level of confinement he should be housed, particularly given the sentencing court's recommendation that the decedent be confined close to his family; (6) failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of the decedent's mental illness culminating in his being housed in an environment of squalor and isolation, an environment which exacerbated his psychotic hallucinations and bipolar disorder; (7) failed to remedy the policies, practices, or customs of FDOC and Corizon employees

resulting in not ensuring the decedent was kept clean, clothed, and fed; (8) failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in not ensuring the decedent received adequate nutrition when his mental health disorders prevented him from eating enough food, to the point of losing 75 pounds in approximately two and one-half years; and, (9) failed to remedy the policies, practices, or customs of Corizon to ensure the provider adequately treated mentally ill and malnourished prisoners in FDOC custody. Id. at 28-32.

Plaintiff contends Defendant Jones' policy, pattern, and practice, as stated above, were the direct and proximate cause of the decedent's harm, resulting in a violation of his Eighth Amendment rights. Id. at 32. Plaintiff further asserts that this conduct was of a gross and flagrant character, in reckless disregard of human life and safety, entitling Plaintiff to punitive damages. Id.

Plaintiff, in Count II, claims Defendant Jordan is personally liable for violating Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Id. at 33. Plaintiff raises comparable allegations against Defendant Jordan, with the exception of the alleged retaliatory conduct outlined in item (3) above and the alleged lack of sufficient evaluation for housing and location outlined in item (5) above. Id. at 33-37. Plaintiff contends Defendant Jordan's actions proximately caused the decedent's harm,

resulting in a violation of his Eighth Amendment rights. Id. at 37. Plaintiff further asserts that this conduct was of a gross and flagrant character, in reckless disregard of human life and safety, entitling Plaintiff to punitive damages. Id.

In Count III, Plaintiff claims Defendant Corizon is directly and vicariously liable for violating Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Id. at 37. Plaintiff alleges Corizon, at all times pertinent to the action, contracted with FDOC to provide mental health and medical care and services to prisoners. Id. Moreover, Plaintiff alleges Corizon was aware of the history of widespread and longstanding abuse and deliberately indifferent treatment by its employees, agents, and implied agents which resulted in unnecessary and avoidable prisoner death and medical injuries. Id. at 37-38.

More specifically, Plaintiff contends Corizon was deliberately indifferent when its policy makers failed to stop their policy, custom, or practice of understaffing; of disciplining and punishing prisoners for behavior stemming from mental illness; of serving "ghost trays;" of employing retaliatory conduct against mentally ill inmates; of insufficient evaluation of mental history and mental illness to assess the appropriate level and location of confinement, resulting in housing the decedent in squalor and isolation exacerbated by psychotic hallucinations and bipolar disorder and failing to keep the decedent clean, clothed, and fed;

of providing inadequate nutrition to the decedent due to mental health disorders preventing him from eating enough food; of inadequately treating mentally ill and malnourished prisoners; and of insufficient evaluation of serious medical needs, including the need to correct the decedent's hyponatremia. Id. at 38-43.

Plaintiff contends Defendant Corizon's actions proximately caused the decedent's harm, resulting in a violation of his Eighth Amendment rights. Id. at 43. Plaintiff further asserts that this conduct was of a gross and flagrant character, in reckless disregard of human life and safety, entitling Plaintiff to punitive damages. Id.

Initially, in Defendants' Motion, Jones states her tenure as Secretary did not begin until 2015, and the decedent was transferred to UCI in the spring of 2015.[9] Defendants' Motion at 3 n.3. Thus, Defendant Jones contends many of the allegations in the Amended Complaint are inapplicable to her as she had not assumed the office of Secretary until 2015. Id. Also, she avers that many of the allegations concern institutions other than UCI. Id.

Defendants Jones and Jordan assert Plaintiff makes conclusory allegations, without factual support, that these Defendants were personally aware of a history of widespread and longstanding abuse

---

[9] Former Governor Rick Scot appointed Julie Jones Secretary of the FDOC, effective January 5, 2015. Governor Ron DeSantis appointed Mark S. Inch Secretary in January 2019.

and indifferent treatment of inmates with respect to mental health and medical services. Id. at 6. Defendants Jones also points out that, with respect to Count IV, the count concerning disability discrimination, Plaintiff is complaining about programs and services like out-of-cell activities, visitation, religious services, reading materials, and the provision of adequate nutrition and a clean and safe prison environment, but these contentions are not consistent or causally related to the allegations concerning the decedent's conditions of confinement at UCI. Id. Finally, Defendants Jones and Jordan claim qualified immunity in their individual capacities. Id.

## A. Supervisory Liability

Defendants Jones (the former Secretary of the FDOC), and Jordan (former Warden of UCI) assert Counts I and II should be dismissed.[10] Defendants' Motion at 13. These Defendants contend Plaintiff's allegations do not establish the subjective and objective components that a substantial risk of serious harm existed, of the which Defendants Jones and Jordan were subjectively aware, and they failed to respond reasonably to that risk. Id.

Plaintiff counters that the Amended Complaint adequately alleges Defendant Jones was aware of widespread problems with the treatment of mentally ill prisoners in the FDOC through numerous

---

[10] Defendant Jones is named in her individual and official capacities, and Defendant Jordan is named in his individual capacity.

reports from the CMA, through subsequent news reports, and based on the FDOC's audit of the CMA's findings. Response at 3-4. Plaintiff submits Defendants Jones was "aware of that history and failed to remedy the unconstitutional policies, customs, and practices" that ultimately led to the decedent's death, and exhibited this awareness by actually promising improvements. Id. at 4. Admittedly, many of the alleged deficiencies began prior to Jones' tenure, however, Plaintiff submits Jones was aware of these problems and failed to remedy them, although she promised to do so. Id.

Plaintiff argues the objective component is satisfied through the content of the CMA reports, outlining the unconstitutional policies, customs, and practices of the FDOC which resulted in the mental and physical abuse of mentally ill prisoners. Id. Furthermore, Plaintiff states the subjective component is properly supported by showing Jones was aware of these issues through numerous means, including historical litigation against the FDOC, the findings of the CMA, FDOC's follow-up audit, and media reports of deficiencies in the treatment of mentally ill inmates. Id. Thus, Plaintiff submits Jones drew the inference of a substantial risk of harm to prisoners because she actually promised to take corrective action after being advised of the deficiencies and problems. Id.

Plaintiff also names former Warden Jordan as a defendant, claiming Jordan was aware of the substantial risk of harm to mentally ill prisoners through his own superior's pronouncements, yet failed to take corrective actions. Response at 5. Plaintiff alleges Jordan was aware of CMA's findings and the history and culture of widespread and longstanding abuse of mentally ill inmates at UCI. Id.

There is a rigorous standard for establishing supervisory liability in a civil rights action:

> "Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994) (internal quotation marks and citation omitted). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Gonzalez, 325 F.3d at 1234 (internal quotation marks and citation omitted).[11] "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

> "The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" Cottone, 326 F.3d at 1360 (citation omitted).[12] "The

---

[11] Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003).

[12] Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003).

> deprivations that constitute widespread abuse
> sufficient to notify the supervising official
> must be obvious, flagrant, rampant and of
> continued duration, rather than isolated
> occurrences." Brown, 906 F.2d at 671. A
> plaintiff can also establish the necessary
> causal connection by showing "facts which
> support an inference that the supervisor
> directed the subordinates to act unlawfully or
> knew that the subordinates would act
> unlawfully and failed to stop them from doing
> so," Gonzalez, 325 F.3d at 1235, or that a
> supervisor's "custom or policy . . . resulted
> in deliberate indifference to constitutional
> rights," Rivas v. Freeman, 940 F.2d 1491, 1495
> (11th Cir. 1991).

Danley v. Allen, 540 F.3d 1298, 1314 (11th Cir. 2008) (overruled on other grounds); see Keith v. DeKalb Cty., Ga., 749 F.3d 1034, 1047-48 (11th Cir. 2014). In sum,

> To state a claim against a supervisory
> defendant, the plaintiff must allege (1) the
> supervisor's personal involvement in the
> violation of his constitutional rights,[13] (2)
> the existence of a custom or policy that
> resulted in deliberate indifference to the
> plaintiff's constitutional rights,[14] (3)
> facts supporting an inference that the
> supervisor directed the unlawful action or
> knowingly failed to prevent it,[15] or (4) a

---

[13] See Goebert v. Lee Cty., 510 F.3d 1312, 1327 (11th Cir. 2007) ("Causation, of course, can be shown by personal participation in the constitutional violation.") (citation omitted).

[14] See Goebert, 510 F.3d at 1332 ("Our decisions establish that supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations.").

[15] See Douglas v. Yates, 535 F.3d 1316, 1322 (11th Cir. 2008) ("Douglas's complaint alleges that his family informed Yates [(an

> history of widespread abuse that put the
> supervisor on notice of an alleged deprivation
> that he then failed to correct. <u>See</u> <u>id.</u> at
> 1328-29 (listing factors in context of summary
> judgment).[16] A supervisor cannot be held
> liable under § 1983 for mere negligence in the
> training or supervision of his employees.
> <u>Greason v. Kemp</u>, 891 F.2d 829, 836-37 (11th
> Cir. 1990).

<u>Barr v. Gee</u>, 437 F. App'x 865, 875 (11th Cir. 2011) (per curiam),

<u>cert</u>. <u>denied</u>, 566 U.S. 996 (2012).

Plaintiff claims supervisory liability on the part of Jones,

and Jordan. Keeping in mind this strict limitation on supervisory

liability, the Court recognizes Defendants may not be held liable

under a theory of respondeat superior. <u>See</u> <u>Braddy v. Fla. Dep't of</u>

<u>Labor & Emp't Sec.</u>, 133 F.3d 797, 801 (11th Cir. 1998) (finding

supervisory liability requires something more than stating a claim

of liability under a theory of respondeat superior).

Plaintiff asserts there is a causal connection between the

Defendants' actions or inactions and the alleged federal

constitutional deprivation. The question is whether Plaintiff has

pled "enough facts to state a claim to relief that is plausible on

---

Assistant Warden)] of ongoing misconduct by Yates's subordinates
and Yates failed to stop the misconduct. These allegations allow a
reasonable inference that Yates knew that the subordinates would
continue to engage in unconstitutional misconduct but failed to
stop them from doing so.").

[16] <u>West v. Tillman</u>, 496 F.3d 1321 (11th Cir. 2007) (per
curiam).

its face." <u>Twombly</u>, 550 U.S. at 570.  In order to make this determination, there are several factors to be considered.

First, "[a] policy is a decision that is officially adopted by the [government entity], or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted), <u>cert</u>. <u>denied</u>, 522 U.S. 1075 (1998).  Liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by governmental policymakers." <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989) (<u>quoting</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483-84 (1986)).

A supervisor/policymaker might officially adopt a policy that permits a particular constitutional violation, or, is some cases, a plaintiff may demonstrate that there is a custom or practice of permitting a constitutional violation.  <u>See</u> <u>Grech v. Clayton Cty., Ga.</u>, 335 F.3d 1326, 1330 (11th Cir. 2003) (en banc); <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004).  A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." <u>Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown</u>, 520 U.S. 397, 404 (1997) (citation omitted).  The Eleventh Circuit defines "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread

practice." <u>Sewell</u>, 117 F.3d at 489. In order to establish liability, there must be a direct causal link between the policy or custom and the alleged constitutional deprivation. <u>Snow ex rel. Snow v. City of Citronelle</u>, 420 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted).

Second, a question arises as to whether Plaintiff has sufficiently alleged a causal connection between the actions of these Defendants and the alleged constitutional deprivation. <u>Hartley v. Parnell</u>, 193 F.3d 1263, 1269 (11th Cir. 1999). A necessary causal connection can be established if: (1) the supervisor knew about and failed to correct a widespread history of abuse; or (2) the supervisor's custom or policy resulted in a constitutional violation; or (3a) the supervisor directed the subordinate to act unlawfully; or (3b) the supervisor knew that the subordinate would act unlawfully and failed to stop him from acting unlawfully. <u>Harrison v. Culliver</u>, 746 F.3d 1288, 1298 (11th Cir. 2014); <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1360 (11th Cir. 2003). But, "[t]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." <u>Id</u>. at 1360-61 (internal quotation marks omitted and citation omitted).

Primarily, Plaintiff relies on allegations that these Defendants were aware of the history and culture of widespread and longstanding practices of treating mentally ill inmates with

deliberate indifference to their serious medical and mental health needs. Plaintiff alleges these Defendants failed to stop policies, customs, or practices of disciplining and punishing inmates for behaviors stemming from mental illness; of serving ghost trays; of using retaliatory conduct (Jones only); of adopting deficient means of evaluation of mentally ill inmates resulting in poor assessment of their mental and physical health; and of making poor housing decisions, resulting in mentally ill inmates living in squalor and filth and being underfed to the point of malnourishment.

In essence, Plaintiff contends Defendants Jones and Jordan knew or should have known, based on the CMA's, CAPS, previous cases, and media reports (and for Jordan, based on his supervisor's acknowledgment of the deficiencies and Jordan's awareness of same), about the conditions the decedent had been subjected to and they failed to remove him from these squalid and poor conditions or change his medical and mental health treatment in order to address his serious medical and mental health needs. Additionally, Plaintiff asserts these Defendants were responsible for promulgating and implementing policies, practices, procedures, or customs with regard to inmate classification and care, and they promulgated or implemented a policy, practice, or custom of depriving Plaintiff of the minimal measures of life's necessities.

It is important to recognize that "[a] policy may be deliberately indifferent if it is facially unconstitutional or

where the policy is implemented 'with deliberate indifference as to its known or obvious consequences.'" <u>Fields v. Corizon Health, Inc.</u>, 490 F. App'x 174, 182 (11th Cir. 2012) (per curiam) (quoting <u>McDowell</u>, 392 F.3d at 1291). Here, Plaintiff alleges Defendants adopted policies, practices, or customs that subjected the decedent to unconstitutional conditions of confinement in violation of the Eighth Amendment.

Jordan, as the former Warden of UCI, was "charged with directing the governance, discipline, and policy of the prison and enforcing its orders, rules, and regulations[.]" <u>Mathews v. Crosby</u>, 480 F.3d 1265, 1275 (11th Cir. 2007), <u>cert</u>. <u>denied</u>, 552 U.S. 1095 (2008). Jones, the Secretary, is the head of the corrections institution, and she is charged with setting Department policy. <u>See id</u>. at 1275-76. Thus, in this case, Defendants Jones and Jordan could face liability under section 1983 predicated on a showing of the adoption of customs or policies deliberately indifferent to a substantial risk of serious harm.

In this regard, Plaintiff has pled enough facts in the Amended Complaint to state a claim to relief that is plausible on its face against Defendants Jones and Jordan. Plaintiff alleges facts supporting his claim of a history of widespread deficiencies that put these Defendants on notice that there was a need to correct the deprivations, but they failed to do so. Plaintiff contends the stated deficiencies and deprivations were obvious, flagrant,

rampant and continued for an extensive period of time, without the Defendants taking corrective action although they were fully aware of the constitutional deficiencies that led to the decedent being deprived of adequate nutrition and treatment for basic and serious mental health and medical needs.

More particularly, Plaintiff has alleged Defendants Jones and Jordan were aware of the failings and deficiencies in the care of mentally ill inmates in the FDOC, and they failed to take corrective action or adopt policies ensuring the delivery of medical and mental health treatment to those unable to care for themselves. Plaintiff asserts there was a history and culture of widespread and longstanding practices of treating mentally ill inmates with deliberate indifference to their serious medical and mental health needs and the Defendants failure to act in response to these serious needs proximately caused the decedent's death.

Defendants Jones and Jordan argue there are no allegations that they were aware of any specific danger to the decedent. Defendants' Motion at 10. Defendants contend they cannot be held accountable for the decedent's death because there was no indication that Plaintiff was in distress immediately prior to his death, and they were not made aware of any specific danger to the decedent prior to his death. Id. In fact, they submit, he exhibited stability prior to his death, without any outward signs of instability or behavioral issues. Id. at 10-11.

It matters not that the Defendants may have been unaware of the decedent's particular circumstances.[17] Plaintiff relies on a claim of widespread problems with the treatment of mentally ill prisoners in FDOC, and the assertion that the Defendants knew about these historical issues and failed to take remedial action to remedy the unconstitutional policies, customs, and practices that ultimately led to the decedent's death.

In <u>Chandler v. Crosby</u>, 379 F.3d 1278, 1288-89 (11th Cir. 2004), the Eleventh Circuit addressed a prison conditions complaint and opined:

> The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The "cruel and unusual punishments" standard applies to the conditions of a prisoner's confinement. <u>Rhodes v. Chapman</u>, 452 U.S. 337, 345-46, 101 S.Ct. 2392, 2398-99, 69 L.Ed.2d 59 (1981). While "the primary concern of the drafters was to proscribe tortures and other barbarous methods of punishment," the Supreme Court's "more recent cases [show that] [t]he [Eighth] Amendment embodies broad and idealistic concepts of dignity, civilized

---

[17] Plaintiff alleges the decedent entered the FDOC on June 24, 2013, standing five feet nine inches tall and weighing 190 pounds, exhibiting a stocky build. By November 12, 2014, he had lost 39 pounds. Just over a year later, on December 3, 2015, he weighed 115 pounds, a loss of another 36 pounds. His body mass index plummeted from 28.1, when he entered the FDOC, to 17.0, below what is even considered underweight (18.5) for a male of his stature. He was found in a deplorable state, unconscious (the medical examiner surmised rigor mortis had set in prior to resuscitation efforts), malnourished, disheveled and unclean (with probable feces on the soles of his feet), with marked congestion and edema in heavy lungs.

standards, humanity, and decency." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (marks, citations, and brackets omitted). "No static test can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." <u>Rhodes</u>, 452 U.S. at 346, 101 S.Ct. at 2399 (marks and citation omitted).

Even so, "the Constitution does not mandate comfortable prisons." <u>Id</u>. at 349, 101 S.Ct. at 2400. If prison conditions are merely "restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." <u>Id</u>. at 347, 101 S.Ct. at 2399. Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they "involve the wanton and unnecessary infliction of pain." <u>Id</u>.

<u>Chandler</u>, 379 F.3d at 1288-89 (footnote omitted).

In order to establish an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate that a prison official was deliberately indifferent to a substantial risk of serious harm to the inmate. <u>Bennett v. Chitwood</u>, 519 F. App'x 569, 573 (11th Cir. 2013) (per curiam) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 832–33 (1994)). To make this showing, both the objective and subjective components to the deliberate-indifference test must be met. <u>Id</u>. (citing <u>Farmer</u>, 511 U.S. at 834).

To satisfy the objective, "substantial risk of serious harm" component, a plaintiff "must show a deprivation that is, 'objectively, sufficiently serious,' which means that the defendants' actions resulted in the denial of the minimal civilized measure of

33

life's necessities." <u>Cottrell v. Caldwell</u>, 85
F.3d 1480, 1491 (11th Cir. 1996). "The
challenged condition must be 'extreme'": the
prisoner must show that "society considers the
risk that the prisoner complains of to be so
grave that it violates contemporary standards
of decency to expose anyone unwillingly to
such a risk." <u>Chandler v. Crosby</u>, 379 F.3d
1278, 1289 (11th Cir. 2004). In evaluating an
Eighth Amendment claim, we consider both the
"severity" and the "duration" of the
prisoner's exposure to extreme temperatures.
<u>Id</u>. at 1295. Merely showing that prison
conditions are uncomfortable is not enough.
<u>Id</u>. at 1289.

For the subjective component, the prison
official must (1) have subjective knowledge of
the risk of serious harm, and (2) nevertheless
fail to respond reasonably to the risk.
<u>Farmer</u>, 511 U.S. at 837, 114 S.Ct. at 1979.
Subjective knowledge on the part of the prison
official requires that the official was aware
of the facts "from which the inference could
be drawn that a substantial risk of serious
harm exist[ed]," and that the official
actually drew that inference. <u>Burnette v.
Taylor</u>, 533 F.3d 1325, 1330 (11th Cir. 2008).
A prison official must have a sufficiently
culpable state of mind to be deliberately
indifferent. <u>Carter v. Galloway</u>, 352 F.3d
1346, 1349 (11th Cir. 2003). "[T]he evidence
must demonstrate that with knowledge of the
infirm conditions, the official knowingly or
recklessly declined to take actions that would
have improved the conditions." <u>Thomas v.
Bryant</u>, 614 F.3d 1288, 1312 (11th Cir. 2010)
(alteration and quotation omitted). Mistakes
and even negligence on the part of prison
officials are not enough for a constitutional
violation. <u>Crosby</u>, 379 F.3d at 1289.

<u>Id</u>. at 574.

The conditions of an inmate's confinement should not inflict unnecessary pain or suffering, "totally without penological justification," resulting "in the gratuitous infliction of suffering." <u>Gregg v. Ga.</u>, 428 U.S. 153, 183 (1976). Eighth Amendment violations are not confined to that which would have been considered to be cruel and unusual "by the framers." <u>Bass v. Perrin</u>, 170 F.3d 1312, 1316 (11th Cir. 1999). This Court must look to "contemporary standards of decency." <u>Ford v. Wainwright</u>, 477 U.S. 399, 406 (1986). Moreover, there is "no static test." <u>Chandler</u>, 926 F.2d at 1064 (citation and internal quotation marks omitted). The standard in the prison context is whether the prison officials violate the Eighth Amendment "through 'the unnecessary and wanton infliction of pain.'" <u>Bass</u>, 170 F.3d at 1316 (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986)). Notably, conditions of confinement have been condemned as violative of the Eighth Amendment when they are unsanitary, degrading, and lengthy. <u>Id</u>. at 1211-12. <u>See</u> <u>Braggs</u>, No. 2:14cv601-MHT (WO), 2017 WL 2773833, at *10 (addressing the profound impact of solitary confinement on prisoners' mental health, particularly on those already deemed mentally ill).

Defendants ask this Court to analyze Plaintiff's Eighth Amendment claim using the deliberate indifference test, referencing the objective and subjective components set forth in <u>Farmer</u>; however, this case is not yet at the trial state, nor is it even at

the summary judgment stage.  On the contrary, this case is before the Court on a motion to dismiss.  Therefore, the only question before the Court is whether the claims have facial plausibility.

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law.  Salvato v. Miley, 790 F.3d 1286, 1295 (11th Cir. 2015); Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citation omitted); Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (citations omitted).  Here, the Plaintiff has certainly "nudged [the] claims across the line from conceivable to plausible[.]" Twombly, 550 U.S. at 570.  Indeed, she has alleged enough facts to state an Eighth Amendment claim to relief that is plausible on its face against Defendants Jones and Jordan.

## B.  Corizon

Corizon contracted with the FDOC to provide medical and mental health services to inmates within the state of Florida.  Although Corizon is not a governmental entity, "[w]here a function which is traditionally the exclusive prerogative of the state ... is performed by a private entity, state action is present" for purposes of § 1983.  Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 703 (11th Cir. 1985) (citations omitted). Indeed,

> "when a private entity . . . contracts with a
> county to provide medical services to inmates,

it performs a function traditionally within
the exclusive prerogative of the state" and
"becomes the functional equivalent of the
municipality" under section 1983. _Buckner v._
_Toro_, 116 F.3d 450, 452 (11th Cir. 1997).
"[L]iability under § 1983 may not be based on
the doctrine of respondeat superior." _Grech v._
_Clayton Cnty., Ga._, 335 F.3d 1326, 1329 (11th
Cir. 2003) (en banc).

_Craig v. Floyd Cty., Ga._, 643 F.3d 1306, 1310 (11th Cir. 2011); _see_

_Denham v. Corizon Health, Inc._, No. 15-12974, 2017 WL 129020, at *4

(11th Cir. Jan. 13, 2017) (per curiam) (when a government function

is performed by a private entity like Corizon, the private entity

is treated as the functional equivalent of the government for which

it works).

Liability for constitutional deprivations under § 1983 cannot

be based on the theory of respondeat superior. _Craig_, 643 F.3d at

1310 (quoting _Grech_, 335 F.3d at 1329); _see Denno v. Sch. Bd. of_

_Volusia Cty._, 218 F.3d 1267, 1276 (11th Cir. 2000), _cert. denied_,

531 U.S. 958 (2000). Instead, a government entity may be liable in

a § 1983 action "only where the [government entity] _itself_ causes

the constitutional violation at issue." _Cook ex. rel. Estate of_

_Tessier v. Sheriff of Monroe Cty., Fla._, 402 F.3d 1092, 1116 (11th

Cir. 2005) (citations omitted). It is a plaintiff's burden to

establish that an official policy or custom of the government

entity was the "moving force" behind the alleged constitutional

deprivation. _See Monell v. Dep't of Soc. Servs._, 436 U.S. 658,

693-94 (1978).

In _Monell_, the Supreme Court held local governments can be held liable for constitutional torts caused by official policies, but this liability is limited to "acts which the [government entity] has officially sanctioned or ordered." _Pembaur v. City of Cincinnati_, 475 U.S. 469, 480 (1986). Under _Monell_, a plaintiff also must allege that the constitutional deprivation was the result of "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." _Denno_, 218 F.3d at 1276 (citations omitted); _see_ _Hoefling v. City of Miami_, 811 F.3d 1271, 1279 (11th Cir. 2016) (stating _Monell_ "is meant to limit § 1983 liability to 'acts which the municipality has officially sanctioned or ordered'"; adding that "[t]here are, however, several different ways of establishing municipal liability under § 1983").

"A policy is a decision that is officially adopted by the [government entity], or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." _Sewell v. Town of Lake Hamilton_, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted), _cert_. _denied_, 522 U.S. 1075 (1998). The policy requirement is designed to "'distinguish acts of the [_government entity_] from acts of _employees_ of the [government entity], and thereby make clear that [governmental] liability is limited to action _for which the [government entity] is actually_

38

responsible.'" <u>Grech</u>, 335 F.3d at 1329 n.5 (quotation and citation omitted). As such, governmental liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by governmental policymakers. <u>City of Canton v. Harris</u>, 489 U.S. at 389 (<u>quoting</u> <u>Pembaur</u>, 475 U.S. at 483-84).

As a consequence, a government entity rarely will have an officially-adopted policy that permits a particular constitutional violation; therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the government entity has a custom or practice of permitting a constitutional violation. <u>See</u> <u>Grech</u>, 335 F.3d at 1330; <u>McDowell v. Brown</u>, 392 F.3d at 1289. In addressing whether the entity has an adopted custom, it must be shown that, although not formally approved by a decisionmaker, the act is "so widespread as to have the force of law." <u>Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown</u>, 520 U.S. at 404 (citation omitted). A "custom" is "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice." <u>Sewell</u>, 117 F.3d at 489.

More must be shown; "[t]o hold the [government entity] liable, there must be 'a direct causal link between [its] policy or custom and the alleged constitutional deprivation.'" <u>Snow ex rel. Snow v. City of Citronelle</u>, 420 F.3d at 1271 (quotation omitted). Because

Corizon's liability under § 1983 would be based on its functional equivalence to the government entity responsible for providing medical and mental health care and services to FDOC inmates, Plaintiff must plead that an official policy or a custom or practice of Corizon was the moving force behind the alleged federal constitutional violation.

In the Amended Complaint, Plaintiff claims Defendant Corizon is directly and vicariously liable for violating Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment as the contract entity that contracted with FDOC to provide mental health and medical care services to prisoners and failed in this regard. In support, Plaintiff alleges Corizon was aware of the history of widespread and longstanding abuse and deliberately indifferent treatment by its employees, agents, and implied agents which resulted in unnecessary and avoidable prisoner death and medical injuries, particularly when its policy makers failed to stop their policy, custom, or practice of understaffing; of disciplining and punishing prisoners for behavior stemming from mental illness; of serving "ghost trays;" of employing retaliatory conduct against mentally ill inmates; of insufficient evaluation of mental history and mental illness, resulting in housing the decedent away from his family, in squalor and isolation exacerbated by psychotic hallucinations and bipolar disorder and failing to keep the decedent clean, clothed, and fed; of providing inadequate nutrition

to the decedent due to mental health disorders preventing him from eating enough food; of inadequately treating mentally ill and malnourished prisoners; and of insufficient evaluation of serious medical needs, including the need to correct the decedent's hyponatremia.

Although some of these claimed deficiencies may not be obviously related to the delivery of medical and mental health care (seemingly more directly related to penological care: the custody, care and control of the inmates by prison staff), several of the policies, customs or practices are certainly related to the provision of medical and mental health care to inmates: (1) the staffing needed to care for the mentally ill; (2) the appropriate evaluation of the mentally ill to ensure proper housing, feeding and care; (3) the treatment of the mentally ill; and (4) the evaluation of serious medical needs, including the very serious side effects caused by psychotropic drugs like Tegretol and the consequences of taking the mentally ill off of psychotropic drugs without replacing those drugs with other drugs or other appropriate treatment or care.

It is not so clear, without more information, as to whether Corizon has any involvement in setting policies, customs or practices concerning the discipline of mentally ill inmates, or in decision-making as to whether a mentally inmates may be disciplined for behavior stemming from mental illness; the actual feeding of

mentally ill inmates or setting policies to ensure mentally inmates are actually fed and not losing weight due to medication or mental health issues and are receiving adequate nutrition generally; and, the adoption of retaliatory measures against the mentally ill. These are matters that would best be fleshed out at the summary judgment stage.

The Court must ask whether Plaintiff has identified an official Corizon policy of deliberate indifference or an unofficial Corizon custom or practice that was "the moving force" behind any alleged constitutional violation. It is clear Corizon cannot be held liable based on any alleged conduct of or decisions made by its employees simply because they were working under contract for Corizon to provide medical and mental health care to inmates incarcerated in the FDOC. Thus, Plaintiff's factual allegations relating solely to alleged individual failures in the decedent's medical and mental health care are insufficient to sustain a claim that there is either a policy to deny medical and mental health care to inmates or a practice or custom of denying adequate medical and mental health care, much less that the practice was so widespread that Corizon had notice of violations and made a

"conscious choice" to disregard them.[18] Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).

The question remains whether Corizon adopted customs or policies deliberately indifferent to the medical and mental health and safety of vulnerable, mentally ill inmates, like the decedent. Plaintiff urges this Court to find that his Amended Complaint adequately alleges that Corizon's customs and practices caused the violations of the decedent's constitutional rights. Response/Corizon at 6. Upon review, Plaintiff alleges: "[a]s a direct and proximate cause, and moving force, of Defendant Corizon's policy, pattern, practice, and deliberate indifference, [the decedent] suffered from harm and violation of his Eighth Amendment rights." Amended Complaint at 43.

Here there is more than just a "[t]hreadbare recital[]," Iqbal, 129 S.Ct. at 1949, of a persistent and widespread custom and policy that led to death of the decedent. The Plaintiff has alleged the decedent had serious medical and mental health needs, and the Plaintiff has adequately alleged Corizon acted with deliberate indifference to the decedent's needs through its customs and policies. As alleged in the Amended Complaint, the decedent

_____

[18] For example, any failure of Dr. Bih Tambi to address the decedent's hyponatremia and any failure of employees Eccles and Morrison to address and appropriately assess the decedent's mental state will not sustain the requirement of showing a custom and policy. More is needed.

had serious, often alarming, mental health and medical needs. He suffered from hyponatremia, malnourishment, an inability to sleep, the lack of medication to address his mental health needs after being taken off of Tegretol, and was found, at the time of his death, malnourished, unkept - with probable feces on his feet, and with congested and heavy lungs.

Based on the allegations before the Court, the decedent suffered drastic weight loss during his incarceration in the FDOC, a matter that seemingly remained unaddressed until his death. The allegations concerning his malnourished condition combined with his suffering from hyponatremia and a lack of substituted medication to address his mental health needs, and Corizon's alleged customs and policies that constituted deliberate indifference to the medical and mental health needs of mentally ill inmates are more than just general allegations of undue care. "Here, Plaintiff identifies at least an unofficial custom or practice that constituted the moving force behind the alleged constitutional violation. Plaintiff has plausibly alleged, and a jury could reasonably infer, that one of these alleged policies, individually or in combination, were directly or causally linked to [the decedent's] injuries [and death] while [an inmate confined in the FDOC] under Corizon's care." Andrews v. Scott, No. 2:16-cv-814-FtM-99MRM, 2018 WL 4360623, at *5 (M.D. Fla. Sept. 13, 2018). Plaintiff has pled "enough facts to state a claim to relief that is plausible on its

face." <u>Twombly</u>, 550 U.S. at 570. Thus, Corizon's Motion is due to be denied.

## VII. Qualified Immunity

Defendants Jones and Jordan contend they are immune from suit, claiming qualified immunity. Defendants' Motion at 13-15. Under the doctrine of qualified immunity, Defendants may claim they are entitled to qualified immunity from monetary damages in their individual capacities. It is undisputed that Defendants were engaged in discretionary functions during the events at issue. To defeat qualified immunity with respect to these Defendants, Plaintiff must show both that a constitutional violation occurred and that the constitutional right violated was clearly established.

Recently, the Eleventh Circuit, in <u>Sebastian v. Ortiz</u>, No. 17-14751, 2019 WL 1187012, at *3 (11th Cir. March 14, 2019), addressed the denial of a motion to dismiss asserting qualified immunity, and explained:

> Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It is designed to permit officials to perform their discretionary duties "without the fear of personal liability or harassing litigation." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002). The doctrine therefore "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" <u>Id</u>. (quoting <u>Willingham v. Loughnan</u>, 261 F.3d

1178, 1187 (11th Cir. 2001), vacated 537 U.S.
801, 123 S.Ct. 68, 154 L.Ed.2d 2 (2002)).
Because qualified immunity protects officials
from suit as well as liability, courts must
determine the validity of a claimed qualified
immunity defense at the earliest possible
time. Id.

To deny qualified immunity at the motion
to dismiss stage, we must conclude both that
the allegations in the complaint, accepted as
true, establish a constitutional violation and
that the constitutional violation was "clearly
established." Keating v. City of Miami, 598
F.3d 753, 762 (11th Cir. 2010). For these
purposes, clearly established law consists of
holdings of the Supreme Court, the Eleventh
Circuit, or the highest court of the relevant
state. See Jenkins v. Talladega City Bd. of
Educ., 115 F.3d 821, 826 n.4 (11th Cir. 1997).
A "public official 'must first prove that he
was acting within the scope of his
discretionary authority when the allegedly
wrongful acts occurred'" to receive the
benefit of qualified immunity. Lee, 284 F.3d
at 1194 (quoting Courson v. McMillian, 939
F.2d 1479, 1487 (11th Cir. 1991)). Here, no
one disputes that Ortiz was acting within the
scope of his discretionary authority when he
arrived at the scene and ultimately arrested
Sebastian. After the defendant makes this
showing, "the burden shifts to the plaintiff
to show that qualified immunity is not
appropriate." Id.

Upon review of the Amended Complaint, Plaintiff has presented

sufficient allegations to present Eighth Amendment claims that

withstand Defendants' Motion to Dismiss, and the constitutional

rights at issue were clearly established. Given the undersigned's

conclusion that the Defendants' motion should be denied as to the

Eighth Amendment claims, and based on the state of the law on

qualified immunity in the Eleventh Circuit, qualified immunity should be denied as to Defendants Jones and Jordan.

## VIII.   ADA and RA

Finally, Defendant Jones contends Plaintiff fails to state a claim upon which relief should be granted in Count IV, violations of Title II of the ADA and § 504 of the RA against Defendant Jones in her official capacity.   Under this count, Plaintiff seeks declaratory relief, equitable relief (the relinquishment of the decedent's remains to Plaintiff), compensatory and punitive damages, attorneys' fees, interest and costs, and all other relief as the Court deems just and proper.  Amended Complaint at 47-48.

Generally, Plaintiff claims this Court has subject matter jurisdiction over Plaintiff's claims under the Eighth and Fourteenth Amendments to the United States Constitution and under the ADA and the RA.   Amended Complaint at 2.   Defendant Jones asserts the ADA and RA claim should fail because the allegations in the Amended Complaint do not state the decedent was deprived or denied any specific program or service, particularly at UCI. Defendants' Motion at 16.   In addition, Defendant Jones contends Plaintiff's claim for monetary damages is barred pursuant to the Eleventh Amendment because there is no specific allegation of a violation of rights under the Fourteenth Amendment.   Id.

"Section 504 of the RA states that '[n]o otherwise qualified individual with a disability in the United States ... shall, solely

by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....' 29 U.S.C. § 794(a)." Crane v. Lifemark Hosps., Inc., 898 F.3d 1130, 1134 (11th Cir. 2018). Under the RA, "a plaintiff may demonstrate discriminatory intent through a showing of deliberate indifference." Wilson v. Smith, 567 F. App'x 676, 679 (11th Cir. 2014) (per curiam) (quoting Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 345 (11th Cir. 2012)). In order to satisfy the requirement of showing deliberate indifference in this context, a plaintiff must demonstrate "the defendant knew that harm to a federally protected right was substantially likely and ... failed to act on that likelihood." Id. (quoting Liese, 701 F.3d at 344).

In Count IV, Plaintiff also relies on the ADA. Of import:

> Congress passed The Americans with Disabilities Act of 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (1990). Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (1990).

> The statutory language of the ADA "unmistakably includes State prisons and prisoners within its coverage." Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 209, 118 S.Ct.

48

1952, 141 L.Ed.2d 215 (1998). To bring a claim under Title II of the ADA, the plaintiff must allege: (1) he is a "qualified individual with a disability"; (2) he was "excluded from participation in or ... denied the benefits of the services, programs, or activities of a public entity" or otherwise "discriminated [against] by such entity"; (3) "by reason of such disability." <u>Shotz v. Cates</u>, 256 F.3d 1077, 1079 (11th Cir. 2001).

A "qualified individual with a disability" is defined under the ADA as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2) (1990). For purposes of the ADA, a disability is:" [sic] (A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2) (1990).

When evaluating whether an impairment substantially limits a major life activity, courts consider: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." <u>Gordon v. E.L. Hamm & Assoc., Inc.</u>, 100 F.3d 907, 911 (11th Cir. 1996). However, "[a] physical impairment, standing alone ... is not necessarily a disability as contemplated by the ADA." <u>Id</u>.

<u>Hodge v. McNeil</u>, No. 08-23440-CIV, 2011 WL 3101781, at *2-3 (S.D. Fla. July 25, 2011).

Plaintiff can seek monetary damages under Title II of the ADA. A state prison is a public entity, and "Title II authorizes suits by private citizens for money damages against public entities that violate § 12132." James v. Campbell, No. 2:05cv451-MHT (WO), 2007 WL 2083690, at *5 (M.D. Ala. July 19, 2007) (citations omitted) (James raised claims concerning the unconstitutional conditions of confinement at a state correctional facility and the deprivation of adequate medical care under the Eighth Amendment as well as the ADA). "The Supreme Court has held that because the Fourteenth Amendment grants Congress the power to enforce its provisions, Title II of the ADA validly abrogates state sovereign immunity to the extent that it creates a cause of action for damages against states for conduct that violates the Fourteenth Amendment." Redding v. Georgia, 557 F. App'x 840, 844 (11th Cir. 2014) (per curiam) (citing United States v. Georgia, 546 U.S. 151, 158-59 (2006)).

In the Amended Complaint, Plaintiff alleges the decedent had a mental impairment, qualifying him as disabled. Amended Complaint at 44. Plaintiff states the decedent "suffered mental impairments that substantially limited one or more of his major life activities." Id. (footnote omitted). Of course, Plaintiff will have to show that the decedent was denied reasonable accommodation by reason of his disability or was otherwise discriminated against by Jones in her official capacity as Secretary of the FDOC. See

<u>James v. Campbell</u>, No. 2:05cv451-MHT (WO), 2007 WL 2083690, at *6 (finding, under the ADA, the inmate must establish he is a qualified individual with a disability under the ADA and has been denied reasonable accommodation by reason of any disability or was otherwise discriminated against).  As noted in <u>United States v. Georgia</u>, 546 U.S. at 157 (citations omitted), "it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted 'exclu[sion] from participation in or . . . den[ial of] the benefits of' the prison's 'services, programs, or activities.'"

This sentiment is further addressed in the concurring opinion in <u>United States v. Georgia</u>, 546 U.S. at 161 (Stephens, J., and Ginsburg, J., concurring), recognizing Congress decided to extend Title II's protection to prison inmates, and noting this extension was "not limited to violations of the Eighth Amendment."  Although cases involving inadequate medical care and inhumane conditions have probably been the most numerous of ADA cases, other access and accommodation claims have certainly been recognized.  <u>Id</u>. at 162.

To the extent Defendant Jones is asserting the Eleventh Amendment bars Plaintiff's ADA claim because it relies on the Eighth Amendment rather than the Fourteenth, such a contention is without merit.  For example, in <u>Mitchell v. Williams</u>, No. 6:15-cv-

93, 2016 WL 723038, at *1 (S.D. Ga. Feb. 22, 2016), a Georgia

inmate who contracted Hepatitis C while in prison and complained of

lack of treatment, raised a claim pursuant to Title II of the ADA

against the Georgia Department of Corrections.  The district court

opined:

> Unlike Section 1983, Title II of the ADA abrogates state sovereign immunity insofar as the Act creates a private cause of action against the States for conduct that violates both the ADA and the Fourteenth Amendment. United States v. Georgia, 546 U.S. 151 (2006); Black v. Wigington, No. 15-10848, 2016 WL 278918, at *8 (11th Cir. Jan. 22, 2016). The Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee against cruel and unusual punishment. Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463 (1947). Accordingly, the Department of Corrections is not immune from Plaintiff's ADA claims.

Mitchell v. Williams, No. 6:15-CV-93, 2016 WL 723038, at *3.

Thus, Plaintiff, in this case, has plausibly raised a claim of

discriminatory medical and mental health care, claiming a denial of

departmental services, programs, and care to the decedent by reason

of his being mentally ill.  He may seek compensatory damages under

Title II of the ADA.  Notably, Plaintiff's request for punitive

damages for alleged violations of the ADA and RA is foreclosed by

law.  Taylor v. Thomas, No. 2:14-cv-345-WHA, 2017 WL 2117030, at

*10 (M.D. Ala. April 12, 2017) (citation omitted), report

and recommendation adopted by No. 2:14-cv-345-WHA, 2017 WL 1758073

(M.D. Ala. May 4, 2017).  See Barnes v. Gorman, 536 U.S. 181, 189

(2000) (finding punitive damages are unavailable under Title II of the ADA or section 504 of the RA); <u>Ortega v. Bibb Cnt'y School Dist.</u>, 431 F.Supp.2d 1296, 1299 (M.D. Ga. 2006) (finding damage remedies available, but not punitive damages).  Thus, Plaintiff's claims for punitive damages under the ADA and RA are due to be dismissed.

Accordingly, it is now

**ORDERED:**

1.    Defendants Julie Jones and Kevin D. Jordan's Motion to Dismiss Counts I, II and IV of the Amended Complaint (Doc. 34) is **DENIED.**

2.    Defendant Corizon Health, Inc.'s Motion to Dismiss the Plaintiff's Amended Complaint (Doc. 35) is **DENIED.**

3.    The Court hereby **dismisses** Plaintiff's claim for punitive damages under the ADA and RA.

4.    Defendants Julie Jones, Mark S. Inch (in his official capacity), Defendant Kevin D. Jordan, and Corizon shall respond to the Amended Complaint by **April 30, 2019.**

**DONE AND ORDERED** at Jacksonville, Florida, this 28th day of March, 2019.

_____
BRIAN J. DAVIS
United States District Judge

sa 3/21
c:
Counsel of Record