## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| LORINE GAINES, as survivor of VINCENT GAINES; RUBIN SIMPSON and EVETT SIMMONS, as Personal Representatives of the Estate[1] | Case No. 3:18-cv-01332-BJD-PDB |
|       Plaintiffs, | |
|               v. | |
| MARK S. INCH, in his official capacity; JULIE JONES, individually; DIANE ANDREWS, individually; DONALD CHRISTOPHER RAY ROSIER, individually; RUSTY JAMES ANDERSON, individually; CORIZON HEALTH, INC.; ELLIOT PEREZ-LUGO, M.D., individually; BIH TAMBI, M.D., individually; ERICKA BISKIE, PsyD, individually; and KELLEY C. SANDERS, PhD, individually. | |
|       Defendants. | |

## SECOND AMENDED COMPLAINT

1.      Plaintiffs putative LORINE GAINES, as surviving mother of Decedent VINCENT GAINES, and RUBIN SIMPSON and EVETT SIMMONS, as Personal Representatives of the Estate[2] (collectively "Plaintiffs"), bring this action to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to the Decedent by the Civil Rights Act, provisions of the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Rehabilitation Act").  Mr. Gaines was denied and deprived entirely of

---

[1] Plaintiffs Simpson and Simmons are putative co-Personal Representatives of the Estate, pending a final order from the probate court.
[2] *Id.,* n. 1.

adequate nutrition and treatment for his serious basic, medical, and mental health needs during a critical period, which resulted in hyponatremia, malnutrition, starvation, and death.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over Plaintiffs' civil rights claims pursuant to 28 U.S.C. §§ 1331 and 1343, which prescribe the authority of the Federal District Courts to exercise jurisdiction over claims arising under the United States Constitution, laws, or treaties of the United States, and to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution of the United States.

3.      Accordingly, this Court has subject matter jurisdiction over Plaintiffs' claims under the Eighth and Fourteenth Amendments to the Constitution of the United States and under the Americans with Disabilities Act, 42 U.S.C. § 12102 *et seq.* and the Rehabilitation Act, 29 U.S.C. § 701 *et seq*.

4.      Venue is proper in the United States District Court for the Middle District of Florida under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred within this district, as set forth below.

5.      All conditions precedent to the filing of this action have occurred, been performed, or have been waived.

## PARTIES

6.      Plaintiff LORINE GAINES is an adult resident of Palm Beach County, Florida. She is the surviving mother of the Decedent.

2

7.    Plaintiff RUBIN SIMPSON is an adult resident of Palm Beach County, Florida. He is a putative co-Personal Representative acting on behalf of the Estate of Vincent Gaines.[3]

8.    Plaintiff EVETT SIMMONS is an adult resident of Palm Beach County, Florida. She is a putative co-Personal Representative acting on behalf of the Estate of Vincent Gaines.[4]

9.    Defendant MARK S. INCH is the Secretary of the Florida Department of Corrections ("FDOC"), the state agency that manages correctional facilities in the State of Florida.  FDOC is the third largest state prison system in the country with a budget of $2.7 billion, incarcerating approximately 96,000 prisoners and overseeing nearly 166,000 offenders on active community supervision.[5] From 2012 to 2016,[6] FDOC contracted with Defendant Corizon Health, Inc. to provide medical and mental health care to all prisoners in FDOC's custody.  At all times material hereto, Mr. Gaines, as an incarcerated individual, was under the custody and control of FDOC and had received medical and mental health care from Corizon. FDOC receives federal financial assistance and is subject to the Rehabilitation Act.  FDOC is also a public entity within the meaning of Title II of the ADA.  Defendant Inch has ultimate responsibility for the promulgation and implementation of FDOC policies, procedures, and

---

[3] *Supra,* n. 1.
[4] *Supra,* n. 1.
[5] *See* "About the Florida Department of Corrections", http://www.dc.state.fl.us/about.html (last accessed: Sept. 5, 2019).
[6] Corizon's contract with FDOC was the subject of litigation that led to an injunction from December 4, 2012 until June 5, 2013.  The contract resumed on July 1, 2013 until Corizon's early termination of the contract.  *See* Pat Beall, *Corizon's prison health care pullout follows withering report,* Palm Beach Post (Dec. 2, 2015), *available at* https://www.mypalmbeachpost.com/news/crime--law/corizon-prison-health-care-pullout-follows-withering-report/AZnYZ6DryKaoWzpKsN2hkM/

practices and for the management of FDOC.  Defendant Inch is an employee or agent of FDOC and is acting within the scope and course of his employment under color of state law.  Defendant Inch is sued in his official capacity.

10.     Defendant JULIE JONES was the Secretary of FDOC during Mr. Gaines' incarceration, and previously had all the responsibilities currently borne by Defendant Inch with respect to FDOC.  At all material times hereto, she was an employee or agent of FDOC and was acting within the scope and course of her employment under color of state law.  Defendant Jones is sued in her individual capacity.

11.     Defendant DIANE ANDREWS is an adult resident of the State of Florida, who at all times material hereto worked for FDOC and was charged with implementing, enforcing and following its laws, rules, regulations, and policies, and providing access to mental health and medical care for prisoners in the custody of FDOC.  At all relevant times, Defendant Andrews was the Warden of Union Correctional Institution ("Union CI"), where Mr. Gaines was housed immediately before his death.  She was responsible for the implementation of all policies, procedures, customs, as well as the training and supervision of FDOC staff at Union CI regarding the adequate provision of hygiene, nutrition, and access to medical and mental health treatment for prisoners there.  Defendant Andrews was also, at all material times hereto, the final administrative decision maker with respect to all grievances filed by prisoners at Union CI.  At all times relevant hereto, Andrews acted under color of law and within the scope of employment.  She is sued individually.

12.     Defendant DONALD CHRISTOPHER RAY ROSIER is an adult resident of the State of Florida, who at all times material hereto worked for FDOC and was charged with

implementing, enforcing and following its laws, rules, regulations, and policies, and providing access to medical and mental health care for prisoners in the custody of FDOC.  At all relevant times, Defendant Rosier was a Sergeant at Union CI, where Mr. Gaines was incarcerated at the time of his death, and was responsible for providing mentally ill prisoners like Mr. Gaines adequate hygiene, nutrition, and access to medical and mental health treatment.  In addition to this personal responsibility, as a Sergeant, Defendant Rosier was also responsible for supervising subordinate officers at Union CI to ensure that they also provided prisoners with adequate hygiene, nutrition, and access to medical and mental health treatment.  At all times relevant hereto, Defendant Rosier acted under color of law and within the scope of employment.  He is sued individually.

13.    Defendant RUSTY JAMES ANDERSON is an adult resident of the State of Florida, who at all times material hereto worked for FDOC and was charged with implementing, enforcing and following its laws, rules, regulations, and policies, and providing access to medical and mental health care for prisoners in the custody of FDOC.  At all relevant times, Defendant Anderson was a Corrections Officer at Union CI, where Mr. Gaines was incarcerated at the time of his death, and was responsible for providing mentally ill prisoners like Mr. Gaines adequate hygiene, nutrition, and access to medical and mental health treatment.  At all times relevant hereto, Defendant Anderson acted under color of law and within the scope of employment.  He is sued individually.

14.    Defendant CORIZON HEALTH, INC. ("Corizon") is a Tennessee Corporation registered in the State of Florida that contracted with correctional agencies, including FDOC, to provide medical and mental health care to prisoners.  At all times material hereto, it was acting

under color of law and was responsible for the promulgation and enforcement of rules, regulations, policies, and practices regarding providing access to and the administration of medical and mental health treatment to prisoners in the custody of FDOC.  Corizon was responsible for ensuring that prisoners were not denied medical care and mental health and received such treatment in a timely and adequate manner.  Corizon was also responsible for the staffing, employment, qualifications, training, supervision, discipline, and conduct of its employees and agents within FDOC facilities.   In failing to end policies/practices such as understaffing, incomplete/inaccurate medical charting, not intervening in the ghost tray practice, as well as not preventing other unconstitutional customs and practices of its employees and agents that resulted in Mr. Gaines' death, Corizon is independently liable and sued on that basis.

15.    Defendant ELLIOT PEREZ-LUGO, M.D., is an adult resident of the State of Florida who, at all times material hereto, was a physician employee or agent of Corizon, and was the Medical Director of Union CI during Mr. Gaines' incarceration there.  He had a duty to enforce the rules, regulations, policies and practices, either formally or by custom, as to prisoners in the custody of the FDOC, and was responsible for the training and supervision of other Corizon employees or agents.  Dr. Perez-Lugo was responsible for ensuring that the prisoner population was not denied necessary and adequate mental health and/or medical treatment and that the prisoners received such treatment in a timely manner.  Dr. Perez-Lugo was also the attending physician on the day of Mr. Gaines' death and, as such, was responsible for both providing and supervising the appropriate level of medical intervention performed on the decedent in Union CI's Urgent Care Area.  At all times material hereto, Dr. Perez-Lugo was acting under color of law and within the scope of employment.  He is sued individually.

16.     Defendant BIH TAMBI, M.D., is an adult resident of the State of Florida who, at all times material hereto, was a physician employee or agent of Corizon, and who treated Mr. Gaines while he was incarcerated at Union CI.  She had a duty to enforce the rules, regulations, policies and practices, either formally or by custom, as to prisoners in the custody of the FDOC, and was responsible for the training and supervision of other Corizon employees or agents.  Dr. Tambi was responsible for ensuring that the prisoner population was not denied necessary and adequate medical and/or mental health treatment—including the appropriate provision of medications—and that they received such treatment in a timely manner.  At all times material hereto, Dr. Tambi was acting under color of law and within the scope of employment.  She is sued individually.

17.     Defendant ERICKA BISKIE, PsyD, is an adult resident of the State of Florida who, at all times material hereto, was a psychologist employee or agent of Corizon, and who treated Mr. Gaines while he was incarcerated at Union CI.  She had a duty to enforce the rules, regulations, policies and practices, either formally or by custom, as to prisoners in the custody of the FDOC, and was responsible for the training and supervision of other Corizon employees or agents.  Dr. Biskie was responsible for ensuring that the prisoner population was not denied necessary and adequate mental health treatment and that they received such treatment in a timely manner.  In addition to this personal responsibility, as a Supervising Psychologist, Defendant Biskie was also responsible for supervising other mental health staff at Union CI to ensure that they also provided mentally ill prisoners at Union CI adequate and necessary mental health treatment in a timely manner.  At all times material hereto, Dr. Biskie was acting under color of law and within the scope of employment.  She is sued individually.

18.     Defendant KELLEY C. SANDERS, PhD, is an adult resident of the State of Florida who, at all times material hereto, was a psychologist employee or agent of Corizon who treated Mr. Gaines while he was incarcerated at Union CI.  She had a duty to enforce the rules, regulations, policies and practices, either formally or by custom, as to prisoners in the custody of the FDOC, and was responsible for the training and supervision of other Corizon employees or agents.  Dr. Sanders was responsible for ensuring that the prison population was not denied necessary and adequate mental health treatment and that they received such treatment in a timely manner.  At all times material hereto, Dr. Sanders was acting under color of law and within the scope of employment.  She is sued individually.

## FACTUAL ALLEGATIONS

### CORIZON AND FDOC'S HISTORY OF MISTREATING MENTALLY ILL PRISONERS

#### Alabama

19.     On June 17, 2014, a class of mentally ill and disabled prisoners within the Alabama Department of Corrections ("ADOC") filed a class action lawsuit against Corizon for "ignoring [their] medical and mental health needs and discriminating against prisoners with disabilities."[7]  *See Braggs v. Dunn,* 257 F. Supp. 3d 1171, 1267-68 (M.D. Ala. 2017).  ADOC had contracted with Defendant Corizon to provide medical care to prisoners in its facilities.

20.     The mental health care administered by ADOC through its contract with

---

[7] "Active case: Braggs, et al. Dunn, et al." Southern Poverty Law Center, https://www.splcenter.org/seeking-justice/case-docket/braggs-et-al-v-jefferson-dunn-et-al (last accessed Aug. 26, 2019).

Defendant Corizon was found to be "horrendously inadequate…[in]:

  (1) Failing to identify prisoners with serious mental-health needs and to classify their needs properly;

  (2) Failing to provide individualized treatment plans to prisoners with serious mental-health needs;

  (3) Failing to provide psychotherapy by qualified and properly supervised mental-health staff and with adequate frequency and sound confidentiality;

  (4) Providing insufficient out-of-cell time and treatment to those who need residential treatment; and failing to provide hospital-level care to those who need it;

  (5) Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to those who are suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis;

  (6) Imposing disciplinary sanctions on mentally ill prisoners for symptoms of their mental illness, and imposing disciplinary sanctions without regard for the impact of sanctions on prisoners' mental health;

  (7) Placing seriously mentally ill prisoners in segregation without extenuating circumstances and for prolonged periods of time; placing prisoners with serious mental-health needs in segregation without adequate consideration of the impact of segregation on mental health; and providing inadequate treatment and monitoring in segregation.

    21.    Defendant Corizon's contract with ADOC was later rescinded in March 2018 when Alabama's Governor signed a new contract with a different medical provider.[8]

_____

[8] Mike Cason, *Gov. Kay Ivey signs contract for health care in Alabama prisons,* AL.com (Mar. 19, 2018), *available at*

**Arizona**

22.     On March 22, 2012, prisoners filed a federal class action lawsuit against the Arizona Department of Corrections ("ADC") and its personnel alleging violations in the provision of medical, mental health, and dental care in Arizona Prisons.  In addition, the plaintiffs cited chronic understaffing of necessary personnel along with inadequate evaluation and screening policies to ensure time access to these services.  *See Parsons v. Ryan, et al,* No. 2:12-cv-00601 (D. Ariz. Mar. 22, 2012).

23.     Beginning in July of that year, the state began contracting with private entities for the provision these services.

24.     On March 3, 2013, Corizon was awarded the contract, taking over from another provider, Wexford Health Services.  *See Parsons v. Ryan,* 754 F.3d 657, 662 (9th Cir. 2014) (affirming district court's certification of plaintiff class and subclass).   Nevertheless, the constitutionally violative deficiencies in the provision of care continued.

25.     In October 2014, the parties entered into a settlement on behalf of more than 33,000 prisoners, requiring "ADC to meet more than 100 health care performance measures" including changes to the use of solitary confinement for prisoners with mental illness to facilitate "mental health treatment and other programming."[9]

26.     However, ADC and Corizon were failed to fulfill their obligations under the

---

https://www.al.com/news/index.ssf/2018/03/gov_kay_ivey_signs_contract_fo.html.
[9] ACLU of Arizona, *Parsons v. Ryan: An update for people in prison and their loved ones,* *available at* https://www.acluaz.org/en/cases/parsons-v-ryan.

agreement, resulting.  As a result, the magistrate judge overseeing the progress of the settlement fining the state $1.4 million "for failing to meet health care standards in state prisons." Additionally, the Court "appointed an independent monitor to oversee the prison health care process after determining the state could not be trusted to monitor its contract with Corizon."[10]

27.    On or about January 18, 2019 ADC terminated its contract with Corizon, effective July 1, 2019, after the state blamed Corizon for failing to comply with the *Parsons* settlement agreement.[11]

### Oregon

28.    On February 11, 2013, while detained at the Lane County Jail in Eugene, Oregon, a suicidal and paranoid schizophrenic prisoner, Kelly Conrad Green II, rammed himself head-first into a cinder block wall.[12]  *See Johnson v. Corizon Health Inc*., No. 6:13-cv-1855-TC, 2015 WL 1549257, at *8 (D. Or. April 6, 2015).

29.    Believing he was faking the resultant paralysis, Defendant Corizon's medical staff did not conduct a full neurological examination, nor did they call for an EMT.[13]

---

[10] Jimmy Jenkins, *Federal Judge Fines Arizona $1.4 Million In Prison Health Case*, 91.5 KJZZ (Jun. 22, 2018), *available at* https://kjzz.org/content/661544/federal-judge-fines-arizona-14-million-prison-health-case.

[11] Jimmy Jenkins, *Corizon Health Loses Arizona Prison Health Care Contract* (Jan. 19, 2019), *available at* https://kjzz.org/content/750863/corizon-health-loses-arizona-prison-health-care-contract.

[12] Mark Wilson, *Mentally Ill Oregon Prisoner's Wrongful Death Suit Settles for $7.4 Million,* Prison Legal News (Sept. 2016), *available at* https://www.prisonlegalnews.org/news/2016/sep/2/mentally-ill-oregon-prisoners-wrongful-death-suit-settles-74-million/.

[13] *Id. Supra,* n. 12.

30.      After Mr. Green lost control of his bowels, a symptom of a spinal injury which Defendant Corizon's staff failed to note in his medical file, jail and Corizon staff left him "naked, soiled, and motionless"[14] in a segregation cell instead of cleaning and changing his clothes.

31.      Some six hours after the injury, Corizon's staff eventually called for an ambulance, but because of the lapse in time, and despite undergoing surgery, Mr. Green became a ventilator-dependent quadriplegic and died 10 months after the injury.[15]

32.      The Lane County Jail terminated its contract with Defendant Corizon in mid-2015.  In July of that year, Corizon and county officials settled the lawsuit brought by Mr. Green's estate, with Corizon paying $7 million and Lane County paying $400,000.[16]

### Florida

33.      On June 23, 2012, mentally ill prisoner Darren Rainey was locked in a blistering hot shower by FDOC corrections officers at Dade Correctional Institution ("Dade CI") in Miami.[17]  *See Chapman v. Fla. Dep't of Corr., Corizon, LLC, et al.*, No. 14-23323-Civ-Scola, 2018 WL 5313881, at *3 (S.D. Fla. Oct. 26, 2018).

34.      Mr. Rainey suffered from severe schizophrenia, and this inhumane treatment was

---

[14] *Id. Id* at n. 12.

[15] *Id.*; *Id.* at n. 12; The Associated Press, *Lane County Jail's medical provider settles suit over inmate's wrongful death,* The Oregonian (Aug. 4, 2015), https://www.oregonlive.com/pacific-northwest-news/index.ssf/2015/08/lane_county_jails_medical_prov.html

[16] Mark Wilson, *supra* at n. 12.

[17] Julie K. Brown, *Florida OKs $4.5 million payout for brutal prison shower death of Darren Rainey,* The Miami Herald (Jan. 26, 2018), https://www.miamiherald.com/news/special-reports/florida-prisons/article196797554.html

devised as a punishment by FDOC guards against prisoners who misbehaved in Dade CI's mental health unit.[18]

35.     After screaming and begging to be released from the stall for nearly two hours, Mr. Rainey collapsed and died, his skin peeling off his body.[19]

36.     Inexplicably, according to the FDOC Office of the Inspector General's ("OIG's") report released two months later, the cause of Mr. Rainey's death was undetermined—it was not until a whistle-blower prisoner, Harold Hempstead, an orderly at Dade CI's Transitional Care Unit, turned to The Miami Herald that the matter was re-investigated.[20]

37.     Mr. Rainey's family filed a civil rights lawsuit, on the basis that FDOC "knew about widespread abuse by correctional officers upon inmates with mental illness" and that "staff employed by Corizon had knowledge of the abuse by correctional officers."[21]

38.     FDOC and Corizon eventually settled the case with Mr. Rainey's family for a total of $4.5 million dollars.[22]

39.     On January 30, 2018, Disability Rights Florida, Florida Legal Services, and private counsel filed a class-action lawsuit seeking injunctive and declaratory relief against FDOC for violating the Eighth Amendment, ADA, and RA rights of mentally ill prisoners inside

---

[18] *Id. Id.,* n. 17.
[19] *Id. Id.,* n. 17.
[20] Laura Cepero, *Will Lawsuits and Exposés Lead to Reform of Florida's Brutal Prisons?,* Prison Legal News (Feb. 2016), *available at* https://www.prisonlegalnews.org/news/2016/feb/2/will-lawsuits-and-exposes-lead-reform-floridas-brutal-prisons/
[21] *Id.,* n. 20.
[22] Julie K. Brown, *supra* at n. 17.

its facilities—violations that were again facilitated by FDOC's contract with Corizon. *See Disability Rights of Florida, Inc. v. Julie Jones and the Fla. Dep't. of Corr.*, No. 3:18-cv-179-J-20JRK, Dkt. # 10 (M.D. Fla. Jan. 30, 2018) (settlement agreement).

40.     The lawsuit focused on the inadequate inpatient treatment of mentally ill prisoners at several of FDOC's facilities, including at Union CI.  Notably, the allegations cover the period of time when Mr. Gaines was incarcerated at Union CI, and focuses on FDOC's general lack of treatment for mentally ill prisoners:  exposure to excessive isolation and segregation; the lack of sufficient qualified clinical staff at inpatient units; inadequate supervision of prisoners on self-harm observation status ("SHOS");[23] inappropriate treatment settings; and disciplinary punishment for behavior caused by mental illness.

41.     Many of the prisoners referenced in the lawsuit died as a result of FDOC's failure to oversee appropriate treatment.  Mr. Gaines similarly died at Union CI as a consequence of the lack of treatment and care by FDOC and Corizon.

42.     On February 8, 2018, the District Court approved a settlement agreement between the parties requiring FDOC to correct a myriad of deficiencies in the provision of mental health care for its prisoners.

43.     On or about November 30, 2015, Defendant Corizon announced it would walk away from the remaining portion of its contract with FDOC; it ended operations in Florida

---

[23] SHOS is a clinical status ordered by the attending clinician that provides for safe housing and close monitoring of patients who are determined to be suicidal or at risk for serious self-injurious behavior by mental health staff, or in the absence of mental health staff, by medical staff.

prisons sometime in 2016.[24]

### FDOC's History with Inadequate Investigations, Cover-ups, and Retaliation Related to Prisoner Deaths

44.     On or about September 19, 2010, officers at Franklin Correctional Institution refused to provide medical intervention to Randall Jordan-Aparo, a 27-year old man who was serving a 19 month sentence for credit card fraud and drug possession.

45.     Mr. Jordan-Aparo "had a congenital blood disorder that, among other symptoms, caused pulmonary and breathing complications."[25]

46.     Nevertheless, because he had "disrespected a nurse",[26] FDOC personnel denied him access to adequate medical attention as his condition worsened over the next few months, until "officers fired nine blasts of noxious gas into his 13-by-8 cell through a slot in the door and, ultimately, left him there, sobbing."[27]  Officers ignored his subsequent pleas for help and that he could not breathe; five hours later, Mr. Jordan- Aparo was found face-down dead on the floor. "His mouth and nose were pressed to the bottom of the door, as if trying to gulp fresh air through the thin crack."[28]

---

[24] *See also* Pat Beall, *supra* at n. 6.

[25] Karl Etters, *Family of inmate who was gassed, killed settles with DOC for $850k*, The Tallahassee Democrat (Apr. 2, 2019), *available at* https://www.tallahassee.com/story/news/2019/04/02/family-killed-inmate-randall-jordan-aparo-settles-florida-doc/3341533002/.

[26] *Id.* at n. 25.

[27] Julie K. Brown, *After Florida inmate's lethal gassing, claims of cover-up*, The Miami Herald (Aug. 30, 2014), *available at* https://www.miamiherald.com/news/politics-government/article1985286.html.

[28] *Id.* at n. 27.

47.     In the immediate aftermath, FDOC's OIG found no evidence of wrongdoing, listing Mr. Jordan-Aparo's death as being from "natural causes", despite the fact that his entire body was covered by the faint orange residue of the agent he was gassed with.  A subsequent investigation by the Florida Department of Law Enforcement also failed to result in any criminal charges.

48.     Sometime later, several investigators within FDOC's OIG began re-examining the internal investigation into Mr. Jordan-Aparo's death.  Finding errors in FDOC's handling of the inquiry, their attempts to report these irregularities to then-inspector general Jeffery Beasley were not only met with inaction, but with retaliation—all three investigators were themselves placed under numerous internal investigations and moved out of their offices.[29]

49.     The former investigators filed a whistleblower lawsuit in Leon County Circuit Court.  *See Land v. Fla. Dep't of Corrs.*, No. 2015-CA-002223 (Fla. 2nd Cir. Ct. 2015).

50.     In June 2016, "a state panel ruled that [FDOC] violated its own policies by stacking up allegations against one of the investigators, Doug Glisson, and spending more time investigating him on bogus charges than actually investigating claims of inmate abuse, such as the case of Jordan-Aparo."[30]

51.     On September 19, 2016, the mother of Mr. Jordan- Aparo's 12 year old daughter

---

[29] Mary Ellen Klas, *Florida to pay prison whistleblowers $800,000 to end lawsuit,* The Miami Herald (Nov. 29, 2016), *available at* https://www.miamiherald.com/news/state/florida/article117760868.html.

[30] Julie K. Brown, *As Florida inmate begged for help, guards gassed him to death, suit says*, The Charlotte Observer (Sept. 19, 2016), *available at* https://www.charlotteobserver.com/latest-news/article102835767.html.

filed a federal lawsuit[31] against FDOC and medical personnel, alleging that "that the officers who gassed Jordan-Aparo, as well as the doctors and nurses at the prison, lied on their reports" and that then-warden, Defendant Diane Andrews, "prevented investigators from interviewing witnesses [and] gave the go-ahead to gassing Jordan-Aparo, even though his medical records stated that he suffered from a disability that made it difficult for him to breathe."[32]

52.     The suit further alleged that Warden Andrews "filed a false Incident Report averring that the use of force against Aparo was in compliance with FDOC regulations and policies."[33]   In addition, Andrews purportedly disciplined the sister of a prisoner witness, Christina Bullins—who was an FDOC employee—for contacting FDOC OIG inspectors "concerning her fear that her brother would be retaliated against in connection with his status as a witness in the Aparo killing."[34]

53.     Ultimately, while Defendant Andrews was aware from at least 2011 that there were unresolved questions about Mr. Jordan-Aparo's death,[35] upon information and belief, she took no action to independently ensure a thorough investigation and that the officers involved in the incident would be held accountable.

54.     On or about November 29, 2016, the state settled the whistleblower claims brought by the former FDOC OIG investigators for $800,000 and the retaliation claims brought

---

[31] *Cimillo v. Austin, et al,* No. 4:16-cv-00584 (N.D. Fla. Sept. 19, 2016).
[32] *Supra,* n. 30.
[33] *See* Third Amended Complaint, *Cimillo v. Austin, et al,* No. 4:16-cv-00584 (N.D. Fla. Oct. 11, 2017) (Dkt. 97).
[34] *Supra,* n. 31 at ¶ 39.
[35] *Supra,* n. 30.

by Christina Bullins for $50,000.[36]

55.     On or about September 12, 2018, the state also settled the suit brought by his family for the death of Randall Jordan-Aparo for $850,000.[37]

### FDOC AND CORIZON'S SUBSTANDARD TREATMENT OF MENTALLY ILL PRISONERS AT UNION CI AND THE AWARENESS OF SUCH INADEQUATE TREATMENT

56.     As a result of federal litigation brought by FDOC prisoners due to inadequate medical care and overcrowding,[38] the Florida legislature created the Correctional Medical Authority (CMA).

57.     Created in 1986,

> [t]he CMA's purpose is to assist in the delivery of health care services for inmates in the Department of Corrections (DOC) by advising the Secretary of Corrections of the professional conduct of primary, convalescent, dental, and mental health care and the management of cost consistent with quality care.[39]

58.     To achieve its objective, the CMA monitors health care services and conducts independent physical and mental health care surveys at each Florida prison every three years, issuing survey reports of its results.

---

[36] *Supra,* n. 29.

[37] *Supra,* n. 25.

[38] *See Costello v. Wainwright,* 397 F. Supp. 20 (M.D. Fla. 1975); 430 U.S. 325 (1977) (reversing Fifth Circuit order reversing district court order granting preliminary injunction reducing FDOC prison population due to, *inter alia,* inadequate medical care); Defs'. Rev'd Offer of Judgment, *Osterback v. McDonough,* No. 97-cv-2806 (M.D. Fla. 2001) (minimizing potentially harmful effects of Close Management).

[39] "Correctional Medical Authority (CMA)", https://www.flgov.com/correctional-medical-authority-cma/ (last accessed: Aug. 26, 2019).

59.     The CMA's survey reports are monitored via Corrective Action Plans ("CAPs") for each facility "until the facilities are in compliance with accepted community standards."[40]

60.     Between 2013 and 2015, at Union CI specifically, the CMA's surveys reflected—and its ensuing CAP assessments determined—that the mental health care services provided at Union CI were not in compliance with accepted community standards.

61.     First, the CMA survey conducted in 2013 indicated that Union CI had considerable staffing shortages: only 14 of 63 nursing positions were filled at the time.

62.     In addition, the survey revealed that "[i]nmates with mental health issues may receive multiple disciplinary reports, sometimes because of difficulty following rules and functioning in the general population, which can result in placement in close management." [41]

63.     Moreover, the CMA survey indicated that of the twenty-two prisoners housed in confinement, general population, and inpatient mental health units at Union CI, nine reported that "ghost trays" were given to some inmates during mealtimes while in confinement or inpatient mental health units.[42]   The report noted that these allegations were documented in an

---

[40] *Id.,* n. 39.

[41] According to FDOC, close management "refers to the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate through his/her own behavior has demonstrated an inability to live in the general population without abusing the rights and privileges of others."  Fla. Dep't of Corr., "Impact of the 'Rethinking Personal Choice Program: September 2002'" *available at* http://www.dc.state.fl.us/pub/RPChoice/intro.html.

[42] The survey defined "ghost trays" as empty Styrofoam containers that should contain a meal. Appropriately, the CMA's psychiatrist surveyor expressed a concern with this practice, specifically for prisoners taking psychotropic medication, as food and water deprivation can increase the likelihood of seizures.

inpatient mental health record.

64.     Furthermore, the same CMA survey documented that the only available cell to be utilized for a prisoner SHOS admission had dried blood on the walls, and other cells had standing water and black mold in them.

65.     As the agency subject to review by the CMA, FDOC was aware of and responsible for the above issues noted in the CMA's survey.

66.     Upon information and belief, as the head of FDOC at the time, Defendant Jones was made personally aware of the issues as reported in the CMA's survey.

67.     Upon information and belief, as the warden of Union CI prior to and during Mr. Gaines' incarceration there, Defendant Andrews would have been made personally aware of the issues reported in the CMA's survey.

68.     The CMA's 2014 CAP assessments for Union CI found that:

a.      Union CI remained deficient in post-discharge evaluation of prisoners previously under SHOS;

b.      Written referrals to mental health staff were not present in the records of prisoners subjected to Union CI's use of force protocol;

c.      In some instances involving the use of force protocol at Union CI, there was no indication that mental health staff interviewed prisoners the next working day to determine the level of mental health care needed going forward;

d.      Prisoners who requested mental health intervention were not seen by mental health staff at Union CI as indicated in the response to the requests;

e.      In some cases, the Individualized Service Plans initiating mental health treatment where not signed by prisoners as required;

f.      In some of  Union CI's treatment records, there was no evidence of a behavioral level review or such a review was not reviewed by

staff in the appropriate timeframe; and

g.      For prisoners in the Crisis Stabilization Unit, the risk assessment for violence was not present in their treatment records;

69.      Another inspection team's report again informed Defendant Jones about poor medical and mental health care in FDOC facilities.  Jones "responded within 72 hours, insisting on more staff, more training, more state oversight, more specialist appointments"[43], indicating that she was personally aware of the issues with the provision of medical and mental health care by Defendant Corizon.

70.      On April 20, 2016, a CAP assessment conducted jointly by CMA staff and FDOC staff based on Union CI's 2015 records revealed that "of the 67 total items reviewed pertaining to inpatient mental health issues, 47 fell at or below 80 percent compliance, resulting in an overall non-compliance rate of 70 percent."[44]

71.      As the agency subject to review by the CMA, and as a co-surveyor with the CMA on the 2016 report, FDOC was aware of and responsible for the above negative findings enumerating persistent deficiencies in the provision of mental health treatment provided by Corizon at Union CI .

72.      In fact, FDOC subsequently conducted its own follow-up audit to the joint assessment, where it found Union CI continually deficient in many of the areas flagged by the

---

[43] *See supra,* Pat Beall at n. 6.
[44] Union CI CAP Assessment, November 2015 Focused Review of Mental Health Services.

previous joint CAP assessments.[45]

73.     As the head of FDOC, Defendant Jones was fully aware of the CMA and FDOC's joint findings in the 2016 CAP assessment and FDOC's conclusions from its follow up audit showing continuing problems at Union CI.

74.     As the contractor for medical services to FDOC at the time, Defendant Corizon was aware of and responsible for the above negative findings enumerating the deficiencies in the provision of mental health treatment at Union CI.

**MR. GAINES' INCARCERATION AND
MISTREATMENT WITHIN FDOC[46]**

75.     On or about June 4, 2013, Mr. Gaines pled guilty in the Fifteenth Judicial Circuit, Palm Beach County, to violation of Fla. Stat. § 810(1)(3) (Burglary of a Dwelling).  He was sentenced to 60 months imprisonment with credit for three hundred and thirty-one (331) days served.  At the sentencing hearing, the Court recommended that Mr. Gaines be housed close to his family in Palm Beach County, and that he be placed in a mental health program.  Mr. Gaines was remanded into the custody of FDOC to begin serving his sentence.

76.     On or about June 24, 2013, Mr. Gaines was received into the custody of FDOC at the South Florida Reception Center ("Reception Center"). At the inception of his prison term, he

---

[45] Daniel Lucas, *Audit raises 'grave concerns' about mental health treatment for inmates at central Fla. prison,* Politico (Nov. 4, 2016),
https://www.politico.com/states/florida/story/2016/11/prison-audit-raises-grave-concerns-about-mental-health-treatment-for-inmates-107079
[46] The following facts were obtained from the custodial and medical records maintained by FDOC and Corizon.

weighed approximately 190 pounds with a height of 5 feet 9 inches, for a Body Mass Index (BMI) of 28.1.  This BMI is considered overweight by the National Institutes of Health.[47]  Under the Custody Assessment and Reclassification System, Mr. Gaines was classified for Close Custody[48] and was assigned to South Bay Correctional Facility ("South Bay").

77.    On or about October 9, 2013, mental health staff at South Bay conducted a biopsychosocial assessment of Mr. Gaines.  Staff noted his history of auditory hallucinations, which had twice led to his being involuntarily held for several months under Florida's Mental Health Act (commonly referred to as the "Baker Act").  In addition, mental health staff at South Bay diagnosed him under the Diagnostic and Statistical Manual of Mental Health Disorders (DSM) as follows:

> AXIS I: 296.44 Bipolar Disorder, mania, with psychotic features
> AXIS II: 317.00 Mild Mental Retardation
> AXIS III: None
> AXIS IV: Incarceration
> AXIS V: GAF= 65 (current).

78.    On or about March 21, 2014, Mr. Gaines was transferred from South Bay to Dade CI with a provisional diagnosis under the DSM for Axis I Bipolar Disorder and Mania and Axis II Borderline Intellectual Functioning.[49]  Prison staff processed the transfer as an emergency referral because Mr. Gaines was exhibiting mood swings, auditory hallucinations, paranoia,

---

[47] Indeed, the FDOC Admission Summary for Mr. Gaines described his build as "Stocky."
[48] "Close custody refers to that class of inmates who must be maintained within an armed perimeter or under direct, armed supervision when outside of a secure perimeter."  Fla. Dep't of Corr., *Inmate Orientation Handbook: Reception Center Processing, available at* www.dc.state.fl.us/pub/files/Inmate%20Orientation%20Handbook.pdf.
[49] Historically referred to as mental retardation.

disorganized thinking, and was talking to himself.  In addition, he was non-complaint with his medications, only taking them sporadically.  Prison staff also noted that at this time, Mr. Gaines was at risk for exploitation, and staff further noted Mr. Gaines' two prior hospitalizations under the Baker Act for a period of 6 months due to psychosis.  On March 27, 2014, Mr. Gaines was admitted to the Transitional Care Unit at Dade CI with a diagnosis of bipolar disorder and psychosis.

79.    On or about November 10, 2014, Mr. Gaines continued to experience auditory hallucinations and delusions, and was urinating and defecating on the floor of his cell.  He refused medication and treatment.  According to mental health staff at the facility, he did not exhibit any suicidal ideations.

80.    On or about November 12, 2014, due to his worsening mental condition, Mr. Gaines was transferred to the Crisis Stabilization Unit of the Reception Center under doctor's orders that he:

  a.  Be placed on suicide watch with checks every 15 minutes;

  b.  Be provided with a suicide mattress, wrap, and blanket;

  c.  Not be permitted any reading materials; and

  d.  Be fed a boneless diet in a Styrofoam tray, without utensils.

81.    Mr. Gaines continued to refuse medication and treatment.  At this time, he reported sleeping only 2 to 3 hours a night.  On November 12, 2014, his weight was recorded by

mental health staff as 151 pounds.[50]  He denied having any suicidal ideations to medical staff at the Reception Center.

82.     On or about April 16, 2015, a disciplinary report was prepared against Mr. Gaines for Failure to Follow a Verbal or Written Order after he allegedly became belligerent when being reprimanded by a correctional officer for attempting to enter the food service area without permission.

83.     Sometime after this disciplinary incident, Mr. Gaines was transferred from the Reception Center to Florida State Prison ("FSP"), almost 400 miles away from the Reception Center and over 300 miles away from all of his family, who live in West Palm Beach, Florida.

84.     Shortly thereafter, Mr. Gaines was yet again transferred a short distance to Union CI in Raiford, Florida, which was still hundreds of miles away from his family.

85.     On or about May 15, 2015, as a result of his mental illness and deteriorating mental condition, Mr. Gaines was placed in Close Management status at Union CI.

86.     On or about August 24, 2015, mental health staff at Union CI requested that Mr. Gaines be transferred for inpatient treatment from Union CI's Transitional Care Unit to its Crisis Stabilization Unit.  Staff reported that Mr. Gaines had "been in [the Transitional Care Unit] for a few months and has consistently had difficulty…" and that while he was cooperative with staff and security, he "has been observed smearing feces on his floor."

87.     Nevertheless, on or about September 29, 2015, only a month later, mental health

---

[50] At that point, since his admission into FDOC custody approximately 16 months earlier, Mr. Gaines had lost 39 pounds.

staff at Union CI requested that Mr. Gaines be transferred back to inpatient treatment from Union CI's Crisis Stabilization Unit to the Transitional Care Unit.  At that time, staff indicated that Mr. Gaines no longer demonstrated psychosis or bizarre behavior, and that he "has achieved a level of stability than can be addressed in Transitional Care Unit."

88.     Throughout October 2015, mental health staff noted nothing out of the ordinary with Mr. Gaines, and recommended that he be kept at the current treatment level.

89.     However, all the while, fellow prisoners and staff at Union C.I., including all of the individual defendants working at the prison, were well-aware of Mr. Gaines' poor mental health and its contribution to his poor sanitation, along with the fact that Mr. Gaines was not receiving adequate nutrition, as reflected in his continued weight loss.

90.     On or about November 4, 2015, according to Annette Eccles, a Registered Clinical Social Worker Intern employed by Corizon who was involved in Mr. Gaines' mental health treatment, Mr. Gaines "refused to come out for individual and psychiatry mental health call-outs."

91.     At that time, Defendant Bih Tambi noted, upon review of his laboratory results, that Mr. Gaines' prescription for Tegretol was discontinued due to hyponatremia.[51]  Mr. Gaines had been prescribed Tegretol prior to and while in FDOC custody since at least 2013.

92.     Between November 9 and 10, 2015, CMA and FDOC personnel conducted an

---

[51] Hyponatremia is a condition that occurs when the level of sodium in the blood is too low.  It is a common side effect of taking Tegretol, which is often prescribed to control acute mania associated with manic depressive disorder, also known as bipolar disorder.  If left uncorrected, hyponatremia can be fatal.

audit of the delivery of mental health services at Union CI.  The results of that audit were summarized as follows:

> This review indicates serious and multiple deficiencies in the delivery of mental health care in both the inpatient and outpatient settings at Union Correctional Institution. The deficiencies in the administration of medication were particularly striking, as was the current nursing vacancy rate. The overall mental health care delivered in the inpatient units is inadequate, as evidenced by poor compliance with required psychiatric, psychological, and nursing services and sparse or missing documentation. The delivery and documentation of care in the Special Housing dorms was equally problematic with respect to the administration of medication and other requirements including those applicable to the Osterback case. Additionally, in many instances, inmates who submitted requests were not seen as intended, raising significant questions about access to care. In some cases it is possible that care was delivered, but was not documented, or the documents had not yet been filed. Nonetheless, this is unacceptable practice and certainly does not account for the majority of the findings in this report.

93.     The audit also specifically determined that "In all 22 [Inpatient Mental Health Services] records reviewed, weights and vital signs were not recorded per policy and in many instances the most recent graphic charts were from July or August."

94.     On November 24, 2015, Mr. Gaines refused to sign his Individualized Service Plan for treatment.

95.     On or about December 1, 2015 Corizon personnel recorded Mr. Gaines' weight as 156 pounds.

96.     That day, Eccles also reported the following of Mr. Gaines:

> Inmate was alert, standing at cell door looking through the window Inmate's cell was clean and organized; Inmate was alert, calm and cooperative and his speech was appropriate
>
> Appearance: clean, appropriate and neat; Condition of cell was clean

97.     Nevertheless, also on December 1, 2015, a prisoner within Mr. Gaines' housing

unit, Lewis Smith, filed a grievance directed to Defendant Diane Andrews indicating that in retaliation for Mr. Gaines defecating and urinating on himself, Defendant Donald Rosier failed to call for a counselor or psychologist for the necessary mental health intervention, or to take steps to ensure that Mr. Gaines and his cell would be cleaned.  Instead, Defendant Rosier verbally abused Mr. Gaines, calling him a "Dumbass" and threatened to enter Mr. Gaines' cell with "the shield and beat his ass."

98.     Mr. Smith also reported that Defendant Rusty James Anderson refused to serve Mr. Gaines with his meal trays, and that along with Defendant Rosier, Anderson also verbally abused Mr. Gaines.

99.     Despite Mr. Smith's grievance, Defendant Andrews neither took action to ensure Mr. Gaines received the necessary mental health intervention, sanitation, and nutrition, nor to discipline Defendants Rosier and Anderson for their behavior.On or about December 2, 2015, at or around 7:55 AM, Dr. Tambi again noted that Mr. Gaines had been taken off Tegretol for hyponatremia and that he was not on an alternate psychotropic medication to replace the Tegretol.  Dr. Tambi also noted that there were no follow up sodium level results reflected in Mr. Gaines' records.  Moreover, the records did not mention whether Mr. Gaines was on any medication to address his hyponatremia.

100.    At or around 8:00 AM that same day, a Corizon employee and member of Mr. Gaines' Multidisciplinary Services Team, Frank Morrison, indicated that Mr. Gaines "declined the opportunity for recreation activity group" and "[n]o behaviors or appearance of concern are noted at this time by staff."

101.    Later that morning, at or around 11:00 AM, Defendant Erika Biskie, who was

28

another member of Mr. Gaines' Multidisciplinary Services Team, noted that the team had met that morning to "Maintain [Gaines'] Current Treatment" within Union CI's Transitional Care Unit.

102.     At or around 12:30 PM on the afternoon of December 3, 2015, correctional officers purportedly served Mr. Gaines lunch.  When the officers returned to his cell a short time later, they noticed that Mr. Gaines had not moved and had not eaten any of his food.  The officers contacted a prison nurse who advised the officers to enter Mr. Gaines' cell.

103.     At around 1:26 PM, following orders from the ranking officer authorizing a cell breach, officers entered Mr. Gaines' cell and found him unresponsive.  Cardiopulmonary resuscitation was started and Mr. Gaines was transported to Union CI's Urgent Care Area.  Defendant Perez-Lugo responded to the emergency and was unable to revive Mr. Gaines, pronouncing him dead at 2:48 PM on December 3, 2015.

104.     On December 4, 2015, an autopsy was performed on Mr. Gaines where the Medical Examiner made the below findings:

    1. MALNUTRITION (HEIGHT 69 INCHES, WEIGHT 115 POUNDS)[52]

    2. GENERALIZED UNWASHED APPEARANCE AND PROBABLE FECES ON SOLES OF FEET

---

[52] This was a far cry from the 156 pounds recorded by Corizon staff as his weight just two days earlier.  In the year between his transfer from the SFRC in November 2014 and his placement at Union CI at the time of his death in December 2015, Mr. Gaines lost 36 pounds; he lost a total of 75 pounds during the approximately two and a half years he was in the custody of FDOC.  At the time of his death, Mr. Gaines' BMI was 17.0—well under the 18.5 minimum considered "underweight" by the National Institutes of Health.

3. CORONARY ARTERY ATHEROSCLEROSIS, MILD TO MODERATE

4. HEAVY LUNGS (1865g) WITH MARKED CONGESTION AND EDEMA

5. MINOR SKIN INJURIES OF VARIABLE AGE INVOLVING ANTERIOR AND POSTERIOR TRUNK AND EXTREMITIES

6. KING TL TUBE PLACEMENT IN TRACHEAL LUMEN

7. NEGATIVE TOXICOLOGY (SEE UF PATHLABS FORENSIC TOXICOLOGY REPORT Rl 5-02466)

**<u>PROBABLE CAUSE OF DEATH</u>: UNDETERMINED**

(Emphasis in original autopsy report).

105.     Additionally, the Medical Examiner noted that while the paramedic on scene had attributed the difficulty in using the King L-T tube on Mr. Gaines during resuscitation efforts to trismus,[53] the Examiner indicated that "[i]n my opinion the 'trismus' was actually rigor mortis of jaw muscles in a dead patient."

106.     On December 5, 2015, Warden Andrews completed an assessment of the incident report compiled by officers on the day of Mr. Gaines' death.  She noted: "Outstanding job by Lt. Davis and all other staff involved.  Extremely well managed and all steps covered.  Proper notification made."

107.     Notwithstanding the above, Defendants did not timely inform Ms. Gaines of her son's passing.  As a result, Mr. Gaines' body was not released to his family: he was buried by FDOC on FDOC property against the wishes and without the consent of Plaintiff.

_____

[53] Trismus is the medical name for "lock-jaw", a condition that causes muscles in the jaw to spasm due to various reasons, including neurological conditions, inflammation, or disease.

108.    On or about December 16, 2015, prisoner Lewis Smith filed an Emergency Motion for A Preliminary Injunction before this Court, requesting an order of protection for his own safety.  *See Smith v. Diane Andrews, et al,* No. 15-cv-01484-BJD-PDB (M.D. Fla. Dec. 16, 2015).

109.    On or about December 12, 2015, as alleged in the Emergency Motion, in retaliation for the grievance he had filed with Defendant Andrews against Defendants Rosier and Anderson, the two officers had tossed Smith's cell, "tore up" his legal mail, and threatened that if Smith did not "mind [his] own business, [he] will be the next nigger to starve to death."  *Id.* at 2.

110.    While this Court dismissed Smith's case without prejudice,[54] it ordered FDOC to file regular updates on the status of the investigation into Mr. Gaines' death, culminating in FDOC's Office of the Inspector General filing its final report with the Court.

111.    FDOC's OIG found no evidence of wrongdoing and reported that the Office of the State Attorney would not be bringing any criminal charges against any Union CI personnel related to Mr. Gaines death.

112.    The Court closed Mr. Smith's case with an order directing that the court file be sent to the Jacksonville Office of the U.S. Attorney's Office.

113.    Mr. Smith was transferred from Union C.I. and is currently incarcerated at Suwanee Correctional Institution.

**COUNT I**
**VIOLATION OF 42 U.S.C. § 1983 AND THE EIGHTH**

---

[54] Chiefly because the emergency motion was not accompanied by a requisite complaint.

## AMENDMENT TO THE UNITED STATES CONSTITUTION
### (Against Defendant Inch)

114.   Defendant Inch is liable in his official capacity as the current head of FDOC for its violation of Mr. Gaines' Eighth Amendment right to be free from cruel and unusual punishment.

115.   FDOC has a history and culture of widespread and longstanding abuse and deliberately indifferent treatment by its employees and agents.   FDOC was deliberately indifferent to the policies, customs, and practices of both itself and of Defendant Corizon that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

116.   In addition, FDOC has a longstanding history and culture of not thoroughly investigating the deaths of prisoners under its care, and not holding accountable those responsible for the mistreatment and abuses leading to those deaths.

117.   FDOC was deliberately indifferent when it:

a.      Failed to stop its custom or practice of disciplining and punishing prisoners for behaviors stemming from their mental illness, once it became aware of this policy, custom, or practice as documented in the CMA's CAP assessments;

b.      Failed to stop its officers' custom or practice of serving mentally ill prisoners "ghost trays" once it became aware of this custom or practice at FDOC facilities like Union CI, as documented in the CMA's surveys;

c. Failed to stop the customs or practices of other retaliatory conduct by its personnel against mentally ill prisoners in its facilities, once it became aware of these customs or practices as documented in the CMA's CAP assessments and media reporting;

d. Failed to remedy the policies, practices, or customs of its and Corizon's employees resulting in insufficient evaluation of Mr. Gaines' mental health history, including his two prior Baker Act commitments, of which FDOC and Corizon were aware, once it became aware of the policy, practices, and customs through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

e. Failed to remedy the policies, practices, or customs of its and Corizon's employees resulting in insufficient evaluation of Mr. Gaines' mental illness to determine which prison and at what level of confinement he should be housed, given the sentencing court's recommendation that Mr. Gaines be confined close to his family support in Palm Beach County, Florida, once it became aware of the policy, practices, and customs through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

f. Failed to remedy the policies, practices, or customs of its and Corizon's employees resulting in insufficient evaluation of Mr. Gaines' mental illness culminating in Mr. Gaines being housed in

an environment whose squalor and isolation exacerbated his psychotic hallucinations and bipolar disorder, once it became aware of the policy, practices, and customs through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

g.    Failed to remedy the policies, practices, or customs of its and Corizon's employees resulting in not ensuring that Mr. Gaines was kept clean and clothed during his incarceration, rather than the unsanitary, disheveled, and naked conditions under which he died, once it became aware of the policy, practices, and customs through the CMA's surveys[55] and its CAP assessments and media reporting on these insufficiencies;

h.    Failed to remedy the policies, practices, or customs of its and Corizon's employees resulting in not ensuring that Mr. Gaines received adequate nutrition when his mental health disorders prevented him from eating enough food, to the point of losing 75 pounds in the approximately two and a half years that he was in the custody of FDOC, once it became aware of the policy, practices,

---

[55] Surveys that revealed, among other things, dirty SHOS cells with blood on the walls.

and customs through the CMA's surveys[56] and its CAP assessments and media reporting on these insufficiencies, through grievances filed against individual FDOC personnel, from reports that Mr. Gaines was not eating, and from his rapid and obvious weight loss;

i.      Failed to adequately supervise/curtail the policies, practices, or customs of Corizon to ensure that that the provider adequately treated mentally ill and malnourished prisoners in FDOC custody, once it became aware of Corizon's policies, practices, and customs through the CMA's surveys[57] and its CAP assessments and subsequent audits, as well as media reporting on these insufficiencies;

j.      Failed to adequately supervise Defendant Andrews to ensure her appropriate handling of Lewis Smith's grievance against Defendants Rosier and Anderson on Mr. Gaines' behalf, given Andrews' prior history with interfering with adequate investigations, as FDOC was made aware from the prior Randall Jordan-Aparo litigation against Andrews and FDOC, and media

---

[56] Surveys that revealed, for example, the "ghost tray" custom or practice.

[57] Including Corizon's staff adequately monitoring prisoner food intake to stop the "ghost tray" custom or practice by FDOC staff, of which Corizon staff was aware.

reporting on the same; and

k.      Failed to adequately supervise FDOC's OIG to ensure that a
thorough investigation of Mr. Gaines' death was conducted, and
that its and Corizon's personnel herein would be held accountable
for Mr. Gaines mistreatment, starvation, and death, and that FDOC
personnel would be held accountable for the retaliation against
Lewis Smith for reporting this abuse, particularly after being aware
of other poorly-handled investigations of prisoner deaths, like
those of Randall Jordan-Aparo and Darren Rainey.

118.    As a direct and proximate cause of Defendant FDOC's deliberate indifference,
Mr. Gaines suffered harm in violation of his Eighth Amendment rights.

119.    Plaintiffs were obliged to retain counsel in bringing this lawsuit and are entitled to
the reasonable value of the attorneys' services, as well as the costs of litigation.

**COUNT II**
**VIOLATION OF 42 U.S.C. § 1983 AND THE EIGHTH**
**AMENDMENT TO THE UNITED STATES**
**CONSTITUTION**
**(Against Defendant Jones)**

120.    Defendant Jones is liable personally, from her tenure as the former head of
FDOC, for violating Mr. Gaines' Eighth Amendment right to be free from cruel and unusual
punishment.

121.    Jones was personally aware of a history and culture of widespread and
longstanding abuse and deliberately indifferent treatment by her employees and agents and that
of Defendant Corizon and its employees and agents during the company's tenure as FDOC's

medical and mental health provider.  Despite being so aware, Jones was deliberately indifferent to the FDOC and Corizon policies, customs, and practices that increased the known risk of serious harm and death to Mr. Gaines in violation of his Eighth Amendment rights.

122.    Jones was deliberately indifferent when she:

a.    Failed to adequately supervise Corizon to make sure that its personnel provided appropriate intervention to ensure that mentally ill prisoners like Mr. Gaines had their basic medical and mental health needs met, notwithstanding those prisoners' refusals of care stemming from their mental illness, once she became aware of the lack of care as documented in the CMA's surveys, its CAP assessments, and subsequent audits by CMA and FDOC personnel;

b.    Failed to stop the custom or practice of disciplining and punishing FDOC prisoners for behaviors stemming from their mental illness, once she became aware of this policy, custom, or practice as documented in the CMA's CAP assessments;

c.    Failed to stop the custom or practice of serving mentally ill prisoners "ghost trays" once she became aware of this custom or practice, as documented in the CMA's surveys;

d.    Failed to stop the customs or practices of other retaliatory conduct by FDOC personnel against mentally ill prisoners in FDOC facilities, once she became aware of these customs or practices as documented in the CMA's CAP assessments and media reporting;

e.  Failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental health history, including his two prior Baker Act commitments, of which FDOC and Corizon were aware, once she became aware of the policy, practices, and customs through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

f.  Failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental illness to determine in which prison and at what level of confinement he should be housed, given the sentencing court's recommendation that he be confined close to his family support in Palm Beach County, Florida, once she became aware of the policy, practices, and customs through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

g.  Failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental illness culminating in Mr. Gaines being housed in an environment whose squalor and isolation exacerbated his psychotic hallucinations and bipolar disorder, once she became aware of the policy, practices, and customs through the CMA's surveys and its CAP assessments and media reporting on these

38

insufficiencies;

h.    Failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in not ensuring that Mr. Gaines was kept clean and clothed during his incarceration, rather than the unsanitary, disheveled, and naked conditions under which he died, once she became aware of the policy, practices, and customs through the CMA's surveys[58] and its CAP assessments and media reporting on these insufficiencies;

i.    Failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in not ensuring that Mr. Gaines received adequate nutrition when his mental health disorders prevented him from eating enough food, to the point of losing 75 pounds in the approximately two and a half years that he was in the custody of FDOC, once she became aware of the policy, practices, and customs through the CMA's surveys[59] and its CAP assessments and media reporting on these insufficiencies;

j.    Failed to remedy the policies, practices, or customs of Corizon to ensure that that the provider adequately treated mentally ill and malnourished prisoners in FDOC custody, once she became aware

---

[58] Surveys that revealed, among other things, dirty SHOS cells with blood on the walls.

[59] Surveys that revealed, for example, the "ghost tray" custom or practice.

of the policy, practices, and customs through the CMA's surveys[60] and its CAP assessments and media reporting on these insufficiencies;

k.      Failed to adequately supervise Defendant Andrews to ensure her appropriate handling of Lewis Smith's grievance against Defendants Rosier and Anderson on Mr. Gaines' behalf, given Andrews' prior history with interfering with adequate investigations, as Jones was made aware from the prior Randall Jordan-Aparo litigation against Andrews and FDOC, and media reporting on the same; and

l.      Failed to adequately supervise FDOC's OIG to ensure that a thorough investigation of Mr. Gaines' death was conducted, and that the FDOC and Corizon Defendant personnel herein would be held accountable for Mr. Gaines mistreatment, starvation, and death, particularly after Jones was aware of other poorly-handled investigations of prisoner deaths, like those of Randall Jordan-Aparo and Darren Rainey.

123.    As a direct and proximate cause of Defendant Jones' deliberate indifference, Mr. Gaines suffered harm in violation of his Eighth Amendment rights.

---

[60] Including Corizon's staff adequately monitoring prisoner food intake to stop the "ghost tray" custom or practice by FDOC staff, of which Corizon staff was aware.

124.    Furthermore, the conduct of Defendant Jones was of a gross and flagrant character, suggestive of a reckless disregard of human life or safety, and/or a complete lack of care suggesting indifference to consequences, thereby entitling Plaintiffs to punitive damages.

125.    Plaintiffs were obliged to retain counsel in bringing this lawsuit and are entitled to the reasonable value of the attorneys' services, as well as the costs of litigation.

**COUNT III**
**VIOLATION OF 42 U.S.C. § 1983 AND THE EIGHTH**
**AMENDMENT TO THE UNITED STATES**
**CONSTITUTION**
**(Against Defendant Andrews)**

126.    Warden Diane Andrews is liable personally for violating Mr. Gaines' Eighth Amendment right to be free from cruel and unusual punishment.

127.    As Warden of Union CI, Andrews was personally aware of a history and culture of widespread and longstanding abuse and deliberately indifferent treatment by FDOC's employees and agents, including that of FDOC staff and Corizon employees and agents under her authority at the prison.  Despite being so aware, Andrews was deliberately indifferent to the FDOC and Corizon policies, customs, and practices at Union CI that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

128.    Defendant Andrews was deliberately indifferent when she:

    a.    Failed to stop the custom, or practice of disciplining and punishing prisoners at Union CI  for behaviors stemming from their mental illness, once she became aware of this policy, custom, or practice as documented in the CMA's CAP assessments, and through grievances filed against individual FDOC personnel;

    b.    Failed to stop the custom or practice of serving mentally ill prisoners "ghost trays" once she became aware of this custom or practice at Union CI, as documented in the CMA's surveys, and through grievances filed against individual FDOC personnel;

    c.    Failed to remedy the policies, practices, or customs of FDOC and

Corizon employees at Union CI resulting in not ensuring that Mr. Gaines was kept clean and clothed during his incarceration, rather than the unsanitary, disheveled, and naked conditions under which he died, once she became aware of the policy, practices, and customs at Union CI through the CMA's surveys[61] and its CAP assessments and media reporting on these insufficiencies, and through grievances filed against individual FDOC personnel;

d.    Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in not ensuring that Mr. Gaines received adequate nutrition when his mental health disorders prevented him from eating enough food, to the point of losing approximately 39 pounds at Union CI, once she became aware of the policy, practices, and customs at Union CI through the CMA's surveys[62] and its CAP assessments and media reporting on these insufficiencies, and through grievances filed against individual FDOC personnel;

e.    Failed to remedy the policies, practices, or customs of Corizon at Union CI to ensure that that the provider adequately treated mentally ill and malnourished prisoners in that facility, once she

---

[61] *See supra* at n. 55.
[62] *See supra* at n. 56.

became aware of the policy, practices, and customs at Union CI through the CMA's surveys[63] and its CAP assessments and media reporting on these insufficiencies;

f.   Failed to supervise her FDOC subordinates to ensure that Ms. Gaines received the proper notification of her son's death; and

g.   Failed to take sufficient action—despite the prior litigation against her by Jordan-Aparo's estate and Christina Bullins—in response to Lewis Smith's grievance against Defendants Rosier and Anderson, including stepping in to ensure Mr. Gaines received adequate medical and mental health intervention, hygiene, and nutrition, as well as appropriately disciplining Defendants Rosier and Anderson for their mistreatment of Mr. Gaines and the threats to retaliate against Lewis for reporting their misconduct.

129.   As a direct and proximate cause of Defendant Andrews' deliberate indifference, Mr. Gaines suffered harm in violation of his Eighth Amendment rights.

130.   Andrews' conduct was of a gross and flagrant character, suggestive of a reckless disregard of human life or safety, and/or a complete lack of care suggesting indifference to consequences, thereby entitling Plaintiffs to punitive damages.

131.   Plaintiffs were obliged to retain counsel in bringing this lawsuit and are entitled to

---

[63] *See supra* at n. 57.

the reasonable value of the attorneys' services, as well as the costs of litigation.

**COUNT IV**
**VIOLATION OF 42 U.S.C. § 1983 AND THE EIGHTH**
**AMENDMENT TO THE UNITED STATES**
**CONSTITUTION**
**(Against Defendant Rosier)**

132.    Defendant Rosier is liable personally for violating Mr. Gaines' Eighth Amendment right to be free from cruel and unusual punishment.

133.    Rosier intentionally withheld the provision of adequate medical and mental health intervention, hygiene, and nutrition to Mr. Gaines.  In so doing, he was deliberately indifferent in a manner that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

134.    Defendant Rosier is also liable for failing to adequately supervise subordinate correctional officers who owed a duty of care to Mr. Gaines, and for failing to intervene to prevent those officers, like Defendant Anderson, from also violating Mr. Gaines' Eighth Amendment rights.

135.    As a Sergeant, in his supervisory capacity over officers like Defendant Anderson, Rosier was personally aware of a history and culture of widespread and longstanding abuse and deliberately indifferent treatment by FDOC's employees and agents, including that of Defendant Anderson and other officers under his authority at Union CI.  Despite being so aware, Rosier was deliberately indifferent to the FDOC policies, customs, and practices at Union CI that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

136.    Defendant Rosier was deliberately indifferent when he:

    a.      Failed to stop the custom or practice of disciplining and punishing

45

prisoners at Union CI  for behaviors stemming from their mental illness—a custom or practice with which he was personally aware due to his threatening to assault Mr. Gaines with a shield for his urinating and defecating on himself;

b. Failed to stop the custom or practice of serving mentally ill prisoners "ghost trays"—a custom or practice with which he was personally involved, and which he knew subordinates like Defendant Anderson were also carrying out to deprive Mr. Gaines of adequate nutrition;

c. Failed to remedy the policies, practices, or customs of FDOC personnel at Union CI resulting in not ensuring that Mr. Gaines was kept clean, clothed, and fed during his incarceration, rather than the unsanitary, disheveled, naked, and starved conditions under which he died—policies, practices, or customs with which he was personally involved, and which he knew subordinates like Defendant Anderson were also carrying out to deprive Mr. Gaines of adequate medical and mental health intervention, hygiene, and nutrition; and

d. Threatened to retaliate against Lewis Smith for grieving to Defendant Andrews the purposeful misconduct of he and Defendant Anderson to deprive Mr. Gaines of adequate mental health intervention, hygiene, and nutrition.

137.   As a direct and proximate cause of Defendant Rosier's deliberate indifference, Mr. Gaines suffered harm in violation of his Eighth Amendment rights.

138.   Rosier's conduct was of a gross and flagrant character, suggestive of a reckless disregard of human life or safety, and/or a complete lack of care suggesting indifference to consequences, thereby entitling Plaintiffs to punitive damages.

139.   Plaintiffs were obliged to retain counsel in bringing this lawsuit and are entitled to the reasonable value of the attorneys' services, as well as the costs of litigation.

**COUNT V**
**VIOLATION OF 42 U.S.C. § 1983 AND THE EIGHTH**
**AMENDMENT TO THE UNITED STATES**
**CONSTITUTION**
**(Against Defendant Anderson)**

140.   Defendant Anderson is liable personally for violating Mr. Gaines' Eighth Amendment right to be free from cruel and unusual punishment.

141.   Anderson intentionally withheld the provision of adequate medical and mental health intervention, hygiene, and nutrition to Mr. Gaines.  In so doing, he was deliberately indifferent in a manner that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

142.   Defendant Anderson was deliberately indifferent when he:

a.   Participated in the custom or practice of serving mentally ill prisoners "ghost trays" to deprive Mr. Gaines of adequate nutrition, to the point of Mr. Gaines losing approximately 39 pounds at Union CI and starving to death; and

b.   Failed to remedy the policies, practices, or customs of FDOC

personnel at Union CI resulting in not ensuring that Mr. Gaines was kept clean, clothed, and fed during his incarceration, rather than the unsanitary, disheveled, naked, and starved conditions under which he died—policies, practices, or customs with which he was personally involved to deprive Mr. Gaines of adequate medical and mental health intervention, hygiene, and nutrition.

143.    As a direct and proximate cause of Defendant Anderson's deliberate indifference, Mr. Gaines suffered harm in violation of his Eighth Amendment rights.

144.    Anderson's conduct was of a gross and flagrant character, suggestive of a reckless disregard of human life or safety, and/or a complete lack of care suggesting indifference to consequences, thereby entitling Plaintiffs to punitive damages.

145.    Plaintiffs were obliged to retain counsel in bringing this lawsuit and are entitled to the reasonable value of the attorneys' services, as well as the costs of litigation.

### COUNT VI
### VIOLATION OF 42 U.S.C. § 1983 AND THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### (Against Defendant Corizon)

146.    As the entity that promulgated and/or endorsed, whether by action or omission, the medical and mental health policies, practices, and customs that led to Mr. Gaines' injury and death, Defendant Corizon is directly liable for violating Mr. Gaines' Eighth Amendment right to be free from cruel and unusual punishment.

147.    Corizon, at all times pertinent to this action, contracted with FDOC to provide mental health and medical care and services to prisoners, and as such, the above-mentioned

actions and/or omissions of Corizon and/or its agents and employees were committed under color of law and/or pursuant to policies, customs, practices, rules, regulations, ordinances, statutes, and/or usages of Defendant Corizon.

148.   In implementing and enforcing policies that led to chronic understaffing in FDOC prisons, including at Union CI—which in turn led to inadequate medical and mental health evaluation and treatment for prisoners like Mr. Gaines—Corizon is liable for the resulting constitutional violations resulting in the harm to the decedent.

149.   Additionally, Corizon's failure to address the custom or practice of its personnel of inadequately and inaccurately charting vital medical information and/or medications resulted in the Eighth Amendment violations that led to the harm and death of prisoners including Mr. Gaines.

150.   Moreover, Corizon was aware of a history of widespread and longstanding abuse and deliberately indifferent treatment by its employees, agents, and implied agents which resulted in many unnecessary and avoidable prisoner deaths and medical injuries during its brief contract with FDOC to provide mental health and medical care.  Despite being so aware, Corizon was deliberately indifferent to the policies, customs, and practices that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

151.   Corizon was deliberately indifferent when its policy makers:

    a.    Failed to stop their policy, custom, or practice of understaffing FDOC facilities like Union CI to achieve the necessary number of medical and mental health staff to properly treat mentally ill prisoners, as documented in the CMA's surveys and CAP

49

assessments, and media reporting on FDOC;

b. Failed to address the custom or practice of incomplete and inaccurate charting of vital medical information by its personnel, such as failing to accurately and consistently record the weight and meal intake of vulnerable prisoners like Mr. Gaines, as documented in the CMA's surveys and its CAP assessments;

c. Failed to address the custom or practice of inaccurate charting and/or administration of medications to mentally ill prisoners like Mr. Gaines, as documented in the CMA's surveys and its CAP assessments;

d. Failed to implement or enforce a policy, custom, or practice to ensure that mentally ill prisoners like Mr. Gaines would receive appropriate intervention to ensure their basic medical and mental health needs were met, notwithstanding those prisoners' refusals of care that stemming from their mental illness, once policymakers became aware of the lack of care as documented in the CMA's surveys, its CAP assessments, and subsequent audits by CMA and FDOC personnel;

e. Failed to stop their policy, custom, or practice at FDOC facilities of disciplining and punishing prisoners for behaviors stemming from their mental illness, once Corizon became aware of this policy, custom, or practice as documented in the CMA's CAP

50

assessments;

f.    Failed to stop their custom or practice of serving mentally ill prisoners "ghost trays" once they became aware of this custom or practice at FDOC facilities, as documented in the CMA's surveys;

g.    Failed to stop their customs or practices of other retaliatory conduct by FDOC personnel against mentally ill prisoners in FDOC facilities, once Corizon became aware of these customs or practices as documented in the CMA's CAP assessments and media reporting;

h.    Failed to remedy their policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental health history, including his two prior Baker Act commitments, of which FDOC and Corizon were aware, once Corizon became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

i.    Failed to remedy their policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental illness to recommend to FDOC in which prison and at what level of confinement he should be housed, given the sentencing court's recommendation that he be confined close to his family support in Palm Beach County, Florida, once Corizon

became aware of the housing policies, practices, and customs in FDOC facilities through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

j.     Failed to remedy their policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental illness culminating in Mr. Gaines being housed in an environment whose squalor and isolation exacerbated his psychotic hallucinations and bipolar disorder, once Corizon became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

k.     Failed to remedy their policies, practices, or customs of FDOC and Corizon employees resulting in not ensuring that Mr. Gaines was kept clean and clothed during his incarceration, rather than the unsanitary, disheveled, and naked conditions under which he died, once Corizon became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys[64] and its CAP assessments and media reporting on these insufficiencies;

l.     Failed to remedy their policies, practices, or customs of FDOC and

---

[64] *See supra* at n. 55.

Corizon employees resulting in not ensuring that Mr. Gaines received adequate nutrition when his mental health disorders prevented him from eating enough food, to the point of losing 75 pounds in the approximately two and a half years that he was in the custody of FDOC, once Corizon became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys[65] and its CAP assessments and media reporting on these insufficiencies, from reports that Mr. Gaines was not eating, and from his rapid and obvious weight loss; and

m.   Failed to remedy their policies, practices, or customs to ensure that that their employees and agents adequately treated mentally ill and malnourished prisoners in FDOC custody, once they became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys[66] and its CAP assessments and media reporting on these insufficiencies.

n.   Failed to remedy their policies, practices, or customs of Corizon employees resulting in insufficient evaluation of Mr. Gaines' known serious medical needs, including the need to correct his hyponatremia, of which Corizon employees and agents were

---

[65] *See supra* at n. 56.
[66] *See supra* at n. 57.

aware, once Mr. Gaines was diagnosed with hyponatremia and he

was taken off Tegretol.

152.   As a direct and proximate cause, and moving force, of Defendant Corizon's

policy, pattern, practice, and deliberate indifference, Mr. Gaines suffered harm in violation of his

Eighth Amendment rights.

153.   Corizon's conduct was of a gross and flagrant character, suggestive of a reckless

disregard of human life or safety, and/or a complete lack of care suggesting indifference to

consequences, thereby entitling Plaintiffs to punitive damages.

**COUNT VII**
**VIOLATION OF 42 U.S.C. § 1983 AND THE EIGHTH**
**AMENDMENT TO THE UNITED STATES**
**CONSTITUTION**
**(Against Defendant Dr. Perez-Lugo)**

154.   Defendant Perez-Lugo is liable personally for violating Mr. Gaines' Eighth

Amendment right to be free from cruel and unusual punishment.

155.   Dr. Perez-Lugo is also liable for failing to adequately supervise subordinate

Corizon medical personnel who owed a duty of care to Mr. Gaines, and for failing to intervene to

prevent those employees and agents, like Defendant Bih Tambi, from also violating Mr. Gaines'

Eighth Amendment rights.

156.   Dr. Perez-Lugo was personally aware of a history and culture of widespread and

longstanding abuse and deliberately indifferent treatment by Corizon's employees and agents,

including that of Corizon personnel under his authority as the Medical Director at Union CI.

Despite being so aware, Dr. Perez-Lugo was deliberately indifferent to the Corizon policies,

customs, and practices at Union CI that increased the known risk of serious harm and death in

54

violation of Mr. Gaines' Eighth Amendment rights.

157.   Dr. Perez-Lugo was deliberately indifferent when he:

a.   Failed, in his capacity as Medical Director, to intervene against Corizon's policy, custom, or practice of understaffing FDOC facilities like Union CI, which led to an insufficient number of medical staff available to adequately treat prisoners like Mr. Gaines, as documented in the CMA's surveys and CAP assessments, and media reporting on FDOC;

b.   Failed, in his capacity as Medical Director, to adequately supervise subordinate medical staff at Union to prevent the custom or practice of incomplete and inaccurate charting of vital medical information, such as failing to accurately and consistently record the weight and meal intake of vulnerable prisoners like Mr. Gaines, once he became aware of this issue through the CMA's surveys and its CAP assessments;

c.   Failed, in his capacity as Medical Director, to adequately supervise subordinate medical staff at Union to prevent the custom or practice of inaccurate charting and/or administration of medications to mentally ill prisoners like Mr. Gaines, once he became aware of this issue through the CMA's surveys and its CAP assessments;

d.   Failed to personally provide, and supervise his subordinate medical

staff to ensure that they provided, appropriate intervention to ensure that mentally ill prisoners like Mr. Gaines had their basic medical needs met, notwithstanding those prisoners' refusals of care stemming from their mental illness, once he became aware of the lack of care as documented in the CMA's surveys, its CAP assessments and subsequent audits by CMA and FDOC personnel, and as was or should have been patently evident from routine examinations;

e. Failed to stop the custom or practice of serving mentally ill prisoners "ghost trays" once he became aware of this custom or practice at Union CI, as documented in the CMA's surveys, through grievances filed against individual FDOC personnel, and as patently evident in Mr. Gaines' rapid weight loss throughout his incarceration at Union CI;

f. Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in not ensuring that Mr. Gaines was kept clean and clothed during his incarceration, rather than the unsanitary, disheveled, and naked conditions under which he died, once he became aware of the policy, practices, and

customs at Union CI through the CMA's surveys[67] and its CAP assessments and media reporting on these insufficiencies, through grievances filed against individual FDOC personnel, and as was or should have been patently evident from routine examinations;

g.    Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in not ensuring that Mr. Gaines received adequate nutrition when his mental health disorders prevented him from eating enough food, to the point of losing approximately 39 pounds at Union CI, once he became aware of the policy, practices, and customs at Union CI through the CMA's surveys[68] and its CAP assessments and media reporting on these insufficiencies, through grievances filed against individual FDOC personnel, from reports that Mr. Gaines was not eating, his rapid weight loss, and as was or should have been patently evident from routine examinations;

h.    Failed to recognize and adequately intervene to prevent Mr. Gaines' further mental decompensation, which occurred as a result of the aforementioned lack of hygiene and nutrition, and further exacerbated Mr. Gaines' condition leading to his death;

---

[67] *See supra* at n. 55.
[68] *See supra* at n. 56.

        i.     Failed to provide adequate medical intervention to save Mr. Gaines' life once FDOC personnel breached his cell and transferred him to the Urgent Care Area.

158.    As a direct and proximate cause of Defendant Perez-Lugo's deliberate indifference, Mr. Gaines suffered harm in violation of his Eighth Amendment rights.

159.    Dr. Perez-Lugo's conduct was of a gross and flagrant character, suggestive of a reckless disregard of human life or safety, and/or a complete lack of care suggesting indifference to consequences, thereby entitling Plaintiffs to punitive damages.

160.    Plaintiffs were obliged to retain counsel in bringing this lawsuit and are entitled to the reasonable value of the attorneys' services, as well as the costs of litigation.

**COUNT VIII**
**VIOLATION OF 42 U.S.C. § 1983 AND THE EIGHTH**
**AMENDMENT TO THE UNITED STATES**
**CONSTITUTION**
**(Against Defendant Dr. Tambi)**

161.    Defendant Bih Tambi is liable personally for violating Mr. Gaines' Eighth Amendment right to be free from cruel and unusual punishment.

162.    Dr. Tambi was personally aware of a history and culture of widespread and longstanding abuse and deliberately indifferent treatment by Corizon's employees and agents, including that of Corizon personnel under her authority as treating psychiatrist at Union CI. Despite being so aware, Dr. Tambi was deliberately indifferent to the Corizon policies, customs, and practices at Union CI that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

163.    Dr. Tambi was deliberately indifferent when she:

a.    Failed to personally provide appropriate intervention to ensure that mentally ill prisoners like Mr. Gaines had their basic medical needs met, notwithstanding those prisoners' refusals of care stemming from their mental illness, once she became aware of the lack of care as documented in the CMA's surveys, its CAP assessments and subsequent audits by CMA and FDOC personnel, and as was or should have been patently evident from routine examinations;

b.    Failed to stop the custom or practice of serving mentally ill prisoners "ghost trays" once she became aware of this custom or practice at Union CI, as documented in the CMA's surveys, through grievances filed against individual FDOC personnel, and as patently evident in Mr. Gaines' rapid weight loss throughout his incarceration at Union CI;

c.    Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in not ensuring that Mr. Gaines was kept clean and clothed during his incarceration, rather than the unsanitary, disheveled, and naked conditions under which he died, once she became aware of the policy, practices, and

customs at Union CI through the CMA's surveys[69] and its CAP assessments and media reporting on these insufficiencies, through grievances filed against individual FDOC personnel, and as was or should have been patently evident from routine examinations;

d. Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in not ensuring that Mr. Gaines received adequate nutrition when his mental health disorders prevented him from eating enough food, to the point of losing approximately 39 pounds at Union CI, once she became aware of the policy, practices, and customs at Union CI through the CMA's surveys[70] and its CAP assessments and media reporting on these insufficiencies, through grievances filed against individual FDOC personnel, from reports that Mr. Gaines was not eating, and from his rapid and obvious weight loss;

e. Failed to recognize and adequately intervene to prevent Mr. Gaines' further mental decompensation, which occurred as a result of the aforementioned lack of hygiene and nutrition, and further exacerbated Mr. Gaines' condition leading to his death

f. Failed to provide adequate medical intervention in taking Mr.

_____

[69] *See supra* at n. 55.
[70] *See supra* at n. 56.

Gaines of Tegretol, additionally failing to provide additional medication to address Mr. Gaines' hyponatremia, and also failing to provide Mr. Gaines with an appropriate substitute medication to Tegretol in order to manage his mental illness.

164.    As a direct and proximate cause of Defendant Tambi's deliberate indifference, Mr. Gaines suffered harm in violation of his Eighth Amendment rights.

165.    Dr. Tambi's conduct was of a gross and flagrant character, suggestive of a reckless disregard of human life or safety, and/or a complete lack of care suggesting indifference to consequences, thereby entitling Plaintiffs to punitive damages.

166.    Plaintiffs were obliged to retain counsel in bringing this lawsuit and are entitled to the reasonable value of the attorneys' services, as well as the costs of litigation.

**COUNT IX**
**VIOLATION OF 42 U.S.C. § 1983 AND THE EIGHTH**
**AMENDMENT TO THE UNITED STATES**
**CONSTITUTION**
**(Against Defendant Dr. Biskie)**

167.    Defendant Erika Biskie is liable personally for violating Mr. Gaines' Eighth Amendment right to be free from cruel and unusual punishment.

168.    Dr. Biskie is also liable for failing to adequately supervise subordinate Corizon mental health personnel who owed a duty of care to Mr. Gaines, and for failing to intervene to prevent those employees and agents, like Defendant Kelley Sanders, from also violating Mr. Gaines' Eighth Amendment rights.

169.    Dr. Biskie was personally aware of a history and culture of widespread and longstanding abuse and deliberately indifferent treatment by Corizon employees and agents

including those under her authority at Union CI.  Despite being so aware, Dr. Biskie was deliberately indifferent to the FDOC and Corizon policies, customs, and practices at Union CI that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

170.   Defendant Biskie was deliberately indifferent when she:

    a.   Failed, in her capacity as Supervising Psychologist, to intervene against Corizon's policy, custom, or practice of understaffing FDOC facilities like Union CI, which led to an insufficient number of mental health staff available to adequately treat prisoners like Mr. Gaines, as documented in the CMA's surveys and CAP assessments, and media reporting on FDOC;

    b.   Failed, in her capacity as Supervising Psychologist, to adequately supervise subordinate mental health staff at Union to prevent the custom or practice of incomplete and inaccurate charting of vital medical information, such as failing to accurately and consistently record the weight and meal intake of vulnerable prisoners like Mr. Gaines, once she became aware of this issue through the CMA's surveys and its CAP assessments;

    c.   Failed, in her capacity as Supervising Psychologist, to adequately supervise subordinate mental health staff at Union to prevent the custom or practice of inaccurate charting and/or administration of medications to mentally ill prisoners like Mr. Gaines, once she

became aware of this issue through the CMA's surveys and its CAP assessments;

d.  Failed to personally provide, and supervise her subordinate mental health staff to ensure that they provided, appropriate intervention to ensure that mentally ill prisoners like Mr. Gaines had their basic mental health needs met, notwithstanding those prisoners' refusals of care stemming from their mental illness, once she became aware of the lack of care as documented in the CMA's surveys, its CAP assessments and subsequent audits by CMA and FDOC personnel, and as was or should have been patently evident from routine examinations;

e.  Failed to stop the custom or practice of serving mentally ill prisoners "ghost trays" once she became aware of this custom or practice at Union CI, as documented in the CMA's surveys, through grievances filed against individual FDOC personnel, and as patently evident in Mr. Gaines' rapid weight loss throughout his incarceration at Union CI;

f.  Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in not ensuring that Mr. Gaines was kept clean and clothed during his incarceration, rather than the unsanitary, disheveled, and naked conditions under which he died, once she became aware of the policy, practices, and

63

customs at Union CI through the CMA's surveys[71] and its CAP assessments and media reporting on these insufficiencies, through grievances filed against individual FDOC personnel, and as was or should have been patently evident from routine examinations;

g.  Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in not ensuring that Mr. Gaines received adequate nutrition when his mental health disorders prevented him from eating enough food, to the point of losing approximately 39 pounds at Union CI, once she became aware of the policy, practices, and customs at Union CI through the CMA's surveys[72] and its CAP assessments and media reporting on these insufficiencies, through grievances filed against individual FDOC personnel, from reports that Mr. Gaines was not eating, and from his rapid and obvious weight loss;

h.  Failed to recognize and adequately intervene to prevent Mr. Gaines' further mental decompensation, which occurred as a result of the aforementioned lack of hygiene and nutrition, and further exacerbated Mr. Gaines' condition leading to his death; and

171.  As a direct and proximate cause of Defendant Biskie's deliberate indifference,

---

[71] *See supra* at n. 55.
[72] *See supra* at n. 56.

Mr. Gaines suffered harm in violation of his Eighth Amendment rights.

172.    Dr. Biskie's conduct was of a gross and flagrant character, suggestive of a reckless disregard of human life or safety, and/or a complete lack of care suggesting indifference to consequences, thereby entitling Plaintiffs to punitive damages.

173.    Plaintiffs were obliged to retain counsel in bringing this lawsuit and are entitled to the reasonable value of the attorneys' services, as well as the costs of litigation.

### COUNT X
### VIOLATION OF 42 U.S.C. § 1983 AND THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### (Against Defendant Dr. Sanders)

174.    Defendant Kelley Sanders is liable personally for violating Mr. Gaines' Eighth Amendment right to be free from cruel and unusual punishment.

175.    Dr. Sanders was personally aware of a history and culture of widespread and longstanding abuse and deliberately indifferent treatment by Corizon employees and agents, including those under her authority at Union CI.  Despite being so aware, Dr. Sanders was deliberately indifferent to the FDOC and Corizon policies, customs, and practices at Union CI that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

176.    Defendant Sanders was deliberately indifferent when she:

a.    Failed to personally provide appropriate intervention to ensure that mentally ill prisoners like Mr. Gaines had their basic mental health needs met, notwithstanding those prisoners' refusals of care stemming from their mental illness;

b.      Failed to stop the custom or practice of serving mentally ill prisoners "ghost trays" once she became aware of this custom or practice at Union CI, as documented in the CMA's surveys, through grievances filed against individual FDOC personnel, and as patently evident in Mr. Gaines' rapid weight loss throughout his incarceration at Union CI;

c.      Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in not ensuring that Mr. Gaines was kept clean and clothed during his incarceration, rather than the unsanitary, disheveled, and naked conditions under which he died, once she became aware of the policy, practices, and customs at Union CI through the CMA's surveys[73] and its CAP assessments and media reporting on these insufficiencies, through grievances filed against individual FDOC personnel, and as was or should have been patently evident from routine examinations;

d.      Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in not ensuring that Mr. Gaines received adequate nutrition when his mental health disorders prevented him from eating enough food, to the point of

---

[73] *See supra* at n. 55.

losing approximately 39 pounds at Union CI, once she became
aware of the policy, practices, and customs at Union CI through
the CMA's surveys[74] and its CAP assessments and media reporting
on these insufficiencies, through grievances filed against individual
FDOC personnel, from reports that Mr. Gaines was not eating, and
from his rapid and obvious weight loss;

e.    Failed to recognize and adequately intervene to prevent Mr.
Gaines' further mental decompensation, which occurred as a result
of the aforementioned lack of hygiene and nutrition, and further
exacerbated Mr. Gaines' condition leading to his death.

177.   As a direct and proximate cause of Defendant Sanders' deliberate indifference,
Mr. Gaines suffered harm in violation of his Eighth Amendment rights.

178.   Dr. Sanders' conduct was of a gross and flagrant character, suggestive of a
reckless disregard of human life or safety, and/or a complete lack of care suggesting indifference
to consequences, thereby entitling Plaintiffs to punitive damages.

179.   Plaintiffs were obliged to retain counsel in bringing this lawsuit and are entitled to
the reasonable value of the attorneys' services, as well as the costs of litigation.

## COUNT XI
## VIOLATIONS OF TITLE II OF THE AMERICANS WITH
## DISABILITIES ACT AND THE REHABILITATION ACT
**(Against Defendant Inch)**

---

[74] *See supra* at n. 56.

180.    Count XI is a claim for disability discrimination against Defendant Inch in his official capacity as Secretary of FDOC for violating Title II of the Americans with Disabilities Act ("ADA") (public entities) and Section 504 of the Rehabilitation Act.

181.    Title II of the ADA prohibits disability-based discrimination by any public entity. *See* 42 U.S.C. §§ 12131-12132; 28 C.F.R. § 39.130; and 28 C.F.R. §35.130.

182.    Section 504 of the Rehabilitation Act prohibits discrimination against an individual based on disability by any program or entity receiving federal funds.   *See* 29 U.S.C. §§ 794(a), (b)(1)(A), (b)(1)(B), and (b)(2)(B).

183.    These disability anti-discrimination laws impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability.

184.    Mr. Gaines was disabled as defined in 42 U.S.C. § 12102 and 42 U.S.C. §§ 12131, 28 C.F.R. §§ 35.108, as he suffered mental impairments that substantially limited one or more of his major life activities.[75]

185.    FDOC is a program or entity that receives federal financial assistance.

186.    FDOC is a public entity as defined by Title II of the ADA.

187.    FDOC's prison, Union CI Correctional Institution, is a facility and its operation comprises a program of service for purposes of Title II of the ADA.

188.    As a prisoner in FDOC's custody, Mr. Gaines was an individual qualified to participate in or receive the benefit of FDOC's services, programs, or activities, including but not

---

[75] *See* DSM diagnosis, *supra* at ¶ 77.

limited to out-of-cell activities, visitation, religious services, reading material, and, most importantly, the provision of adequate nutrition and a clean and safe prison environment.

189.   FDOC excluded Mr. Gaines, a mentally ill prisoner housed in its inpatient mental health units, from participating and benefiting in its programs, services, and activities, and subjected him to discrimination because of his disability.

190.   FDOC had a practice or custom of allowing prisoners like Mr. Gaines to be disciplined and punished, by Defendants Rosier, Anderson and others, for conduct that was a direct result of their mental illness, which constitutes discrimination against individuals based on their disability in violation of the ADA.

191.   FDOC also failed to house Mr. Gaines, a mentally ill prisoner, in the most integrated setting appropriate to his needs; placed him in inappropriate security classifications and in facilities that did not offer the same programming as other FDOC facilities; and deprived him of visitation with family members by placing the decedent in a distant facility—against the recommendation of the sentencing judge—where Mr. Gaines was not initially, and would not otherwise, have been housed.

192.   As demonstrated by the CMA's CAP assessments, and grievances against individual FDOC personnel like Defendants Rosier and Anderson, FDOC knew about the violations noted herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Mr. Gaines as a mentally disabled prisoner in an inpatient mental health unit in FDOC custody.

193.   Had FDOC and its agents, implied agents, and employees not discriminated against Mr. Gaines due to his mental disability, he would not have been disciplined as a result of

behavior stemming from his mental illness and he would not have been kept in such insalubrious conditions and in isolation, nor would he have become malnourished to the point of starving to death in the custody of FDOC.

194.    As a direct and proximate cause of FDOC's discriminatory policy, pattern, practice, and deliberate indifference against mentally ill prisoners, Mr. Gaines suffered harm in violation of his rights under the ADA and RA.

## **PRAYER FOR RELIEF**

195.    WHEREFORE, for violation of Mr. Gaines' rights under 42 U.S.C. § 1983 and the Eighth Amendment, Plaintiffs demand the following relief against all Defendants:

    i.    Equitable relief against Defendant Inch in his official capacity in the form of FDOC's relinquishment of Mr. Gaines' remains to Plaintiff;

    ii.    Judgment in their favor against the individual Defendants and Corizon for those Defendants' violation of the Eighth and Fourteenth Amendment and 42 U.S.C. § 1983 in an amount to be proven at trial for damages, including, without limitation, pecuniary injury, compensatory damages, and punitive damages;

    iii.    Plaintiffs' attorneys' fees, interest and costs under 42 U.S.C. § 1988; and

    iv.    All such other relief as the Court deems just and proper.

196.    WHEREFORE, for violation of Mr. Gaines' rights under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, Plaintiffs demand the following relief against Defendant Inch in his official capacity as FDOC Secretary:

    i.    Declaratory relief that FDOC violated Mr. Gaines' rights under the Americans

70

with Disabilities Act and Rehabilitation Act;

ii.   Equitable relief against FDOC in the form of the relinquishment of Mr.
      Gaines' remains to Plaintiffs; and

iii.  Judgment in Plaintiffs' favor against FDOC for violating the ADA and
      Rehabilitation Act in an amount to be proven at trial for damages including,
      without limitation, pecuniary injury and compensatory damages;

iv.   Plaintiffs' attorneys' fees, interest and costs; and

v.    All such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs by and through their attorneys, hereby demand a trial by jury on all issues so
triable.

Dated: September 6, 2019

                                   Respectfully submitted,

                                   /s/ Masimba Mutamba
                                   Masimba Mutamba, Fla. Bar No.: 102772
                                   mmutamba@hrdc-law.org
                                   Sabarish Neelakanta, Fla. Bar No.: 26623
                                   sneelakanta@hrdc-law.org
                                   Daniel Marshall, Fla. Bar No.: 617210
                                   dmarshall@hrdc-law.org
                                   HUMAN RIGHTS DEFENSE CENTER
                                   P.O. Box 1151
                                   Lake Worth, FL 33460
                                   Tel.: (561) 360-2523
                                   Fax: (866) 735-7136

                                   Edwin Ferguson, Fla. Bar. No.: 15216
                                   eferguson@thefergusonfirm.net
                                   THE FERGUSON FIRM, PLLC
                                   2826 Broadway Avenue
                                   Suite 102

Riviera Beach, FL 33404
Tel.: (561) 840-1846
Fax: (561) 840-1642

John Scarola, Fla. Bar. No.: 169440
scarolateam@searcylaw.com
SEARCY DENNEY SCAROLA BARNHART &
SHIPLEY, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Tel: (561) 686-6300
Fax: (561) 383-9451

*Attorneys for Plaintiffs*