UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
CASE NO.:  3:18-cv-01332-BJD-PDB

LORINE GAINES, AS SURVIVOR OF VINCENT GAINES, RUBIN SIMPSON
AND EVETT SIMMONS, AS PERSONAL REPRESENTATIVES OF THE
ESTATE,

            Plaintiffs,

vs.

MARK S. INCH, IN HIS OFFICIAL CAPACITY, JULIE JONES,
INDIVIDUALLY, DIANE ANDREWS, INDIVIDUALLY, DONALD
CHRISTOPHER RAY ROSIER, INDIVIDUALLY, RUSTY JAMES
ANDERSON, INDIVIDUALLY, CORIZON HEALTH, INC., ELLIOT PEREZ-
LUGO, M.D., INDIVIDUALLY, BIH TAMBI, M.D., INDIVIDUALLY, ERICKA
BISKIE, PSYD, INDIVIDUALLY, AND KELLEY C. SANDERS, PH.D.,
INDIVIDUALLY,

            Defendants.

_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS CORIZON HEALTH,
INC., ELLIOTT PEREZ-LUGO, M.D., BIH TAMBI, M.D., ERICKA BISKIE, PSYD, AND
KELLEY C. SANDERS, PHD'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiffs LORINE GAINES, as survivor of VINCENT GAINES ("Gaines"),

and RUBIN SIMPSON and EVETT SIMMONS, as Personal Representatives of the Estate

(collectively "Plaintiffs"), by and through undersigned counsel and pursuant to Rule 56 of the Federal

Rules of Civil Procedure, hereby file their Response in Opposition to Defendants Corizon Health,

Inc. ("Corizon"), Elliot Perez-Lugo, M.D. ("Lugo"), Bih Tambi, M.D. ("Tambi"),  Ericka Biskie,

PSYD ("Biskie"), and Kelley C. Sanders ("Sanders") (collectively "Corizon Defendants") Motion for

Summary Judgment [ECF No. 114] and state as follows:

## I.      INTRODUCTION

Vincent Gaines' death is a tragic illustration and direct consequence of Corizon's pervasive

and long history of providing inmates inadequate medical and mental health care and displaying

deliberate indifference to inmates' serious medical and mental health care needs. Corizon and the individuals charged with caring for Gaines denied and deprived him of adequate nutrition, hygiene, and medical and mental health care, which resulted in his malnutrition, starvation, and death. Plaintiffs bring claims against the Corizon Defendants for violations of Gaines' Eighth Amendment right to be free from cruel and unusual punishment. In moving for summary judgment, the Corizon Defendants fail to view the facts and inferences in the light most favorable to Plaintiffs, while also omitting key evidence demonstrating genuine issues of material fact. Since there are many genuine issues of material facts in dispute, summary judgment should be denied in its entirety.

## II.    MATERIAL FACTS THAT DEFEAT SUMMARY JUDGMENT

### a.  Lack of Care Received by Gaines

Gaines had a long history of schizophrenia/psychotic disorder, bipolar disorder, antisocial personality disorder, and borderline intellectual functioning. ECF No. 126-1 at 1. Gaines was admitted to the FDOC on June 24, 2013, weighing 190 pounds with a "stocky build." ECF No. 126-2 at 00001. When he died at Union Correctional Institution ("UCI") on December 3, 2015, Gaines weighed 115 pounds. ECF No. 126-3 at 00071; ECF. No. 126-4. Throughout Gaines' incarceration, Corizon was under contract to provide medical and mental health care to inmates. ECF No. 114 at 2.

Gaines had two episodes of hypoglycemia in November 2014, which caused him to lose consciousness. ECF No. 126-1 at 3. On November 23 and 25, 2014, Gaines was found unresponsive in his cell due to hypoglycemia, which can be caused by starvation, and if left untreated, can result in death. ECF No. 126-1 at 3. He was reported as "comatose," with an extremely low temperature and pulse.  ECF. No 126-6 at 7. Gaines was not evaluated by a medical provider after being found unconscious in his cell on November 25, 2014, despite being severely hypoglycemic. *Id.*

While incarcerated, Gaines had several transfers for acute care for psychiatric

decompensation. ECF No. 126-1 at 1. On March 27, 2014, he was transferred to the Transitional Care Unit ("TCU") at Dade CI because he was "psychotic." ECF No. 126-6 at 5. On November 12, 2014, Gaines was emergently transferred to the South Florida Reception Center's Crisis Stabilization Unit ("CSU") for "unspecified non-organic psychosis." Gaines was noted as putting feces all over his cell, speaking gibberish, and experiencing psychosis. *Id.* at 6. Two days later, he was transferred to the Mental Health Treatment Facility ("MHTF") at Lake CI, because he was "very psychotic…[had] very poor hygiene…covered in feces and urine." *Id.* On December 12, 2014, Gaines was admitted to the MHTF at UCI due to psychosis, poor hygiene, and smearing feces. *Id.* at 9.

On December 8, 15, and 23, 2014, and January 13 and 20, 2015, lab studies were ordered for Gaines. *Id.* There are no indications in the record of any of these labs being drawn as there are no lab results in the records produced that were obtained after November 23, 2014 and prior to April 23, 2015. *Id.* On April 23, 2015, lab studies showed a serum sodium level that evidenced severe hyponatremia. There is no indication in the medical records that this abnormal lab result was ever noted by the medical staff or acted upon. *Id.* at 11. On April 29, 2015, Gaines was admitted to TCU at UCI, weighing <u>140 pounds</u>. During the last four months of his life, Gaines took only 6 showers - one in August, two in September, two in October, and one in November. *Id.* at 12-13.

On May 18, 2015, Gaines' lab studies showed a serum sodium level that evidenced severe hyponatremia. *Id.* at 12. Defendant Lugo, the lead doctor and medical director at UCI, reviewed the lab studies on June 15, 2015. Lugo took <u>no action</u>, however, to identify the cause of Gaines' chronic hyponatremia or to treat this life-threatening abnormality. No follow-up appointments or additional lab tests were requested by Lugo. *Id.* On July 27, 2015, Gaines was seen for treatment for his hypertension. The doctor reported the results of the May 18, 2015 labs as <u>normal, even though they were severely abnormal with a life-threatening low serum sodium</u>. *Id.* at 13. On October 12, 2015,

lab studies were drawn, showing that Gaines was still suffering from profound hyponatremia. ECF No. 126-1 at 1,3. The results were severely abnormal and demonstrated a critically low level of sodium. ECF No. 126-6 at 14, 29. This severe hyponatremia requires emergent hospitalization. *Id.* These results were noted by Lugo on October 19, 2015; while he initialed the results, he <u>failed</u> to identify the critically low level of sodium, <u>implausibly noting that the results were "OK TO FILE" and required no action</u> – a fatal mistake. *Id.* at 14. Lugo failed to take any action to address this life-threatening abnormality. *Id.* The cause of the hyponatremia was never determined or treated. ECF No. 126-1 at 3; ECF No. 126-6 at 29-30. On November 4, 2015, Defendant Tambi ordered Gaines' lab results be sent to Lugo for review because of the severely low sodium levels indicative of hyponatremia. Lugo did not review the lab results and no action was taken. ECF No. 126-6 at 15

The last time Gaines received his antipsychotic medication Prolixin was on October 20, 2015, six weeks before his death. *Id.* at 17. He was ordered to be given this medication every two weeks. He did not receive his Prolixin on November 3 or November 27. *Id.* On December 2, 2015, Biskie noted that there "was no behavior or appearance of concern noted by the staff." *Id.* On December 3, 2015, Gaines was found unresponsive in his cell and pronounced dead later that day. ECF No. 126-1 at 1-2. He died naked and covered in feces. ECF No. 126-6 at 20. RN Denise Cordeau reported that she was unable to start an IV because Gaines was so dehydrated. *Id.* Autopsy photographs reveal a thin black male with dried feces on the soles of his feet. ECF No. 126-1 at 2.

On December 3, 2015, Biskie, who was in charge of Gaines' mental health treatment and responsible for maintaining his charts, was interviewed as part of the death investigation. ECF No. 126-6 at 18. She stated that: (a) between November and December 2015, an odor of urine and feces had been coming out of Gaines' cell; (b) Gaines was a topic of discussion the week prior to his death with the treatment team to possibly refer him back to CSU; (c) the week before he died, the team of

doctors, nursing, and officers had noticed an odor coming out of Gaines' cell; and (d) for the two days preceding Gaines' death, the security team reported to her that his cell was disheveled and he was eliciting an odor of urine and feces. *Id.* at 18-19. In a recorded statement, Officer Finley described the condition of Gaines when he went to his cell on the day he died: "feces were everywhere…"; "[he] was nude"; feces were "scattered all over the place"; "In his opinion Inmate Gaines should not have been in that dorm…that place was not set up to take care of him." *Id.* at 21. Inspector Randall Merritt noted: "A strong odor of feces and urine was present in the cell. The cell floor was covered in feces…There were probable feces on the soles of the inmate's feet." *Id.* at 26.

Dr. Hamilton performed the autopsy of Gaines on December 4, 2015. His autopsy findings include: (i) malnutrition (height 69 inches, weight 115 pounds); and (ii) generalized unwashed appearance and probable feces on soles of foot. *See* ECF Nos. 126-3; 126-4 at 1. Dr. Hamilton testified that his finding of malnourishment was based on "[Gaines] height and weight. A man 69 inches in length should weigh more than 115 pounds. He also had serious atrophy of his body fat stores; that is another good marker of malnutrition." ECF No. 126-12 at 7:18-23.[1] He testified that he has no reason to believe that the recorded weight of 115 pounds at the time of autopsy was inaccurate. *Id.* at 34:4-10. Importantly, he testified that the 85 pounds Gaines lost while incarcerated was consistent with malnutrition. *Id.* at 34:17-35:1. On December 18, 2015, Douglas Weiner, the Chief of Investigations for Florida, emailed Inspector General Jeffrey Beasley: "… the autopsy determined [Gaines] was very malnourished, and dehydrated and this was possibly negligence, it's not natural..." ECF No. 126-7.

Plaintiffs' experts have opined that Gaines likely died from a combination of severe malnutrition and untreated hypoglycemia and hyponatremia – all treatable causes.  ECF No. 126-1 at 4; ECF No. 126-6 at 22, 27.  Plaintiffs' expert Dr. Robert Cohen determined:

---

[1] "Because I could see him, I could tell he was malnourished, and you don't get serious atrophy of body fat stores with someone who has adequate body weight," *Id.* at 9:9-11

Corizon staff represented in their interviews with the…Inspector General that they were aware of [Gaines] condition, and aware that he was not taking medication. They knew he was refusing his medication, they knew he was psychotic, they knew he was covered in feces, and they did nothing. The behavior of the nursing, psychology, and psychiatry staff is appalling and shocking…Staff at UCI watched as Vincent Gaines deteriorated, watched as his weight went down, and down, and down, watched as he remained in his cell, urinating and defecating, naked and covered with feces, never coming out, and they did nothing. Their failure to act, while fully aware of the consequences of their inaction is frightening to consider. Their inaction was responsible for [Mr. Gaines'] death.

…

…Medical staff and nursing staff ignored the dramatic weight loss suffered by Vincent Gaines…At no time did the medical staff…take any action to understand why Mr. Gaines was losing weight…The medical staff recorded [Mr. Gaines'] weight as it dropped 25% the first year, and 33% the second year, but took no action to understand the reason for his weight loss…Failure to closely monitor the weight of Mr. Gaines while he wasted away in solitary confinement caused his death. Had his weights been correctly observed, and had medical staff responded to his weight loss and his other medical problems appropriately, he would not have died naked, covered with feces of untreated malnutrition, in a cell covered in feces…failure to monitor and treat massive weight loss is not consistent with ethical humane medical, nursing, or correctional care.

ECF No. 126-6 at 18, 25-26. With respect to Gaines' hyponatremia, Dr. Cohen opined:

Failure to diagnose and treat life-threatening hyponatremia in the presence of repeated measurements of low serum sodium caused Vincent Gaines' death…When Mr. Gaines lost consciousness on November 23, 2014, laboratory studies showed…hyponatremia. No action was taken by medical staff to determine why this man…suddenly lost consciousness and developed indications of severe liver and electrolyte dysfunction. Medical staff had ordered laboratory tests, the results were delivered to the clinical facility, were present in the medical record, and absolutely no action was taken by medical staff to follow up on these extremely abnormal results…The callousness of the medical staff to this life-threatening situation is extremely disturbing. Their indifference to [Mr. Gaines'] serious medical condition characterizes the care he received for the next year, as he wasted away, and died of severe malnutrition, untreated hyponatremia, and untreated severe mental illness.[2]

…

Vincent Gaines died of conscious abandonment. Medical staff documented that he was not receiving his medications…Mental health staff watched, and wrote copy-cat notes, failing to document the deterioration of his mental health while his cell filled with feces and he lay naked on the floor. Medical staff ignored life threatening lab results and failed to provide

---

[2] "Acute hyponatremia is life-threatening…The failure of Corizon's medial staff, for a period of more than one year, to seek a cause for the hyponatremia, and to treat it, is appalling.  Laboratory studies over a one-year period demonstrated significant and finally, two months before his death, extreme hyponatremia.  Medical staff were provided laboratory results on November 24, 2014. They were provided abnormal results of serum sodium, becoming increasingly life altering, and, in Mr. Gaines' case, life threatening, four more times in 2015…The results were consistently abnormal, and by October 2015, life threatening, and staff took no action to determine the cause of hyponatremia or to treat it.  [Mr. Gaines] was not examined, he was left to waste away and die in his feces covered solitary confinement cell.  The standard of care requires the determination of the cause of abnormally low sodium levels." *Id.* at 29-30.

any effort to diagnose or treat his critical condition. These problems were unfortunately not unique to Mr. Gaines but, for him, they were fatal…Medical staff knew that Mr. Gaines was severely ill. They knew he had life-threatening hyponatremia. They knew he was psychotic, covered with feces, and not receiving any medication. They knew that his weight was dropping precipitously. They knew all this and let him die without treatment. Medical staff knew that he had suffered unexplained losses of consciousness and sever hypoglycemia and made no effort to determine the reason, no effort to prevent it from happening again. Medical staff ignored severely abnormal life threatening lab results on multiple occasions, and misrepresented abnormal results as normal…The abandonment of this dying man by the medical, nursing, and mental health staff at Corizon, and the daily observation of his deterioration by FDOC is shocking…Vincent Gaines died from the abandonment by the medical and nursing staff which failed to diagnose and treat his life-threatening serious medical and mental health problems.

*Id.* at 28-29; 37-38.[3]

      **b. Corizon Has a Long History of Deliberate Indifference to the Serious Medical Needs of Inmates as evidenced by prior litigation and documented by the CMA**

The behavior of the Corizon Defendants in Florida is consistent with the behavior of Corizon employees nationwide. For over a decade, Corizon has been criticized by judges and special masters for their deliberate indifference to the medical needs of inmates. In 2011, a federal judge in Idaho appointed Dr. Marc Stern to be a special master in a case against the Idaho DOC and Corizon.[4] Dr. Stern "found serious problems with the delivery of medical and mental health care…many of which either have resulted or risk resulting in serious harms to inmates" that were "frequent, pervasive, [and] longstanding." Report of Marc Stern at 3, Ex. B.[5] In 2012, the Eleventh Circuit affirmed a jury verdict against Corizon for deliberate indifference to the serious medical needs of a prisoner, in failing to

---

[3] "Severe and life-ending malnutrition was one of the causes of death. Failure to diagnose or treat life-threatening hyponatremia in the presence of repeated measures of low sodium caused the death. Failure to provide him – to note the serious deficiencies – his serious mental health problems and to act upon them is an opinion I have. **I have an opinion that the practice of not paying attention to his laboratory results and his weight loss and his mental health status were issues that were known to FDOC at Union, had been repeatedly identified as very serious problems prior to his death and at the time of his death.  That it was preventable**." *See* Cohen Dep. 70:5-19, July 27, 2020, Ex. F.
[4] Order Appointing Special Master, No. 81-CV-1165 (D. Idaho July 20, 2011), **Ex. A.**
[5] "In multiple ways, these conditions violate the right of inmates…to be protected from cruel and unusual punishment." Since many of these problems are frequent, pervasive, and long standing, and authorities are or should have been aware of them, it is my opinion that authorities are deliberately indifferent to the serious health care needs of their charges…that there are problems with the delivery of health services should not come as an unexpected conclusion.  **IDOC staff monitor care delivered by Corizon…via annual and follow up audits. During the annual audit of 2010, Corizon failed 23 of the 33 categories of the audit**…" Ex. B at 3.

treat an infection that led to paralysis. *Fields v. Corizon, Inc.,* 490 Fed. Appx. 174 (11th Cir. 2012). In 2014, a class of mentally ill prisoners within the Alabama DOC filed a class action lawsuit against Corizon for "ignoring their medical and mental health needs…" ECF No. 64 at 8; *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1267-68. (M.D. Ala. 2017). After a bench trial, the Court determined that the mental health care provided by Alabama's DOC through its contract with Corizon violated the Eighth Amendment in failing to provide mentally ill prisoners with adequate mental health care. *Id.*

The Correctional Medical Authority ("CMA") monitors health care services and conducts independent physical and mental health care surveys at each Florida prison, issuing survey reports of its results. The survey reports are monitored via Corrective Action Plans ("CAPs"). The CMA conducted a review of UCI on June 18-21, 2013. *See* ECF No. 126-8. The survey revealed:

> [P]atient records were often disorganized with important documents either difficult to find or missing altogether…Baseline diagnostic and historical information was lacking in many patient charts. <u>Surveyors expressed concern that poor documentation could lead to medical errors.</u>

*Id.* at 00233. The survey exposed: considerable staffing shortages, with only 14 of the 63 nursing positions filled, *id.*; weekly weights and vital signs were not documented at required intervals, *id.* at 00237; psychiatric evaluations were missing or not completed, *id.* at 00239; <u>follow up lab tests were not completed as required</u>, *id.*; medical records were disorganized with pages missing altogether, *Id.* at 00240; and months of progress notes were missing, *id.* at 0024.[6] The 2013 Survey also exposed concerns about the use of "ghost trays" and access to mental health services:

> Twenty-two inmates…were interviewed. <u>Nine reported "ghost trays" are given to some inmates during mealtimes while in confinement or inpatient mental health units</u>. They explained that "ghost trays" are empty Styrofoam containers that should contain a meal…The CMA psychiatrist surveyor stated this would be concerning for inmates taking psychotropic medication, as food and water deprivation can increase the threshold of

---

[6] "Despite the survey team being comprised of experienced surveyors who are familiar with…medical records, they had difficulty finding the appropriate documentation needed to carry out the survey protocols. For example, some psychiatry progress notes were filed under the "plan of care" tab, while others were filed with the nursing notes. Progress notes were often out of chronological order and printed dates were crossed out and alternative dates handwritten." *Id.* at 00241.

seizures…Of the 22 inmates interviewed, 11 were housed in inpatient mental health units. <u>Seven of the 11 reported barriers to accessing mental health services.</u> They stated they are either ignored or told no if they attempt to declare a psychological emergency, ask for an inmate request form and/or ask to attend group activities.

*Id.* at 00242. The 2013 survey additionally exposed serious concerns about staffing shortages:

<u>UCI faces chronic staffing vacancies</u> including psychiatric, psychological, security, nursing and medical records… <u>These staffing challenges likely contribute to many of the findings regarding missing or late assessments and inconsistent documentation of vital signs and weights</u>…Staffing concerns create challenges with documentation consistency, disrupt continuity of care, and may affect treatment outcomes.

*Id.* at 00243. On January 23, 2014, a CAP assessment was conducted at UCI. ECF No. 126-9 at 00205-206. The CAP revealed that prisoners who requested mental health intervention were still not seen by mental health staff. *Id.* at 00212.

On November 9-10, 2015, CMA surveyors conducted a targeted review of UCI. *See* ECF No. 126-10.[7] The review: (a) "confirmed <u>grave concerns about the administration of medications</u> in the inpatient units..." Out of the records reviewed, only one inmate received his medication as prescribed over the past 3-4 months; *id.* at 00174; (b) exposed that "it was not unusual for inmates receiving transitional care to see a psychiatric provider every 2 months instead of the required monthly or biweekly visit," *id.* at 00175; (c) exposed "serious deficiencies in in-patient nursing care, in addition to the medication administration… in all the records reviewed, <u>weights and vital signs were not recorded per policy</u>," *id.*; and (d) revealed that "the primary complaint pertained to medication administration. Inmates reported they do not always receive their medications and are informed by nursing staff that they ran out, the bottle is empty." *Id.* at 00178. Additionally, only 26% of the records reviewed indicated inmates received psychiatric follow-ups at the required levels; <u>only 50% of the records reviewed showed clinically appropriate initial lab tests were ordered; only 40% of the records</u>

---

[7] There was a total of 67 items reviewed that related to inpatient mental health services.  Of these, 47 fell at or below 80% compliance - an overall non-compliance rate of 70%.  For outpatient mental health services, there was a total of 54 items reviewed.  Of these, 29 fell at or below 80% compliance - an overall compliance rate of 54%.  *Id.* at 00174.

reviewed showed that clinically appropriate follow-up labs were ordered; only 50% of abnormal labs for psychotropic meds were treated appropriately; only 56% of all psychiatric evaluations were completed timely; 0% of the records reviewed showed weights recorded timely; only 5% of required nursing evaluations were documented; only 14% of the mental health professional notes were clinically appropriate and timely; and only 30% of the records reviewed indicated that the treatment provided to mentally ill prisoners was clinically appropriate. *Id.* at 00174-75. The review further exposed that "many of the progress notes in the TCU records… were "cookie-cutter" making it impossible to follow the course of the treatment." *Id.* at 00176. The review again expressed concerns about staffing shortages and the ability to adequately treat inmates, revealing 18 current vacancies including…the Director of Nursing. *Id.* at 00178. The review concluded:

> This review indicates serious and multiple deficiencies in the delivery of mental health care in both the inpatient and outpatient settings at Union CI. The deficiencies in the administration of medication were particularly striking, as was the current nursing vacancy rate. The overall mental health care delivered in the inpatient units is **inadequate**, as evidenced by poor compliance with required psychiatric, psychological, and nursing services and sparse or missing documentation. The delivery and documentation of care in the Special Housing dorms was equally problematic with respect to the administration of medication... Additionally…inmates who submitted requests were not seen as intended, raising significant questions about access to care.

*Id.* at 00179 (emphasis added).

### III.    MEMORANDUM OF LAW

#### a.  Legal Standard Governing Summary Judgment

Summary judgment is proper if the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See id.* at 255.

The moving party bears the burden of proving the absence of any triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-4 (1986).

**b.  Claims against Individual Corizon Defendants**

The Eighth Amendment's prohibition on cruel and unusual punishment extends to the failure to provide adequate medical care. *Braggs v. Dunn*, 257 F.Supp.3d 1171, 1188 (N.D. Ala. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)). This obligation to provide adequate medical care includes psychiatric and mental healthcare. *Id.* (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) ("Failure to provide basic psychiatric and mental healthcare states a claim of deliberate indifference to the serious medical needs of prisoners.")). Plaintiffs must show that the individual Corizon Defendants acted with deliberate indifference to Gaines' serious medical needs.  *Estelle*, 429 U.S.at 105-06. This inquiry consists of both an objective and subjective test. The Corizon Defendants do not contest that Plaintiffs can meet the objective test. The subjective test requires a showing that the individual Corizon Defendants knew of and disregarded an excessive risk to Gaines' health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). With respect to Defendants Lugo, the medical director and lead doctor at UCI, and Biskie, the supervising psychologist at UCI, Plaintiffs also bring a claim under a supervisory theory of liability. Defendants do not address, analyze, or contest the supervisory claims brought against Lugo and Biskie.[8]

Here, Defendants move for summary judgment on five grounds: (1) Gaines was provided medical care; (2) there is no evidence that "ghost trays" were utilized at UCI; (3) the individual

---

[8] "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). "The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985) ("The required causal connection can also be established when a history of abuse by subordinates has put the supervisor on notice of the need for improved supervision and training, and his failure to take corrective action sets the stage for the inmate's injury.")

Corizon Defendants acted within their medical judgment; (4) there is no evidence of staff shortages, inadequate charting, or that Gaines was housed in squalor; and (5) there is no evidence that any action or inaction caused Gaines' death.  Each of these arguments are misplaced and belied by the record. Because there is sufficient evidence for a jury to conclude that the individual Corizon Defendants acted with deliberate indifference, their motion for summary judgment should be denied.  Plaintiffs will address each argument in turn, while addressing the first and third arguments together.

First, the individual Corizon Defendants argue summary judgment must be granted because while the medical care provided was inadequate, medical care was provided nonetheless, and the practitioners can rely on their medical judgment. This argument, however, does not comport with the governing law – an inmate does not have to show that he was ignored by medical staff to prevail. The record demonstrates that Gaines received cursory treatment for his rapid psychiatric decompensation and no treatment for his life-threatening hyponatremia, hypoglycemia, and severe malnutrition constituting deliberate indifference to his serious medical needs and leading to his death.

Whether a medical provider acted with deliberate indifference presents a question of fact. Proof can be based upon circumstantial evidence, and need not rely upon the direct testimony of the medical person whose judgment is questioned:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence,…and a factfinder may conclude a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Otherwise, an official would be able to win a case simply by asserting that he or she acted in good faith, like the individual Corizon Defendants are attempting to do here. For example, in *Sherrod v. Lingle*, a jail inmate complained that his symptoms of pending appendicitis were ignored. The Seventh Circuit held that a chart note ("rule out appendicitis") could be taken as evidence by the jury that tests were needed to eliminate appendicitis

as a cause of the plaintiff's pain, but no tests were performed:

> The evidence, when resolved in Sherrod's favor, raises questions of material fact as to whether the prison medical staff exhibited deliberate indifference, by returning Sherrod to his cell despite the appendicitis symptoms, thereby precluding summary judgment for the defendants…A prisoner is not required to show that he was literally ignored by the staff. If knowing that a patient faces a serious risk…, the prison official gives the patient an aspirin and an enema and sends him back to his cell, a jury could find deliberate indifference although the prisoner was not 'simply ignored.'

*Sherrod*, 223 F.3d 605, 611 (7th Cir. 2000).  In *Gibson v. Moskowitz,* a mentally disabled inmate died in prison from dehydration. The Court affirmed a jury verdict of deliberate indifference. The Court addressed whether the defendant physician subjectively ignored the inmate's medical needs:

> [Dr.] Moskowitz argues that he 'did not believe that a serious medical need existed * * *.' * * * The question, however, is not just whether the state employee has admitted the inmate faced an excessive and imminent health risk; it is also whether circumstantial evidence including 'the very fact that the risk was obvious,' shows the employee must have understood the nature of the risk. A reasonable jury could fairly conclude that Moskowitz 'kn[ew] of and disregard[ed] an excessive risk to [Vaughn's] health or safety.

*Gibson,* 523 F.3d 657, 662 (6th Cir. 2008). Deliberate indifference may be inferred when medical decisions "are so far afield" from professional standards that an inference cannot be drawn that the decisions were based on actual medical judgment.  *See Bochner v. Martin Cty,* Case No. 17-cv-14422, 2019 WL 7842321, *7 (S.D. Fla. Dec. 30, 2019) (citing *Duckworth v. Ahmad,* 532 F.3d 675, 680 (11th Cir. 2008)). Deliberate indifference may also be inferred where the care given is so cursory as to amount to no treatment at all. *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) ("...a jury could find that the medication provided to Elmore was so cursory as to amount to no care at all.").

In *Carswell v. Bay County,* 854 F.2d 454 (11th Cir.1988), the plaintiff made a series of requests for medical care and attention. Although the medical staff diagnosed and provided some medication to the plaintiff, the Eleventh Circuit nonetheless affirmed a jury verdict for the plaintiff, explaining that, because plaintiff's condition worsened and the jail medical staff failed to respond, "with evidence of

knowledge the jury could have concluded that the failure to provide Carswell with medical care constituted deliberate indifference." *Id.* at 457

Here, a jury can conclude that Lugo's failure to provide Gaines with life-saving medical care constituted deliberate indifference. On June 15, 2015, Lugo reviewed Gaines' lab studies showing a low serum sodium level that evidenced severe hyponatremia; he took no action, however, to identify the cause of the hyponatremia or to treat this life-threatening abnormality. Similarly, on October 19, 2015, Lugo reviewed Gaines' lab studies drawn on October 12, 2015. These results showed that Gaines was still suffering from profound hyponatremia, requiring emergent hospitalization. Lugo initialed these lab results while again failing to identify the critically low sodium levels even implausibly noting that the results required no action. A jury could conclude that Lugo's repeated inaction and failure to treat Gaines' deadly hyponatremia over the span of several months despite repeated lab results showing Gaines needed emergent medical care and hospitalization was "far afield" from professional standards and constituted deliberate indifference. Moreover, on November 4, 2015, Tambi ordered Gaines' lab results be sent to Lugo for review because of the severely low sodium levels evidencing profound hyponatremia requiring emergent care. Like in *Sherrod*, Lugo's failure to treat Gaines' severe hyponatremia despite this note could be taken as evidence by the jury that tests were needed to identify the cause of Gaines' hyponatremia, but no tests were performed exhibiting deliberate indifference.

Here, a jury can also conclude that Biskie's failure to provide Gaines with adequate mental health care constituted deliberate indifference. Biskie, who was in charge of overseeing Gaines' mental health treatment, noted one day before his death that there "was no behavior or appearance of concern noted by the staff."  Yet, one day later when interviewed as  part of the death investigation, she described how Gaines' rapid psychiatric decompensation and lack of hygiene, behavior, and

appearance and body odor were topics of alarm amongst the medical and security staff in the months leading up to Gaines' death. She reported that Gaines had been refusing mental health call outs for a month before his death.  ECF No. 126-6 at 19. The mental health care provided to Gaines was so cursory as to amount to no treatment at all.  Biskie failed to document the deterioration of Gaines' mental health, instead writing cookie-cutter notes that did not reflect his current condition, while his cell filled with feces and he lay naked on the floor dying.[9] The fact that some medical care was provided does not absolve the individual Corizon Defendants of liability when the treatment was cursory and was the functional equivalent to no treatment at all.

Second, Defendants' argument that there is no evidence of ghost trays at UCI or that Gaines was malnourished is again belied by the record. On December 1, 2015, Lewis Smith, a prisoner in Gaines' housing unit, filed a grievance indicating that officers were giving Gaines' ghost trays in retaliation for his mental illness. S*ee* ECF No. 126-13. Additionally, as set forth in the statement of facts, the 2013 CMA survey exposed serious concerns about the usage of ghost trays at UCI. Biskie testified that she heard about the usage of ghost trays at UCI. Ex. C at 50:3-11. Dr. Shuman testified that it would be obvious that Gaines was malnourished and being starved as he was losing a lot of weight. Ex. E at 38:22-39:5. The medical examiner testified that it was obvious that Gaines was malnourished just by looking at him. ECF No. 126-12 at 9:9-11. *See McElligott*, 182 F.3d at 1255. ("a factfinder may conclude that a[n]…official knew of a substantial risk from the very fact that the risk was obvious").  Defendants' argument is simply not true.

Third, Defendants' one-sentence argument that there is no evidence of staff shortages, inadequate charting, or that Gaines was housed in squalor is again belied by the record and would

---

[9] The above analysis is only relevant to the individual claims brought against Lugo and Biskie and not the supervisory claims which Defendants fail to address, contest, or analyze in their motion.  With respect to supervisory liability, Plaintiffs would rely on the CMA surveys, CAPS, and audits, as addressed below.

require this Court to ignore a large portion of the record. To start, the CMA surveys, CAPs, and reviews set forth in great detail in Plaintiffs' statement of facts explicitly and repeatedly express concerns about considerable medical staffing shortages and inadequate charting and documentation, leading to medical errors. They establish the pervasive and continuing nature of Corizon's alarming staffing shortages, as well as inadequate charting of vitals, weights, administration of medication, and other important medical information necessary to adequately treat inmates. Biskie testified that she personally participated in the CMA surveys, CAPs and reviews <u>regularly</u>. *See* Biskie Dep. 53:11-56:5, July 10, 2020, Ex. C. She testified that many of the inadequacies in medical and mental health care revealed in the surveys, CAPs, and reviews dealt with inadequate charting and errors in documentation. *Id.* at 55:9-13. She testified that the medical staff would have group meetings to discuss the inadequacies in medical and mental health care revealed by the CMA; and that her supervisor would discuss the inadequacies with her as well. *Id.* at 55:21-56:5.[10]

Lugo testified that he was familiar with the CMA survey, CAPS, and review process, and that he had knowledge of prior surveys, CAPS, and reviews that took place before he became medical director in 2015. *See* Lugo Dep. 30:18-33:21; 51:6-12, July 10, 2020, Ex. D. He testified that there were significant staffing shortages, particularly in the nursing staff, while he was medical director. *Id.* at 19:21-20:6. He testified that he was aware that medical staff he supervised was failing to consistently weigh and record weights of inmates as well as vital signs pursuant to the requisite policies and procedures. *Id.* at 23:17-24:7.[11] He testified that in order for inmates to receive adequate medical care, it is necessary to consistently weigh them. *Id.* at 24:8-10. He testified that it would be

---

[10] This comports with Defendant Andrews' testimony. *See* ECF No. 126-5 at 46:20-47:3 (testifying that she had group meetings with the medical team to point out inadequacies in medical and mental health care that inmates were receiving)

[11] Failure to enforce policies as a supervisor may be evidence of deliberate indifference. *See LaMarca v. Turner*, 995 F.2d 1526, 1537 (11th Cir. 1993) (finding deliberate indifference where prison official "failed to ensure that his direct subordinates followed the policies he established"); *Goka v. Bobbitt*, 862 F.2d 646, 652 (7th Cir. 1988) (holding that failure to enforce a policy where the policy is critical to inmate safety may rise to the level of deliberate indifference)).

alarming and troubling if medial records were disorganized and missing, as repeatedly revealed by the CMA, because in order to properly treat any illness, medical records need to be complete for subsequent treaters to understand the medical history and plan of treatment.  *Id.* at 60:22-62:7. The CMA surveys, CAPs, and reviews alone provide sufficient evidence for a jury to conclude that Biskie and Lugo acted with deliberate indifference both with respect to the individual and the supervisory claims brought against them. Each was subjectively aware of Corizon's history of widespread inadequate medical and mental health care rendered to inmates which put them on notice of the need to correct the inadequacies and they failed to do so, setting the stage for Gaines' tragic death.

With respect to evidence that Gaines' was living in unhygienic conditions, the Corizon Defendants' argument is equally misplaced. Similar to Defendant' Andrews, the Corizon Defendants point to a December 1, 2015 note written by a mental health counselor, indicating that Gaines was alert, clean, calm, and cooperative. ECF No. 114 at 6. However, a litany of record evidence creates genuine issues of material fact as to whether Gaines was living in unhygienic conditions. As detailed in Plaintiffs' Statement of Facts, Gaines had a long history of living in squalor with his cell covered in feces and urine. Biskie confirmed this when interviewed the day Gaines died as part of the death investigation. Thus, the counselor's note is contradicted by other evidence in the record and cannot support summary judgment, as all inferences must be made in the light most favorable to the Plaintiffs.[12] Defendants' conclusory argument that there is no record evidence of staff shortages, inadequate charting, or that Gaines was housed in squalor is simply not true.

Fourth, the Corizon Defendants' argument that there is no evidence that any action or inaction

---

[12] The 2015 Review exposed that "many of the progress notes in the TCU records… were "cookie-cutter" making it impossible to follow the course of the treatment." This is notable in addressing the argument that there is no evidence that Gaines was living in squalor, with Defendants' pointing to Eccles' 12/1/15 note. However, it appears that Eccles' progress notes were "cookie cutter," suffering from the same defects identified in the 2015 Review of UCI and making it impossible to follow Gaines' course of treatment. Indeed, a comparison of Ms. Eccles' November 10 Note and her December 1 Note reveal that the portion of the progress note relied on by Defendants in their motion is identical in both notes, including the same typos. *See* ECF No. 126-6 at 15-16. Sadly, for Gaines, the consequence of these cookie-cutter notes was deadly.

caused Gaines' death again does not comport with the record. As set forth in Plaintiffs' Statement of Facts, Plaintiffs' experts Drs. Cohen and Shuman have opined that Gaines' died of a combination of malnutrition and untreated hypoglycemia and hyponatremia – all three which are treatable with clinically appropriate care. Dr. Cohen specifically opined: "Their [Corizon Defendants] **failure to act**, **while fully aware of the consequences of their inaction is frightening to consider. Their inaction was responsible for [Gaines'] death**." ECF No. 126-6 at25-26. Dr. Shuman testified that untreated hypoglycemia which is caused by starvation, untreated hyponatremia, or a combination of both caused Gaines' death. *See* Shuman Dep. 16:14-20; 33:1-34:2; 35:21-38:16; 45:2:12; 51:17-24 July 17, 2020, Ex. E.[13] Dr. Shuman testified that he agreed with the medical examiner's finding that Gaines was malnourished at the time of his death. *Id.* at 44:18-21. Dr. Cohen testified that "severe and life-ending malnutrition," was a cause of Gaines' death as well as "failure to diagnose and treat life-threatening hyponatremia in the presence of repeated measures of low-sodium." *See* Ex F at 70:5-23; 71:20-72:11; 76:15-77:2; 87:14-21; 94:5-11; 121:9-122:3. Defendants' argument is again simply not true. The individual Corizon Defendants' motion for summary judgment should be denied.

### c. Claim Against Corizon

Corizon, as an entity contracted to provide medical services to inmates incarcerated by the FDOC, can be liable under section 1983 when undertaking duties to treat inmates. *See West v. Atkins*, 487 U.S. 42, 54 (1988) While an entity such as Corizon cannot be held liable under a theory of respondeat superior, *City of Canton v. Harris*, 489 U.S. 378, 387 (1989), Corizon is liable under *Monell v. Dept. of Soc. Serv. Of City of New York*, 436 U.S. 658 (1978) when its policies or practices cause constitutional violations. Because Corizon "must be held accountable for more than its

---

[13] The Corizon Defendants argue that there is no evidence that inaction caused Gaines' death because the medical examiner noted that Gaines' cause of death was "undetermined." Dr. Shuman testified that this is likely because there were multiple causes of death working together (i.e. malnutrition, untreated hyponatremia, and untreated hypoglycemia). *Id.* at 26:19-27:12.

officially codified policies, [Corizon] may also be liable for 'customs and practices having the force of law.'" *Nelson v. Prison Health Servs., Inc.*, 991 F.Supp.1452 (M.D. Fla. 1997) (quoting *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989)).  In order to prove liability based on custom, "[Plaintiff] must establish a widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991).  In *Nelson*, the personal representative of an inmate who died brought an action against the company that provided medical services for the jail. The Court denied summary judgment, finding that there was sufficient evidence to establish a custom of violating inmates' constitutional right to medical treatment.  *Nelson*, 991 F. Supp. 1452 (M.D. Fla. 1997). In order to establish a custom of Prison Health Services providing inadequate medical care that was so widespread and permanent as to constitute a custom with the force of law, the Court relied on the reports of monitors, similar to the CMA surveyors here, who reported on the conditions of inmates in the jail:

> Plaintiff has…presented evidence of precisely this sort of 'widespread' and 'longstanding' failure to provide adequate medical treatment. From 1975 forward, the Pinellas County Jail operated under the oversight of this Court, pursuant to which a Court Appointed Monitor reported on the conditions of inmates at the Jail. Both in 1993 and 1994, this Monitor emphasized in her reports pervasive and deep-seated failures in providing medical care to the inmates of the jail.…The same evidence of custom…also forms the basis for PHS' liability under section 1983. Indeed, Dr. Smith's reports indict PHS as thoroughly, if not more so, than they do the County…The Court therefore concludes that the Plaintiff has proffered sufficient evidence to establish PHS' liability under section 1983.

*Id.* at 1465; *see also* n. 6, *supra*. Here, like in *Nelson*, Plaintiffs have proffered sufficient evidence through the CMA surveys, CAPs, and reviews as well as the prior litigation against Corizon, to establish a custom of Corizon providing inadequate medical care  to inmates and displaying deliberate indifference to the serious medical needs of prisoners that was so widespread and permanent as to

constitute a custom with the force of law. While Corizon conclusory[14] argues that summary judgment must be granted in its favor, this would require the Court to ignore the core tenets governing its summary judgment analysis and a plethora of record evidence with respect to the findings of the CMA investigations and prior litigation against Corizon. As set forth in the statement of facts, Plaintiffs have cited widespread evidence of Corizon's "pervasive" and "longstanding" customs of chronic understaffing, inadequate charting and documentation, failing to order clinically appropriate lab studies or follow-up lab studies, failing to document weights and vital signs as required, disorganized medical records, use of ghost trays leading to malnutrition, significant barriers to accessing mental health services, failing to perform required psychiatric checks, failing to administer medication as prescribed, and failing to provide adequate medical and mental health care leading to inmate deaths. Indeed, the conclusion of the 2015 review was that the health care delivered was "**inadequate**."[15] For Gaines, the consequences of Corizon's customs were deadly– Lugo, Biskie, and other doctors repeatedly failed to recognize and treat Gaines' life-threatening medical conditions; failed to order and carry out clinically appropriate lab tests and follow-up tests; failed to document and monitor Gaines' vital signs and weights as required pursuant to policy or treat Gaines' obvious life-threatening weight loss, failed to document and treat Gaines' rapid psychiatric decompensation, and failed to administer Gaines' medication as prescribed, leading to his malnutrition, starvation, and death.

  With respect to Corizon's argument that there is no proof that a custom was the direct cause

---

[14] In one paragraph, Corizon states: there was no policy of understaffing. There was no policy allowing inadequate medical or mental health care. There was no policy of allowing inaccurate or inadequate charting. There was no policy allowing employees to discipline mental health care patients. There was no policy condoning the provision of inadequate nutrition. There was no policy of allowing inmates to live in unclean cells. ECF No. 114 at 24.

[15] This review indicates serious and multiple deficiencies in the delivery of mental health care in both the inpatient and outpatient settings at Union CI. The deficiencies in the administration of medication were particularly striking, as was the current nursing vacancy rate. The overall mental health care delivered in the inpatient units is **inadequate**, as evidenced by poor compliance with required psychiatric, psychological, and nursing services and sparse or missing documentation…Additionally, in many instances, inmates who submitted requests were not seen as intended, raising significant questions about access to care.

of Gaines' death, this again is simply not true. Plaintiffs have set forth in great detail the expert opinions of Drs. Shuman and Cohen in which they opine that Corizon's customs, including its failure to order clinically appropriate lab studies and follow-up lab studies, treat mental illness and appropriately document weights and vital signs, resulted in the failure of Gaines to receive adequate medical and mental health care for his severe hyponatremia, hypoglycemia, malnutrition, and mental illness, leading to this death *See* statement of facts, *supra*; ECF Nos. 126-1 (Shuman Report), 126-6 (Cohen Report); and Ex. F at 70:13-19.[16] There is no merit to Corizon's argument, and for the reasons set forth above, Defendants' motion for summary judgment should be denied in its entirety.

.

By: /s/ Elise Sherr Allison

Elise Sherr Allison
Florida Bar No.: 99154

---

[16] "I have an opinion that the practice of not paying attention to his laboratory results and his weight loss and his mental health status were issues that were known to FDOC at Union, had been repeatedly identified as very serious problems prior to his death and at the time of his death."

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via E-Serve to all Counsel on the attached list this 16th day of November, 2020.

/s/ Elise Sherr Allison
Elise Sherr Allison
Florida Bar No.: 99154
Attorney E-Mail:  eallison@searcylaw.com and
cgreenia@searcylaw.com
Primary E-Mail: allisonteam@searcylaw.com
John Scarola, Esq.
Florida Bar. No. 169440
Attorney E-Mail:  jsx@searcylaw.com;
Primary E-Mail:  scarolateam@searcylaw.com
and mmccann@searcylaw.com
SEARCY DENNEY SCAROLA BARNHART &
SHIPLEY, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Tel.: (561) 686-6300/Fax: 561-383-9451/9465

Daniel Marshall
Florida Bar No.: 617210
dmarshall@hrdc-law.org
HUMAN RIGHTS DEFENSE CENTER
P.O. Box 1151
Lake Worth, FL 33460
Tel.: (561) 360-2523/Fax: (866) 735-7136

Edwin Ferguson, Esq.
Florida Bar. No.: 15216
eferguson@thefergusonfirm.net
THE FERGUSON FIRM, PLLC
41 West 27th Street
Riviera Beach, Florida 33404
Tel.: (561) 840-1846/Fax: (561) 840-1642

*Attorneys for Plaintiffs*

## COUNSEL LIST

J. Steven Carter, Esq. Miriam Coles, Esq.
HENRY BUCHANAN, P.A.
Post Office Drawer 14079 Tallahassee, FL  32317-4079
Tel.: (850) 222-2920
Fax: (850) 224-0034
scarter@henryblaw.com mcoles@henryblaw.com
*Attorney for Defendants Inch, Jones and Jordan*

Gregg Toomey, Esq.
The Toomey Law Firm LLC 1625 Hendry Street, suite 203 Ft. Myers, FL  33901
Tel.: (239) 337-1630
Fax: (239) 337-0307
gat@thetoomeylawfirm.com
*Attorney for Defendant Corizon Health, Inc.*

Robert B. Buchanan
SIBONI & BUCHANAN, PLLC
Attorneys for Defendant Rosier 1900 SE 18th Avenue, Suite 300
Ocala, Florida 34471
Primary email: rbuchanan@sbtrial.com Secondary: aperry@sbtrial.com
Tel: (352) 629-7441
Fax: (352) 629-7745
*Attorney for Defendants Rosier and Anderson*