UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LORINE GAINES, as survivor of
VINCENT GAINES; RUBIN SIMPSON
and EVETT SIMMMONS, as Personal
Representatives of the Estate,

          Plaintiffs,

v.                                                                Case No. 3:18-cv-1332-BJD-PDB

JULIE JONES et al.,

          Defendants.

_____

## ORDER

### I. Status

This cause is before the Court on the following dispositive motions: (1) Defendants Anderson and Rosier's motion for summary judgment (Doc. 107; Anderson Motion); (2) Defendant Inch's motion for summary judgment (Doc. 109; Inch Motion); (3) Defendant Jones's motion for summary judgment (Doc. 110; Jones Motion); (4) Defendant Andrews' motion for summary judgment (Doc. 111; Andrews Motion); and (5) Defendants Corizon Health, Inc., Perez-Lugo, Tambi, Biskie, and Sanders' motion for summary judgment (Doc. 114; Medical Defendants Motion). Plaintiffs notified the Court that they "will not be filing responses in opposition" to Defendants Inch's and Jones's motions. See

Notice (Doc. 127). Plaintiffs have responded to Defendants Anderson and Rosier's motion for summary judgment (Doc. 128; Pl. Anderson Resp.), to Defendant Andrews' motion for summary judgment (Doc. 126; Pl. Andrews Resp.), and to the Medical Defendants' motion for summary judgment (Doc. 132; Pl. Medical Defendants Resp.). With leave of Court, the Medical Defendants filed a limited reply (Doc. 136; Medical Defendants Reply).

Also before the Court are Defendants Inch, Jones, and Andrews' motion to exclude testimony of Plaintiffs' expert Robert Cohen (Doc. 104) and the Medical Defendants' motion to continue trial (Doc. 137), which Defendants Inch, Jones, and Andrews join (Doc. 141) and Plaintiffs oppose (Doc. 143).

## II. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."

Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. Id. Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing [the motion]." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

3

### III. Overview

Plaintiffs, co-personal representatives of Vincent Gaines's estate and Mr. Gaines's mother, are proceeding on a second amended complaint (Doc. 64; Am. Compl.) for alleged violations of Mr. Gaines's civil rights while he was incarcerated at Union Correctional Institution (UCI). See Am. Compl. ¶ 1. Mr. Gaines entered the Florida Department of Corrections' (FDOC's) custody in 2013, and was transferred to UCI on April 29, 2015, where he was placed in a TCU (Transitional Care Unit) because he had a history of psychological illness, including schizoaffective disorder and bipolar disorder.[1] See FDOC Med. Records (Doc. 108-2) at 683; Gaines Overall Inmate Record (Doc. 108-4) at 4; Gaines Internal Mvmt. (Doc. 108-5) at 2.

On December 3, 2015, at age fifty-two, Mr. Gaines "died alone, naked, and covered with feces, in his solitary confinement cell at [UCI]." See Cohen Report (Doc. 126-6) ¶ 67. The medical examiner concluded the cause of his death was "undetermined," though found notable that Mr. Gaines was malnourished (weighing 115 pounds), had an "unwashed appearance," and had

---

[1] Mr. Gaines was housed in U Dorm, which was "a TCU that provided access to necessary treatment and services to inmates for their diagnosed mental disorders commensurate with their identified mental health needs, level of adaptive functioning, and pre-release continuity of care planning." See Aufderheidi Dec. (Doc. 108-8) ¶ 8.

4

mild to moderate coronary artery atherosclerosis. See Autopsy Report (Doc. 126-3) at 7.

At deposition, the medical examiner, Dr. William Hamilton, testified that a man of Mr. Gaines's height—69"—should weigh more than 115 pounds. See Hamilton Dep. (Doc. 126-12) at 7.[2] Dr. Hamilton also noted Mr. Gaines had "serious atrophy of his body fat stores," which is another indicator of malnutrition. Id. Dr. Hamilton does not believe malnutrition caused Mr. Gaines's death but said malnutrition could have made Mr. Gaines "a little more susceptible to a natural cause." Id. at 24, 47.

Plaintiffs' expert Mark J. Shuman, M.D., M.S., opines Mr. Gaines, who had a history of psychological disorders, including schizophrenia, likely died from hypoglycemia or hyponatremia.[3] See Shuman Report (Doc. 126-1) at 4. Dr. Shuman does not believe Mr. Gaines died from hypertensive cardiovascular disease. Id. at 3. A second Plaintiffs' expert, Robert L. Cohen, M.D., opines "[s]evere and life-ending malnutrition was one of the causes of the death of Vincent Gaines." See Cohen Report (Doc. 126-6) ¶ 71. Dr. Cohen opines

---

[2] When citing deposition transcripts, the Court will use page numbers assigned by the court reporter service. Page numbers for all other exhibits will be those assigned by the Court's electronic management system (CM/ECF).

[3] "Hyponatremia occurs when the concentration of sodium in [the] blood is abnormally low." See Mayo Clinic website, available at https://www.mayoclinic.org (last visited Mar. 16, 2021).

another cause of Mr. Gaines's death was hyponatremia, which went undiagnosed and untreated despite "repeated measurements of low serum sodium." Id. ¶ 85.

### IV. Defendants Anderson & Rosier's Motion

Plaintiffs allege Defendants Anderson and Rosier—a corrections officer and sergeant—were deliberately indifferent to Mr. Gaines's health and safety by depriving him of food, which caused Mr. Gaines to lose "approximately 39 pounds . . . and starv[e] to death," and withholding "adequate medical and mental health intervention."[4] See Am. Compl. ¶¶ 133, 136, 142. Plaintiffs further allege Defendant Rosier, in his role as a sergeant, "failed to adequately supervise subordinate correctional officers." Id. ¶¶ 134-35.

Defendants Anderson and Rosier invoke qualified immunity, maintaining Plaintiffs cannot establish they were deliberately indifferent to Mr. Gaines's serious medical needs. See Anderson Motion at 24. An official sued in his individual capacity "is entitled to qualified immunity for his discretionary actions unless he violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Black v. Wigington, 811 F.3d 1259, 1266 (11th Cir. 2016) (quoting Case v. Eslinger,

---

[4] Defendants Anderson and Rosier clarify in their motion that Mr. Gaines lost only 25 pounds when he was at UCI. See Anderson Motion at 17.

555 F.3d 1317, 1325 (11th Cir. 2009)). Qualified immunity allows government employees to exercise their official duties without fear of facing personal liability. Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018). The doctrine protects all but the plainly incompetent or those who knowingly violate an inmate's constitutional rights. Id. In other words, "[q]ualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." Taylor v. Riojas, 141 S. Ct. 52, 53 (2020) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)).

Upon invoking qualified immunity, a defendant bears the initial burden to demonstrate he was acting within his discretionary authority at the relevant times. Id. Plaintiffs do not dispute Defendants Anderson and Rosier were acting within their discretionary authority at the relevant times. As such, the burden shifts to Plaintiffs, who must point to facts that, accepted as true, demonstrate Defendants Anderson and Rosier violated a constitutional right that was "clearly established" at the time of the alleged violation. Id.

Defendant Rosier avers his job duties did not include food tray distribution, although he may have assisted with such duties when other officers were unavailable. See Rosier Aff. (Doc. 107-3) ¶ 8. Defendant Rosier denied having ever refused to give Mr. Gaines his meals, and he was unaware

of any subordinate officer having done so. Id. ¶ 10. Defendant Anderson similarly denies having refused Mr. Gaines food. See Anderson Dec. (Doc. 107-4) ¶ 8.

Plaintiffs point to some evidence that contradicts Defendants' contentions. First, they cite a grievance and an emergency pleading submitted by an inmate, Lewis Smith, who was housed in U Dorm with Mr. Gaines. On December 1, 2015, two days before Mr. Gaines died, Inmate Smith submitted a grievance to the Warden's office reporting that Defendant Anderson refused to give Mr. Gaines his food tray and Defendant Rosier verbally abused and threatened Mr. Gaines for defecating and urinating on himself instead of notifying the proper officials that he needed medical attention. See Smith Grievance (Doc. 107-7) at 1-2.

On December 14, 2015, Inmate Smith filed an emergency pleading in which he repeated the allegations made in his grievance and also wrote, "Anderson and Sergeant Rousier [sic] routinely starved inmate Gaines by placing the tray in the tray flap . . . but was not opening the flap so Gaines could receive his food." See Smith Pleading (Doc. 126-11) at 1-2 (emphasis added). In the pleading, Inmate Smith said he feared for his life because Defendants Anderson and Rosier threatened him for submitting the

grievance, telling him he would be "the next N***er to starve to death" if he did not mind his own business. Id. at 2.

Defendants Anderson and Rosier argue prison records show different officers, not themselves, signed off on each of the three meals Mr. Gaines received on the day Inmate Smith alleges Defendant Anderson refused to give Mr. Gaines a meal tray. See Anderson Motion at 11. This argument disregards that Inmate Smith accused Defendants Anderson and Rosier of "routinely" withholding food from Mr. Gaines. See Smith Pleading (Doc. 126-11) at 2. Even more, while Inmate Smith submitted his grievance on December 1, 2015, he did not say the events of which he complained occurred on that day. See id.; see also Smith Grievance (Doc. 107-7) at 1-2.

In addition to Inmate Smith's grievance and pleading, Plaintiffs point to evidence of Mr. Gaines's weight loss to bolster the allegation that Defendants Anderson and Rosier routinely denied Mr. Gaines food. Dr. Cohen explains in his report that Mr. Gaines's weight steadily dropped during his incarceration in the FDOC. See Cohen Report (Doc. 126-6) ¶ 75. Mr. Gaines's recorded weight fluctuated between 150 and 160 pounds between June 14, 2015, and October 27, 2015, but on November 7, 14, and 28, 2015, he weighed about 138 or 139 pounds, and on the date of his death, he weighed a mere 115

pounds.[5] See id. ¶74. Dr. Cohen acknowledges that the records are not necessarily a reliable indicator of Mr. Gaines's weight, but he concludes "the medical and nursing staff ignored the dramatic weight loss suffered by [Mr.] Gaines during the 28 months he was imprisoned in FDOC." Id. ¶ 75.

Dr. Cohen does not attribute Mr. Gaines's significant weight loss to conduct by corrections officers and, indeed, testified at deposition that he draws no conclusions about Defendants Anderson's and Rosier's conduct. Id.; Cohen Dep. (Doc. 132-6) at 121. However, Inmate Smith's grievance and emergency pleading considered in tandem with records of Mr. Gaines's weight loss permit the reasonable inference that Mr. Gaines was losing weight in part because Defendants Anderson and Rosier "routinely" denied him meals. See Smith Grievance (Doc. 107-7) at 2.

Plaintiffs also allege Defendants Anderson and Rosier consciously disregarded Mr. Gaines's mental health and medical needs in the weeks

---

[5] When Mr. Gaines was transferred to UCI on April 29, 2015, he weighed 140 pounds. There is some dispute in the records regarding how much Mr. Gaines likely weighed on the day he died, and defense experts question the weight recorded by the medical examiner's office. For instance, one defense expert, Jonathan Arden, surmises Mr. Gaines weighed closer to 122 pounds when he died. See Arden Dec. (Doc. 113-7) ¶¶ 8-10. During an investigation conducted by the Florida Department of Law Enforcement (FDLE) on the day Mr. Gaines died, Defendant Perez-Lugo told an investigator that Mr. Gaines appeared to have lost weight and was about 110 or 120 pounds. See FDLE Report (Doc. 107-10) at 13. Defendant Perez-Lugo apparently described Mr. Gaines as being "skinny like cancer patients." Id. The Court is obliged to construe the facts in the light most favorable to Plaintiffs. As such, the Court accepts that Mr. Gaines weighed 115 pounds when he died.

leading up to his death. There is some evidence in the record to support such an allegation. For instance, in a report prepared by the FDOC Office of Inspector General (IG), an investigator noted a UCI inmate, Sean Champs, called the TIPS line from U Dorm on December 3, 2015. See IG Report (Doc. 108-19) at 9. Inmate Champs reported that on December 1, 2015, Mr. Gaines told Defendant Anderson and "the dorm sergeant," presumed to be Defendant Rosier, that he was "sincerely ill" and needed medical attention. Id. According to Inmate Champs, Mr. Gaines complained that he had been "throwing up, vomiting, [and] defecating on himself," but the officers did not report Mr. Gaines's condition or seek help for him. Id. Inmate Champs said Mr. Gaines passed out in his cell on December 1, 2015. Id. Similarly, the FDLE's investigative report notes that Inmates Smith and Jacobs said Mr. Gaines had been sick for a week or a month before he died. See FDLE Report (Doc. 108-20) at 15.

A common theme in the FDLE report was that Mr. Gaines had poor hygiene and regularly defecated in his cell. Id. at 4, 8, 9. Defendant Biskie, senior psychologist in the TCU at the time, told an investigator that between November and December, "an odor had been coming out of Mr. Gaines' [sic] cell, described as body odor, urine, and feces." Id. at 19. Dr. Biskie said these conditions were "indicative of Gaines' [sic] pattern of decompensation of not

11

taking care of himself due to his mental illness." Id. In addition to oral reports of Mr. Gaines's unhygienic habits, photos of Mr. Gaines's cell taken the day he died showed "feces and other bodily matter throughout the cell floor," along with clothing and other material. Id. at 46.

UCI officers who regularly interacted with inmates in U Dorm told investigators with the IG's office that Mr. Gaines could not take care of himself and had recurring hygiene issues. See IG Report (Doc. 107-10) at 5, 10. A sergeant who was assigned to U Dorm on the day Mr. Gaines died reported that Mr. Gaines urinated inside his cell so regularly that sometimes "they would sandbag it so the urine would not come out of the cell." Id. at 5. The sergeant said Mr. Gaines's hygiene was a recurring issue, and he (the sergeant) spoke with "psych about it a few times." Id.

A corrections officer said Mr. Gaines's cell was always dirty but not typically covered in feces. Id. at 10. However, the officer said he believed Mr. Gaines should not have been in U Dorm because Gaines could not take care of himself and, even in his best mental state, "[did] not really know where he was." Id. Based on other officers' observations from working in U Dorm, it is reasonable to infer that Defendants Anderson and Rosier could have observed Mr. Gaines's steady decline but refused to notify the appropriate officials.

Upon review and construing the facts in the light most favorable to Plaintiffs, there is some evidence upon which a jury could conclude Defendants Anderson and Rosier were deliberately indifferent to Mr. Gaines's mental or physical health in the weeks leading up to his death, either by refusing to feed him or ignoring his express or obvious need for medical or mental health intervention. Prison officials and corrections officers have long known that they must "provide humane conditions of confinement," which includes ensuring prisoners "receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994); Estelle v. Gamble, 429 U.S. 97, 105 (1976) ("Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under [section] 1983.").

Moreover, accepting as true that Defendant Anderson routinely starved Mr. Gaines and Defendant Rosier, the supervising sergeant, knew of the conduct and in fact participated in it but failed to correct it, Plaintiffs' supervisory liability claim against Defendant Rosier proceeds. See Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) ("Supervisory liability occurs … when the supervisor personally participates in the alleged constitutional violation."). Accordingly, Defendants Anderson and Rosier are not entitled to

qualified immunity on the deliberate indifference claims against them, and their motion is due to be denied.

## V. Motion by Corizon & Individual Medical Providers

Plaintiffs proceed against Corizon on a theory of supervisory liability, alleging Corizon's "policies, practices, and customs . . . led to Mr. Gaines' [sic] injury and death." See Am. Compl. ¶ 146. They proceed against Defendants Perez-Lugo and Biskie in their roles as supervisors and for their personal participation in alleged violations. Id. ¶¶ 154-55, 167-68. Plaintiffs proceed against Defendants Tambi and Sanders solely for their personal participation in alleged violations. See Pl. Medical Defendants Resp. at 11 (clarifying they "bring a claim under a supervisory theory of liability" against Defendants Perez-Lugo and Biskie).

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) ("The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." (alteration in original)), abrogated in part on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010).  Supervisory liability arises only "when the supervisor personally participates in the alleged

constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007) (internal quotation marks and citation omitted).

> The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." Alternatively, the causal connection may be established when a supervisor's "custom or policy ... result[s] in deliberate indifference to constitutional rights" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."

Cottone, 326 F.3d at 1360 (internal citations omitted).

When a claim against a supervisor is premised on a supervisor's knowledge of prior constitutional deprivations, the plaintiff must show those prior deprivations were "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Brown, 906 F.2d at 671. A supervisor's failure to train employees may constitute an unconstitutional policy or custom, but a plaintiff must allege "the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." See Keith v. DeKalb Cty., Georgia, 749 F.3d 1034, 1053 (11th Cir. 2014) (alteration in original). Under a failure-to-train theory, a plaintiff

15

ordinarily must establish the alleged training deficiency resulted in "[a] pattern of similar constitutional violations." Id. (alteration in original) (quoting Connick v. Thompson, 563 U.S. 51, 62 (2011)).

### A. Claim Against Corizon

Plaintiffs allege Corizon promulgated or endorsed policies, practices, or customs that led to Mr. Gaines's death. See Am. Compl. ¶ 146. Plaintiffs list the alleged unconstitutional policies and practices in paragraph 151 of the second amended complaint. Upon review, Plaintiffs do not point to sufficient evidence to support their allegations. That Corizon's health care standards or policies may have been the subject of lawsuits or investigations in other states under different circumstances does not demonstrate Corizon was on notice of a widespread problem at UCI at the relevant times.

Aside from citing previous lawsuits as evidence to support their supervisory liability claims, Plaintiffs point to reports generated by the Correctional Medical Authority (CMA) in 2013 and 2015.[6] Plaintiffs' reliance

---

[6] The CMA's mission "is to monitor and promote delivery of cost-effective health care that meets accepted community standards to inmates in the [FDOC]." See CMA Webpage (Doc. 128-2) at 1. The CMA's purpose is to "assist in the delivery of health care services for inmates," which it accomplishes by conducting triennial surveys to advise "the Governor and Legislature on the status of the [F]DOC's health care delivery system." Id. In addition to conducting triennial surveys at each correctional institution, the CMA is obligated to report "serious or life-threatening deficiencies to the Secretary of Corrections for immediate action." See 2015-16 CMA Annual Report (Doc. 128-4) at 8.

on the CMA reports and resulting corrective action plans (CAPs) is unpersuasive. The June 2013 CMA report, for instance, highlighted primarily documentation and record-keeping issues, not systemic failures in the quality of mental health services at UCI. See generally 2013 CMA Report (Doc. 126-8). While staffing shortages were identified as a deficiency, there was no suggestion those shortages resulted in patient-care problems but rather "likely contribute[d]" to the findings regarding "missing or late assessments and inconsistent documentation of vital signs and weights." Id. at 10, 20. Additionally, Defendant Perez-Lugo testified at deposition that he never considered the medical staffing at UCI to be inadequate because when there were staffing vacancies, UCI would fill those positions temporarily with contract employees. See Perez-Lugo Dep. (Doc. 132-4) at 19-21, 56.

The CMA did not conclude that any instances of record-keeping issues resulted in serious medical complications or death. In fact, the CMA simply concluded some of the deficiencies "may affect treatment outcomes." See 2013 CMA Report (Doc. 126-8) at 20 (emphasis added). The surveyors further noted, "Even with the challenges of serving a difficult population as well as staff shortages, it is evident mental health staff had a strong desire to provide quality treatment." Id. at 21. Even more, the CAP assessment for the 2013 report, which was distributed on February 3, 2014, noted most of the

deficiencies related to the provision of mental health care had been adequately corrected and "closed," including those related to documenting patients' vital signs and weights and completing timely follow-up laboratory tests. See 2014 CAP (Doc. 126-9) at 8-9.[7] Accordingly, to the extent Corizon had notice of deficiencies that could be described as "widespread," it took steps to—and did—correct those deficiencies. See 2015-16 CMA Annual Report (Doc. 128-4) at 12 ("Findings deemed corrected are closed and monitoring is no longer required.").

A 2015 joint CMA and FDOC targeted audit found "serious and multiple deficiencies in the delivery of mental health care . . . at [UCI]," with the "deficiencies in the administration of medication [being] particularly striking." See 2015 Audit (Doc. 126-10) at 6. The audit was based on surveys conducted on November 9 and 10, 2015, less than a month before Mr. Gaines died. There is no date indicating when the report was distributed or to whom it was distributed.[8] Accordingly, even if the 2015 audit had put Corizon on notice that "[t]he overall mental health care delivered in the inpatient units

---

[7] The CAPs that remained open related to issues different from those Plaintiffs fault Corizon for in this action.

[8] As a comparison, the 2013 CMA report was distributed on July 17, 2013, almost a month after the survey was conducted. See 2013 CMA Report (Doc. 126-8) at 1.

[was] inadequate" at the time, there is no evidence Corizon received the report before Mr. Gaines died. See id.

Moreover, had Corizon learned of the results of the 2015 audit near the time the survey was conducted, the CMA process allows correctional institutions time to cure any noted deficiencies: "Within 30 days of receiving [a] survey report, institutional staff develops and submits a CAP . . . for approval. CMA staff subsequently approves the CAP and monitoring begins." See 2015-16 CMA Annual Report (Doc. 128-4) at 12. Defendant Perez-Lugo explained at his deposition that when the CMA issues a report, CAPs are developed to address the issues noted, and the institution then has "six months to fix [those issues]." See Perez-Lugo Dep. (Doc. 132-4) at 79.[9]

Finally, assuming Corizon had notice of a history of widespread inadequate mental health care at UCI, Plaintiffs point to no evidence showing Corizon ignored CAPs or declined to take corrective action in response to the 2015-16 audit. Cf. Thomas v. Bryant, 614 F.3d 1288, 1315 (11th Cir. 2010) (pointing to CMA reports as one source of information that established supervising officials had notice that a written policy they promulgated carried

---

[9] In his report, Dr. Cohen references another CAP that was "submitted on September 28, 2015," which was based on a survey conducted in August 2015, covering medical services rendered in May through July 2015. See Cohen Report (Doc. 131-1) ¶ 112. Plaintiffs have not submitted documentation showing the CMA conducted a survey at UCI in the summer of 2015.

a risk of serious harm for mentally ill inmates and affirming the district court's finding that the supervising officials "recklessly disregarded" the risk in part by choosing "not to adopt [the CMA's] recommendation").[10]

In sum, Plaintiffs point to no evidence showing Corizon was on notice of a history of widespread deficiencies in the mental health care rendered to patients at UCI at the relevant times and, with such knowledge, ignored the deficiencies. Accordingly, Plaintiffs' claim against Corizon is due to be dismissed.

## B. Supervisory Claims Against Defendants Perez-Lugo & Biskie

Plaintiffs assert they proceed against Defendants Perez-Lugo and Biskie in their supervisory capacities. See Pl. Medical Defendants Resp. at 11. See also Am. Compl. ¶¶ 155, 156, 168, 169. As they do in support of their claim against Corizon, Plaintiffs' rely upon the "CMA surveys, CAPS, and audits" to support their claims. See Pl. Medical Defendants Resp. at 15 n.9.

---

[10] In Thomas, the plaintiffs relied on CMA reports to show supervisors had knowledge that a written, implemented policy was inappropriate or problematic when applied to mentally ill inmates. See 614 F.3d at 1293, 1315. The plaintiffs in Thomas did not point to the CMA reports as evidence that unofficial policies or customs existed, as Plaintiffs do here. In their response to Defendant Andrews' motion, Plaintiffs contend, "the CMA surveys, CAPs, and Reviews provided Defendant with the subjective knowledge of the widespread and continuing risk of harm facing mentally ill prisoners." See Pl. Andrews Resp. at 13. Plaintiffs unconvincingly suggest the CMA reports and CAPs demonstrate not only the existence of unofficial policies but also Defendants' knowledge that those policies resulted in constitutional violations.

To the extent the supervisory liability claims are based on a theory other than Defendants Perez-Lugo's and Biskie's personal participation in alleged unconstitutional conduct, the claims fail for reasons previously addressed. However, to the extent the claims are based on Defendants Perez-Lugo's and Biskie's personal participation in alleged unconstitutional conduct, the claims proceed, as addressed below.

### C. Claim Against Defendant Sanders

The deliberate indifference claim against Defendant Sanders is factually unsupported. Defendant Sanders was a senior psychologist in the Crisis Stabilization Unit (CSU) when Mr. Gaines was housed at UCI. See FDOC Med. Records (Doc. 108-1) at 539. Mr. Gaines was transferred from the TCU to the CSU on August 26, 2015, and he stayed there until September 30, 2015. Id. at 578. Defendant Sanders evaluated Mr. Gaines when he was first admitted to the CSU on August 26, 2015, and subsequently evaluated him on August 27, 2015, August 31, 2015, September 9, 2015, September 14, 2015, September 22, 2015, and September 29, 2015. Id. at 539, 541-42, 547, 556, 562, 572, 577. On September 14, 2015, Defendant Sanders found Mr. Gaines had improved enough to return to the TCU pending bed availability. Id. at 562. After Mr. Gaines's return to the TCU on September 30, 2015, he did not return to the CSU or treat with Defendant Sanders again.

There is no evidence that Defendant Sanders' treatment of Mr. Gaines contributed to his death or was constitutionally inadequate. In fact, Dr. Cohen, one of Plaintiffs' experts, explicitly omits Defendant Sanders from the list of UCI clinicians whose treatment or lack thereof contributed to Mr. Gaines's death. <u>See</u> Cohen Report (Doc. 126-6) ¶ 125. Instead, Dr. Cohen opines Defendants Biskie, Perez-Lugo, and Tambi "contributed to Mr. Gaines [sic] death." <u>Id.</u> <u>See also</u> Cohen Dep. (Doc. 132-6) at 70.

Dr. Cohen even acknowledges Mr. Gaines showed improvement when he was under Defendant Sanders' care in the CSU. <u>See</u> Cohen Dep. (Doc. 132-6) at 102. Dr. Cohen's opinion in this regard is consistent with Dr. Fowlkes's (a defense expert), who notes that the CSU team "was able to get Mr. Gaines to be compliant with his antipsychotic medication," and while in the CSU, Mr. Gaines's weight stabilized. <u>See</u> Fowlkes Report (Doc. 107-17) ¶ 8. Because there is no evidence that would permit the reasonable inference Defendant Sanders was deliberately indifferent to Mr. Gaines's mental health needs between August 26, 2015, and September 30, 2015, she is due to be dismissed from this action.

## D. Claims Against Defendants Biskie, Perez-Lugo, and Tambi

It is undisputed that Mr. Gaines's October 12, 2015 lab results showed a sodium level of 116, which indicates hyponatremia. <u>See</u> Cohen Report (Doc.

131-1) ¶ 50. <u>See also</u> FDOC Med. Records (Doc. 108-1) at 84-85. However, the parties dispute whether those lab results indicated a life-threatening condition under the circumstances. When Defendant Perez-Lugo reviewed the lab results on October 19, 2015, he checked the box indicating the lab report was "ok to file." <u>See</u> FDOC Med. Records (Doc. 108-1) at 84. In his declaration, Defendant Perez-Lugo avers that, had Mr. Gaines's sodium level been life-threatening on October 12, 2015, "[Mr. Gaines] would have been in the emergency room long before [he] reviewed [the] laboratory report" about one week later. <u>See</u> Perez-Lugo Dec. (Doc. 113-6) ¶ 4.

On November 4, 2015, Defendant Tambi noted Mr. Gaines had a "critically low" sodium level, ordered that the medical doctor be notified, and discontinued Tegretol, a medication that can cause low sodium. <u>See</u> FDOC Med. Records (Doc. 108-1) at 611; Cohen Report (Doc. 131-1) ¶ 53. Dr. Cohen notes, "There is no indication that any medical doctor reviewed Mr. Gaines [sic] laboratory studies or took any action to respond." <u>See</u> Cohen Report (Doc. 131-1) ¶ 53. On December 2, 2015, Defendant Tambi noted that Tegretol had been discontinued, but "no f/u [follow up] sodium levels [were] in [the] chart." <u>See</u> FDOC Med. Records (Doc. 108-1) at 637. Defendant Tambi further acknowledged that Mr. Gaines had been refusing mental health services." <u>Id.</u>

According to Dr. Cohen, Mr. Gaines "died of conscious abandonment." See Cohen Report (Doc. 126-6) ¶ 118. Dr. Cohen contends Defendants Biskie, Perez-Lugo, and Tambi personally contributed to Mr. Gaines's death by failing to act in the face of Mr. Gaines's obviously deteriorating condition and "pattern of decompensation"; failing to determine the cause of his low sodium level and chronic hyponatremia; failing to determine the cause of his "[s]ubstantial changes in weight"; and failing to ensure he received his medications. Id. ¶¶ 62, 63, 75, 80, 85, 91, 99, 105, 125. Dr. Cohen notes that between April 29, 2015, and December 3, 2015, Mr. Gaines "rarely left his cell," refusing mental health appointments and showers. Id. ¶¶ 46-48. In his last four months of life, Mr. Gaines took six showers. Id. ¶ 48. Dr. Cohen attributes Mr. Gaines's death to malnourishment, hyponatremia, and the substandard care he received at UCI. Id. ¶¶ 71, 85, 105, 125.

Dr. Shuman concurs that Mr. Gaines's hyponatremia was a "potential mechanism of his death," as was hypoglycemia, a condition that caused Mr. Gaines to lose consciousness in November 2014, when he was housed at a different institution. See Shuman Report (Doc. 126-1) at 1, 3, 4. Dr. Shuman does not believe a cardiac event or hypertension caused Mr. Gaines's death. Id. at 3. Dr. Shuman explains that starvation or medications likely caused

Mr. Gaines's hypoglycemic episodes in 2014, and opines Mr. Gaines may have been hypoglycemic when he died. Id.

On the other hand, the defense experts opine Mr. Gaines received appropriate care at UCI and conclude his hyponatremia was chronic and, therefore, not an emergency or life-threatening. See Fowlkes Report (Doc. 107-17) at 11; Arden Dec. (Doc. 113-7) ¶ 11; Fournier Dec. (Doc. 113-8) ¶¶ 2, 3, 5. Dr. Fowlkes concludes Mr. Gaines did not lose "significant weight" while at UCI, did not have a medical need that was not "being met by health care staff," and was not dehydrated or malnourished when he died. See Fowlkes Report (Doc. 107-17) at 12, 13, 15. Dr. Abrams opines the medical records indicate Mr. Gaines likely "died from a cardiac disease." See Abrams Report (Doc. 107-16) ¶ 1. Dr. Abrams says, "there is no evidence that Mr. Gaines was being starved or mistreated" or suffered from malnutrition. Id. ¶¶ 3, 37.

Dr. Abrams attributes Mr. Gaines's low sodium level to a common side-effect of Tegretol. Id. ¶ 22. According to Dr. Abrams, Defendant Tambi's decision to stop the Tegretol was the "standard of care" for such "adverse medication effects." Id. Dr. Abrams concludes, "There is a marked difference between an inmate's valid refusal of treatment and a failure to provide treatment." Id. ¶ 40.[11]

---

[11] The medical records show Mr. Gaines "refused some form of treatment approximately 170 times" between May 2014—before Mr. Gaines entered UCI—and

Similarly, Dr. Arden avers Mr. Gaines "did not die as a result of weight loss or malnutrition" and contends the medical examiner "recorded a body weight that appears to be inaccurately low." See Arden Dec. (Doc. 113-7) ¶¶ 10, 11. Dr. Arden concludes Mr. Gaines had chronic, asymptomatic "walking" hyponatremia, caused by the medication Tegretol, which did not cause his death. Id. ¶ 11. See also Fournier Dec. (Doc. 113-8) ¶ 3 ("Chronic mild hyponatremia is common in medical practice and generally of no consequence.").

While Dr. Arden does not speculate on the cause of Mr. Gaines's previous hypoglycemic incidents (in November 2014), Dr. Arden opines "hypoglycemia may have been the incident mechanism for a sudden cardiac event that culminated in [Mr. Gaines's] death." See Arden Dec. (Doc. 113-7) ¶ 13. Because there was no evidence of injury causing Mr. Gaines's death, Dr. Arden concludes, "[T]he greatest likelihood is that his death was caused by some natural process." Id. ¶ 14. See also Fournier Dec. (Doc. 113-8) ¶¶ 3, 5 (noting low sodium levels and malnutrition do not cause sudden death).

---

December 2, 2015. See Abrams Report (Doc. 107-16) ¶ 20. Dr. Cohen opines Mr. Gaines's refusal of treatment and medications in the month before his death should have signaled to the psychologist and psychiatrist (Biskie and Tambi) that some intervention was necessary, especially considering the low sodium level reported on October 12, 2015. See Cohen Dep. (Doc. 132-6) at 95-96.

Dr. Cohen agreed at his deposition that Tegretol can cause low sodium, and a clinician's decision to discontinue the medication when that happens is appropriate. See Cohen Dep. (Doc. 132-6) at 88. However, he also testified that a person with an extremely low sodium level of 116 should be hospitalized and steps should be taken to determine the cause. Id. See also Cohen Report (Doc. 131-1) ¶ 92 (table of serum sodium values). He agrees that associating low sodium with Tegretol is not unreasonable, but a sodium level of 116 is life-threatening and simply discontinuing the medication "was an inadequate response." See Cohen Dep. (Doc. 132-6) at 89, 93, 106. Dr. Cohen testified that Mr. Gaines had not received his antipsychotic medications for six weeks prior to his death (because he refused it), and he was showing signs of decompensation during the month preceding his death, yet his doctors did nothing to intervene or treat him. Id. at 95.

Defendant Biskie, who was the supervising psychologist of U Dorm at the time, recognized Mr. Gaines was decompensating before his death. Defendant Biskie told an FDLE investigator the treatment team discussed Mr. Gaines the week before his death and was considering "possibly refer[ring] [Mr.] Gaines back to the CSU" because he was showing signs of decompensation between November and December.[12] See FDLE Report (Doc.

---

[12] Defendant Biskie referred Mr. Gaines to the CSU in August because he was showing signs of decompensation and lack of hygiene. See FDOC Med. Records (Doc.

27

108-20) at 19-20. On the day Mr. Gaines died, Defendant Biskie ordered an officer to pull Mr. Gaines from his cell to have him showered and "to have medical and mental health assess him." Id. at 20. Mr. Gaines was found unresponsive in his cell before that could happen. Id. Dr. Cohen opines that Defendant Biskie and the mental health team, which includes Defendant Tambi, waited too long to intervene when Mr. Gaines refused his medications and showed signs of decompensation. See Cohen Dep. (Doc. 132-6) at 96, 98.

The evidence conflicts regarding whether Defendants Biskie, Perez-Lugo, or Tambi knew of and disregarded an "excessive risk to [Mr. Gaines's] health or safety." See Farmer v. Brennan, 511 U.S. 825, 837 (1994). Whether their treatment decisions were reasonable or perhaps merely negligent, on the one hand, or evinced deliberate indifference, on the other hand, remains a question of fact for the jury's determination. For these, reasons, Plaintiffs' deliberate indifference claims against them will proceed.

## VI. Motions by Defendants Inch & Jones

Plaintiffs allege Defendant Inch, in his official capacity, and Defendant Jones, in her individual capacity, violated Mr. Gaines's "Eighth Amendment right to be free from cruel and unusual punishment" by evincing deliberate

---

108-2) at 701. Defendant Biskie noted Mr. Gaines needed "more intensive care in order to improve self-care and compliance with treatment." Id.

indifference to a known risk of serious harm based on a "culture of widespread and longstanding abuse." See Am. Compl. ¶¶ 114, 115, 120, 121. Both Defendants Inch and Jones move for summary judgment, arguing Plaintiffs provide no evidence to establish the requisite causal connection for supervisory liability. See Inch Motion at 15; Jones Motion at 14-17.

Plaintiffs chose not to file a response to Defendants Inch's and Jones's motions. See Notice (Doc. 127). Based on Plaintiffs' complaint allegations, it appears they premise their supervisory liability claims on the CMA reports and CAPs they relied on in opposition to the Medical Defendants' motion. See Am. Compl. ¶¶ 117, 122, 192. For the reasons discussed previously, the evidence Plaintiffs point to is insufficient to meet the rigorous standard upon which to impose supervisory liability. See Cottone, 326 F.3d at 1360. To the extent Plaintiffs seek to hold the FDOC Secretary responsible for Defendants Anderson's or Rosier's alleged withholding of food from Mr. Gaines, as discussed in more detail below, there is no evidence supervising officials were aware of such conduct or, if they were, that it was a widespread issue.

Plaintiffs also assert a claim for disability discrimination against Defendant Inch in his official capacity under Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (RA). See Am. Compl. ¶ 180. A claim of discrimination under the ADA and RA requires

a plaintiff to establish "(1) that he is a qualified individual with a disability; and (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." Owens v. Sec'y, Fla. Dep't of Corr., 602 F. App'x 475, 477 (11th Cir. 2015) (quoting Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1083 (11th Cir. 2007)).[13]

Normally, ADA and RA violations only entitle a plaintiff to injunctive relief.[14] Silberman v. Miami Dade Transit, 927 F.3d 1123, 1134 (11th Cir.

---

[13] "With the exception of its federal funding requirement, the RA uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable." Badillo v. Thorpe, 158 F. App'x 208, 214 (11th Cir. 2005) (citing Cash v. Smith, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000)); J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ., 877 F.3d 979, 985 (11th Cir. 2017) ("Discrimination claims under the ADA and the [RA] are governed by the same standards, and the two claims are generally discussed together.").

[14] In their complaint, Plaintiffs seek not only damages for all claims (under § 1983 and the ADA/RA) but also injunctive relief in the form of the "FDOC's relinquishment of Mr. Gaines' remains." See Am. Compl. ¶ 195. (Mr. Gaines was buried at the UCI cemetery after attempts to locate a next of kin failed. See Andrews Dec. (Doc. 108-21) Ex. 2.) Defendant Inch argues Plaintiffs are not entitled to the injunctive relief they seek because they do not "link the requested equitable relief of returning Mr. Gaines' [sic] remains to a violation" raised in the complaint. See Inch Motion at 19, 25. It is not clear whether Plaintiffs still pursue this relief given they have not responded to Defendant Inch's motion. Regardless, the Court finds Defendant Inch's argument well-founded. See Stevens v. Osuna, 877 F.3d 1293, 1311 (11th Cir. 2017) ("[T]o establish Article III standing, a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."); Thomas, 614 F.3d at 1317-18 (noting the scope of injunctive relief should be commensurate with the identified harm).

2019). "To get damages . . . a plaintiff must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of 'deliberate indifference.'" Id. (quoting Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 348 (11th Cir. 2012)). To show deliberate indifference, a plaintiff must prove that "the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood." Id. (alteration adopted) (quotation marks omitted) (quoting Liese, 701 F.3d at 344).

Contrary to Plaintiffs' allegations, there is no evidence Mr. Gaines was excluded from "participating and benefiting in [FDOC's] programs, services, and activities." See Am. Compl. ¶ 189. On the contrary, Mr. Gaines was placed in a special housing unit—a TCU—designed to address and treat inmates with mental illness. The parties dispute whether the mental health and medical care Mr. Gaines received in the TCU was constitutionally adequate, not whether he was denied access to services. In fact, the records show Mr. Gaines was offered psychological services almost daily, and he declined most of the services offered. See Abrams Report (Doc. 107-16) ¶ 20; Refusals of Treatment (Doc. 113-1).

Even if Defendants Anderson or Rosier intentionally discriminated against Mr. Gaines because of his disability—by denying him food—there is

no evidence showing the Secretary of the FDOC had knowledge of such discrimination and failed to adequately respond to it. And Defendants Anderson and Rosier are not "qualifying officials" whose actions speak for the FDOC as a whole. Thus, Plaintiffs have not "cleared the hurdle" to get damages. See Silberman, 927 F.3d at 1134.

Upon review, Defendants Inch and Jones carry their burden on summary judgment, and Plaintiffs do not oppose their motions. Accordingly, their motions are due to be granted.

## VII. Defendant Andrews' Motion

Finally, Plaintiffs allege Defendant Andrews, in her role as Warden of UCI, was deliberately indifferent to a "known risk of serious harm and death in violation of Mr. Gaines's Eighth Amendment rights." See Am. Compl. ¶ 127. As with the supervisory liability claims against the other Defendants, Plaintiffs rely upon the CMA reports and prior litigation. Id. ¶ 128. Defendant Andrews argues there is no evidence of a history of widespread abuse that she failed to correct, and she invokes qualified immunity. See Andrews Motion at 11, 16.

Plaintiffs primarily fault Defendant Andrews for failing to ensure Mr. Gaines received reasonably adequate nutrition, hygiene, and medical and mental health care. See Pl. Andrews Resp. at 13. With respect to nutrition,

Plaintiffs emphasize a note in the 2013 CMA report that nine of twenty-two inmates interviewed reported "'ghost trays' are given to some inmates during mealtimes while in confinement or inpatient mental health units." See 2013 CMA Report (Doc. 126-8) at 19.

Defendant Andrews started her tenure as Warden of UCI in October 2013, after the 2013 CMA report was distributed. See Andrews Dep. (Doc. 126-5) at 25. At her deposition, Defendant Andrews testified she did not recall the results of the 2013 CMA survey having been discussed with her, but she had heard through inmate grievances about the use of ghost trays, which she described as "trays that didn't have food on [them]." Id. at 19, 33, 34. When she heard of such complaints, she interviewed staff. She also implemented a system for the delivery of meals to ensure food was on all trays when delivered to inmates and to "track officers' actions to make sure that they were doing the right thing." Id. at 20, 99. Defendant Andrews testified that she "never had evidence" that officers were in fact serving "ghost trays," but nevertheless, she "ma[d]e an effort to ensure that it didn't happen." Id. at 21, 32.

Defendant Andrews also testified that she did not recall seeing the grievance Inmate Smith submitted days before Mr. Gaines died reporting that Defendants Anderson and Rosier refused Mr. Gaines his food tray. Id. at

64, 66. The grievance was signed by a staff member, not Defendant Andrews, but Andrews said the staff member "did exactly what [she] would have done" by referring the allegation to the IG's office "for further review and disposition." Id. at 65.

Plaintiffs point to no other evidence showing Defendant Andrews knew corrections officer routinely served mentally ill inmates "ghost trays." Accordingly, even if there were isolated instances of such conduct, there is no evidence permitting the inference that the practice was "widespread" or was "obvious, flagrant, rampant and of continued duration." Brown, 906 F.2d at 671. Even more, to the extent Plaintiffs' claim against Defendant Andrews is based on Inmate Smith's allegations in both his grievance and emergency pleading that Defendants Anderson and Rosier routinely denied Mr. Gaines his meals, Inmate Smith did not accuse them of giving Mr. Gaines "ghost trays." See Smith Grievance (Doc. 126-19) at 1-2; Smith Pleading (Doc. 126-11) at 2. Instead, he explained that Defendants Anderson and Rosier would put Mr. Gaines's trays in the food flap but would not open the flap. See Smith Pleading (Doc. 126-11) at 2.

Finally, the evidence shows Defendant Andrews did not ignore potential constitutional violations. She testified at deposition that she interviewed staff members and implemented a system to ensure inmates

received their meals. As such, she cannot be said to have been deliberately indifferent to known violations. See, e.g., LaMarca v. Turner, 995 F.2d 1526, 1537 (11th Cir. 1993) ("Mere knowledge of the infirm conditions persisting . . . does not establish deliberate indifference. The plaintiffs must also demonstrate that, with knowledge of the infirm conditions, [the supervisor] knowingly or recklessly declined to take actions that would have improved the conditions.").

As to the Plaintiffs' allegations that Defendant Andrews was deliberately indifferent to widespread abuse related to the accessibility of mental health services, there similarly is no evidence of such. Plaintiffs again rely on a note in the 2013 CMA report, which indicated seven of eleven inmates housed in inpatient mental health "reported barriers to accessing mental health services." See 2013 CMA Report (Doc. 126-8) at 19. First, Defendant Andrews was not the Warden when the 2013 report was issued and, even if she had been, seven unverified complaints do not constitute a widespread or flagrant problem. Second, there is no evidence Mr. Gaines requested mental health services that were denied to him. On the contrary, the evidence shows mental health services were offered to Mr. Gaines, but he consistently refused them. Thus, even assuming Defendant Andrews was on notice of a flagrant or widespread issue of mentally ill inmates not receiving

the mental health services they requested, there is no causal connection between such an alleged unconstitutional practice and Mr. Gaines's injuries and death.

Third, even if Defendant Andrews had become aware of deficiencies in the provision of mental health services when the results of the November 2015 targeted audit were distributed, there is no evidence she ignored the deficiencies identified. Defendant Andrews testified at her deposition that, while she did not "have ultimate supervisory authority over the medical team," she held weekly meetings to ensure the medical team was working on any outstanding CAPs to correct issues identified by the CMA. See Andrews Dep. (Doc. 126-5) at 13-15, 21, 22, 91.

Finally, there is no evidence of a widespread custom or policy that mentally ill inmates were forced to live in unhygienic conditions. Even if Defendant Andrews was aware that Mr. Gaines was frequently malodorous and prone to fecal smearing, there is no evidence that other inmates in the TCU had similar problems that went uncorrected such that Defendant Andrews was on notice of a widespread or flagrant violation.

For these reasons, Plaintiffs fail to point to evidence showing a genuine issue of material fact exists regarding whether Defendant Andrews was

deliberately indifferent to a history of widespread abuse that caused Mr. Gaines's injury or death. As such, she is entitled to qualified immunity.

Accordingly, it is now

**ORDERED:**

1.     Defendants Anderson and Rosier's motion for summary judgment (Doc. 107) is **DENIED**.

2.     Defendant Inch's motion for summary judgment (Doc. 109) is **GRANTED**.

3.     Defendant Jones's motion for summary judgment (Doc. 110) is **GRANTED**.

4.     Defendant Andrews' motion for summary judgment (Doc. 111) is **GRANTED**.

5.     Defendants Corizon, Perez-Lugo, Tambi, Biskie, and Sanders' motion for summary judgment (Doc. 114) is **GRANTED in part** and **DENIED in part** as stated in this Order.

6.     Defendants Inch, Jones, Andrews, Corizon, and Sanders are entitled to summary judgment as to all claims asserted against them. Judgment to that effect will be withheld pending adjudication of the action as a whole. See Fed. R. Civ. P. 54.

7.      Defendants Inch, Jones, and Andrews' motion to exclude testimony of Plaintiffs' expert Robert Cohen (Doc. 104) is **DENIED as moot**.

8.      Defendants Corizon, Perez-Lugo, Tambi, Biskie, and Sanders' motion to continue trial (Doc. 137) is **DENIED**. Trial will commence on **April 5, 2021**, per the Court's December 4, 2020 Case Management and Scheduling Order (CMSO) (Doc. 134). The **final pretrial conference** will be held on **March 24, 2021**, as per the CMSO. However, the conference will begin at **11:00 a.m.** instead of 10:00 a.m.

**DONE AND ORDERED** at Jacksonville, Florida, this 17th day of March 2021.

_____
BRIAN J. DAVIS
United States District Judge

Jax-6
c:
Counsel of Record

38